Filing # 151857626 E-Filed 06/21/2022 10:14:14 AM

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
CIVIL ACTION

**MEGAN ROSE RUIZ,**
███████████

**LAUREN WILSON,**
**CAITLIN HENNING,**
████████████████████

**NICKOLAS BERGER,** and
███████████████████

       Plaintiffs,

                                    Case No.:

       vs.

**RINGLING COLLEGE OF ART AND DESIGN, INC.,**

       Defendant.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW, the Plaintiffs, MEGAN ROSE RUIZ, ███████████ LAUREN WILSON, CAITLIN HENNING, ██████████████, ██████████████ NICKOLAS BERGER, and ██████████████████ by and through the undersigned attorneys, and hereby sues the Defendant, RINGLING COLLEGE OF ART AND DESIGN, INC., a Florida not-for-profit corporation, and alleges as follows:

**Introduction**

As set forth in this Complaint, RINGLING breached its duty to protect its student population by providing a safe campus environment. RINGLING failed to protect the Plaintiffs from the mishandling of student-on-student reports of sexual assault, sexual harassment, threats of violence, and stalking. Plaintiffs' trauma from student-on-student misconduct was exacerbated by RINGLING'S misconduct, causing additional trauma. RINGLING breached its duty to protect Plaintiffs, who were students residing on campus at RINGLING at all material times hereto, from discrimination based upon gender, race,

disabilities, and LGBTQ+ status.  RINGLING failed to protect student employee plaintiffs from discrimination based upon disabilities and gender.  Plaintiffs suffered traumatization, fear, and helplessness due to RINGLING'S failure to protect them from its employees and agents.

Moreover, RINGLING has engaged in a pattern and practice of silencing students and covering up reports of student-on-student misconduct and violations of Florida and federal anti-discrimination laws since 2008.  RINGLING engaged in this conduct to misrepresent its campus as an extraordinarily safe campus in its marketing and promotion of the college. RINGLING knowingly allowed its student population to suffer repeated traumatization and silenced its students and alumni to profit from tuition and the revenue from housing and expenses.  In June of 2020, MEGAN ROSE RUIZ publicly spoke out about the misconduct, discrimination, and abuses of power she witnessed as a student employee at RINGLING. Plaintiffs then discovered that the abuses and trauma they suffered were part of a systematic campaign by RINGLING to silence students to prevent them from telling the truth about their experiences at RINGLING.   Plaintiffs have brought this lawsuit to hold RINGLING accountable and encourage RINGLING to create a safer and more protective environment for its students in the future.

## **GENERAL ALLEGATIONS**

1.      This is an action for damages in excess of Thirty Thousand Dollars ($30,000.00) Dollars, exclusive of costs and interest.

2.      Plaintiff, MEGAN ROSE RUIZ, is a resident of Los Angeles County, California.

3.      Plaintiff, ███████████████████████████████

4.      Plaintiff, LAUREN WILSON, is a resident of Ouchita Parrish, Louisiana.

5.      Plaintiff, CAITLIN HENNING, is a resident of Manatee County, Florida.

6.      Plaintiff, ███████████████████████████████

7.   Plaintiff, ███████████████████████████████

8.   Plaintiff, NICKOLAS BERGER, is a resident of Orange County, Florida.

9.   Plaintiff, ████████████████████████████████████████
████████████████

10.   Defendant, RINGLING COLLEGE OF ART AND DESIGN, INC. ("**RINGLING**"), is a not-for-profit Florida Corporation doing business and located in Sarasota County, Florida.

11.   Venue is proper in this Court because the conduct giving rise to Plaintiffs' claims occurred in Sarasota County, Florida.

12.   The Plaintiffs have retained the undersigned law firm to represent them and are obligated to pay their attorneys a reasonable fee for their services.

<u>**Factual Allegations**</u>

13.   RINGLING operates a private, not-for-profit higher education college with a focus on art and design located in Sarasota County, Florida.

14.   At all times material hereto, RINGLING employed CHRISTOPHER SHAFFER as its Associate Dean of Students for Residence Life.

15.   MEGAN ROSE RUIZ attended RINGLING from August 2015 until her graduation in May 2019.

16.   SHAFFER supervised Plaintiff, MEGAN ROSE RUIZ, during her employment as a Resident's Assistant ("**RA**") at RINGLING from August 2016 to May 2019.

17.   On <u>June 22, 2020</u>, Plaintiff, MEGAN ROSE RUIZ, posted on Facebook stating "Hey guys.  There is a big conversation happening about dangerous men in art communities. I'm just going to say it.  If you're a women and you go to Ringling, or plan on going to Ringling, stay the fuck away from Chris Shaffer.  Don't go into a space alone with him."  A copy of the "**Ruiz June 22, 2020 Post**" is attached and incorporated hereto as **Exhibit "A."**

18.     In response to the Ruiz June 22, 2020 Post, MEGAN ROSE RUIZ received numerous messages from students, alumni, former students, parents of students and alumni, faculty, former administrators, and current employees of RINGLING who had negative experiences with SHAFFER.

19.     Many of the messages that MEGAN ROSE RUIZ received stated that the sender feared retaliation from RINGLING and/or SHAFFER for speaking out about their experiences and concerns.

20.     MEGAN ROSE RUIZ encouraged the individuals who contacted her to share their concerns directly with RINGLING through its official channels.

21.     On June 24, 2020, MEGAN ROSE RUIZ sent an "Open Letter" to RINGLING. Attached to the Open Letter was a PDF entitled "Stories" that contained the redacted stories of reporting students, former students, alumni, and parents regarding their experiences at RINGLING.  Most of the stories involved negative experiences with SHAFFER.  A copy of the "**June 24, 2020 Open Letter**" is attached hereto as **Exhibit "B."**

22.     MEGAN ROSE RUIZ made public claims against SHAFFER based upon his wrongdoings committed as an employee and agent of RINGLING in the Open Letter, including the following:

(a) Mishandling and misconduct related to student-on-student reports of sexual assault;

(b) Mishandling and misconduct related to student-on-student reports of stalking;

(c) Mishandling and misconduct related to student-on-student reports of violence and threats of violence;

(d) Mishandling and misconduct related to the handling of students' private information, including but not limited to violations of HIPAA and FERPA;

(e) Discrimination related to students identifying as LGBTQ+;

(f) Discrimination related to students with lower socioeconomic status;

(g) Discrimination related to students based upon race;

(h) Discrimination related to students based upon disability;

(i) Discrimination related to students based upon mental health or invisible disabilities; and

(j) Discrimination related to students based upon gender.

23.     On June 26, 2020, RINGLING'S President Larry Thompson sent an email to the Ringling College Community, a copy of which is attached hereto as **Exhibit "C,"** in response to the Open Letter.  The email communication confirmed that the "allegations [against SHAFFER] do not reflect actions that conform to [RINGLING'S] core values or [its] expectations of what constitutes appropriate professional and acceptable behavior at [RINGLING]."

24.     Based upon information and belief, RINGLING conducted an internal investigation into the allegations against SHAFFER, which began in late June 2020.

25.     RINGLING did not terminate SHAFFER prior to commencing its investigation, nor did RINGLING limit SHAFFER'S access to RINGLING'S files regarding the reporting students and alumni.  Instead, SHAFFER'S immediate supervisor Tammy Walsh involved SHAFFER in the investigation.  A copy of text messages between Shaffer and Walsh are attached hereto as **Exhibit "D,"** (the "**Shaffer/Walsh Messages**").

26.     On June 29, 2020, SHAFFER referenced in writing to Walsh his intended lawsuit against MEGAN ROSE RUIZ.  *See* Exhibit "D" at page 12.

27.     Based upon information and belief, on or about June 30, 2020, SHAFFER met with Tammy Walsh, Darren Matthews, and Christine Carnegie, the Vice President of Human Resources at RINGLING, via Zoom regarding SHAFFER'S standing with RINGLING and the status of the investigation.  During this meeting, SHAFFER advised these representatives of RINGLING that he intended to file a criminal complaint and civil lawsuit against MEGAN

ROSE RUIZ.

28.     Based upon information and belief, Ms. Carnegie advised SHAFFER that he was free to pursue civil action against MEGAN ROSE RUIZ, but that such action would be at his own expense and may be construed as interfering with the ongoing investigation.

29.     On July 14, 2020, SHAFFER referenced in writing to Walsh his intention to file a lawsuit against MEGAN ROSE RUIZ.  *See* Exhibit "D" at page 23.

30.     On July 24, 2020, SHAFFER referenced again in writing to Walsh his intention to file a lawsuit against MEGAN ROSE RUIZ, stating, "Wanted to clarify legal action with someone so that I stay in good standing with my employer.  I don't want to make her into a martyr and/or have her claim retaliation."  *See* Exhibit "D" at page 46.

31.     Based upon information and belief, on July 31, 2020, SHAFFER met with Darren Mathews, the Director of Human Resources at RINGLING.  During this meeting, Mr. Mathews advised SHAFFER that the investigation into the allegations by MEGAN ROSE RUIZ had concluded, and despite RINGLING'S receipt of additional complaints regarding SHAFFER, no new investigation would take place.

32.     Based upon information and belief, during this July 31, 2020 meeting, Mr. Mathews advised SHAFFER that he would not be terminated.

33.     Based upon information and belief, during this July 31, 2020 meeting: SHAFFER advised Mr. Mathews that his lawsuit against MEGAN ROSE RUIZ was ready to be filed; SHAFFER offered to Mr. Mathews that he would not file the lawsuit if RINGLING would reimburse SHAFFER the retainer he paid to his attorney to commence the lawsuit; RINGLING did not respond to SHAFFER'S offer.

34.     On August 3, 2020, SHAFFER filed a lawsuit against MEGAN ROSE RUIZ, in the Circuit Court for the Twelfth Judicial Circuit in and for Sarasota County, Florida, Case No. 2020-CA-003308 (the "**Defamation Lawsuit**").

35.    The Second Amended Complaint in the Defamation Lawsuit contains 13 counts: Libel Per Se (I); Libel Per Se (II); Libel (III); Libel Per Se (IV); Libel Per Se (V); Libel Per Se (VI); Libel Per Se (VII); Libel Per Se (VIII); Defamation of Character (IX); Slander (X); Civil Conspiracy (XI); Injurious Falsehood (XII); and Tortious Interference with a Business Relationship (XIII).

36.    On August 25, 2020, RINGLING transmitted to SHAFFER a letter advising of the conclusion of RINGLING'S investigation into the reports associated with the "Open Letter," a copy of which is attached hereto as Exhibit "E."

37.    In the August 25, 2020 correspondence, RINGLING advised SHAFFER of its retention of SHAFFER as an employee, albeit with "a reassignment of duties and change of title which focuses more closely on student housing and administration," to begin immediately. *See* Exhibit "E."

38.    RINGLING further advised SHAFFER to "keep in mind that submitting concerns, complaints is a protected activity and any adverse action taken against a complainant by you are [sic] by someone on your behalf could constitute unlawful retaliation." *See* Exhibit "E."

39.    On August 27, 2020, RINGLING transmitted to SHAFFER a letter identified as a separation, waiver, and general release agreement, a copy of which is attached hereto as Exhibit "F."  The letter outlined the terms of a proposed separation and release whereby, among other things, SHAFFER would "agree to cause the lawsuit against Megan Ruiz (and any lawsuit you may have filed against any other Ringling College alumni or against any current student) filed by your attorney to be dismissed and to provide Ringling College with proof of the dismissal no later than 3 days after you execute this Agreement." *See* Exhibit "F."

40.    Based upon information and belief, SHAFFER did not sign the August 27, 2020

separation, waiver, and general release agreement.

41.    On September 10, 2020, RINGLING transmitted to SHAFFER a termination of employment letter, a copy of which is attached hereto as **Exhibit "G."**

42.    On September 10, 2020, RINGLING President Thompson transmitted a communication to the Ringling College Community regarding the termination of Shaffer, a copy of which is attached hereto as **Exhibit "H."**

43.    Based upon information and belief, RINGLING took no further action to seek to have the Defamation Lawsuit dismissed or otherwise resolved.

44.    At all times material hereto, RINGLING held itself out to be and specifically advertised itself as being a uniquely safe campus environment, with zero incidences of sexual assault, violence, and stalking occurring on their campus for multiple consecutive years. This was a point emphasized by Ringling representatives at potential student interviews and during new student orientations. Ringling's website also prominently displayed a snapshot of its Title IX reporting of zero incidents of "Dating Violence, Domestic Violence, Stalking for 2016, 2017, 2018." A copy of the website snapshot is attached hereto as **Exhibit "I"** ("**Zero Reports 2016-2018**"). The snapshot of the Zero Reports 2016 – 2018 was removed from RINGLING'S website in 2020.

45.    As a not-for-profit college, RINGLING maintains a 501(c)(3) tax-exempt status with the Internal Revenue Service.

46.    As a private, not-for-profit college, RINGLING is subject to the provisions of the Americans with Disabilities Act and the Florida Civil Rights Act.

47.    RINGLING'S administration, including its employees, faculty, administration, and staff, and including SHAFFER, pursuant to a special relationship between the university administration and its students, had a special duty to ensure that the campus environment was safe pursuant to their representations.

48.   Generally, students, particularly those living in dormitories, rely on colleges for assistance and protection, and colleges are in the best, if not the only, position to assist. RINGLING understood this duty, and the reasonable expectations of students, as evidenced by its multiple aforementioned representations, including the Zero Reports 2016 – 2018.

49.   A special relationship exists between a college and its students, meaning that higher education institutions must take steps to ensure students are protected.   Where one party has more control, that party bears more responsibility.

50.   College students are vulnerable and dependent upon their colleges for a safe environment.   Colleges have a superior ability to provide that safety with respect to activities they sponsor and facilities they control.

51.   RINGLING'S Staff Handbook pertaining to its Non-Harassment Policy, prohibits "harassment based on sex, age, gender, color, race, national or ethnic origin, religion, marital status, sexual orientation, sexual identity, disability, veteran status, genetic information, or any other basis prohibited by law."  A copy of the Non-Harassment Policy is attached hereto as **Exhibit "J."**

52.   The Non-Harassment Policy acknowledges that sexual harassment is inherently complex and contains a "Definition of Sexual Harassment," which includes "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is aimed at coercing an unwilling person into a sexual relationship whether or not int involves physical contact; that makes rejecting such conduct the basis for employment or academic decisions affecting the individual; or that unreasonably interferes with the individual's work or academic performance by creating an intimidating, hostile, or offense environment for learning."  *See* Exhibit "J."

53.   The Non-Harassment Policy provides specific examples of sexual harassment, including "sexual attacks; sexual violence; the requesting of sexual favors accompanied by

implied or overt threats concerning one's job, grade, letter of recommendation, or similar activities; verbal abuse of a sexual nature; physical contact such as patting, pinching, or unnecessary touching; subtle pressure for sexual activity; sexist remarks regarding a person's body, clothing or sexual activity; or derogatory comments about a person's sexual orientation." *See* Exhibit "J."

54.     The Non-Harassment Policy contains a "Special Note to Faculty, Teaching Assistants, Staff, and Other Persons in Positions of Power," which states in pertinent part:

> "Harassment occurs when a person who is in a position of trust or authority engages in behaviors or creates conditions that are inappropriate, unwanted and/or non-reciprocal. This is especially true in instances of sexual harassment when an unwelcome personal element is introduced into what should be a sex neutral situation.  Because of the difference in power between faculty and students and supervisors and employees, a faculty member or supervisor cannot be certain that a personal relationship is truly welcome or consensual. Those who abuse, or appear to abuse, their power violate their responsibility to the community."

*See* Exhibit "J."

55.     RINGLING'S Non-Harassment Policy provides that student-to-student complaints are to be processed under the disciplinary procedure established and operated by the Office of Student Life. *See* Exhibit "J."

56.     RINGLING'S Staff Handbook contains a policy for Title IX Compliance pursuant to Title IX of the Educational Amendments of 1972, the Federal law that prohibits discrimination on the basis of sex in education, programs or activities. A copy of the Title IX Compliance policy is attached hereto as **Exhibit "K."** This policy provides that RINGLING "has a designated Title IX Coordinator and Deputy Title IX Coordinator to oversee its response to all reports of sex discrimination, including harassment and sexual misconduct, and coordinate compliance with the mandates of Title IX."

57.     RINGLING'S Staff Handbook contains a policy for the Violence Against Women Act (VAWA) Compliance, a copy of which is attached hereto as **Exhibit "L."** This policy explicitly states that RINGLING "does not discriminate on the basis of sex in its

education programs and activities, or in the context of employment" and that "sexual harassment, including sexual misconduct . . . and sexual violence is a form of sex discrimination." The policy goes on to define domestic violence, dating violence, and stalking.

58.     As the Associate Dean of Students for Resident Life, SHAFFER was familiar with RINGLING'S Staff Handbook and responsible for: "overall operation and management of the Residential Life program that provides a living-learning experience for resident students." His position included oversight for "community development, residence hall operations, oversight of the room assignment process, budget management, programming, emergency and crisis response and mitigation, and overall student development." A copy of RINGLING'S Staff Handbook's provisions regarding SHAFFFER'S position is attached hereto as **Exhibit "M."**

59.     The availability of academic resources favors students living on RINGLING'S campus. The vast majority of RINGLING students reside in RINGLING on-campus housing.

60.     For freshmen students who reside in on-campus housing, there is a requirement for the students to purchase a pre-paid meal plan at RINGLING. Both the student housing and requisite meal plans generate additional revenue streams for RINGLING.

61.     As a result of RINGLING'S pattern and practice of implementation of the policies and procedures in the Student Handbook, the policies and procedures promulgated by the Office of Student Life (to the extent such Office of Student Life policies and procedures were in existence at the material times hereto), and the Staff Handbook, in conjunction with its undocumented pattern and practice of handling student reports of student-on-student sexual assault, threats of violence, violence, and stalking, RINGLING serves as law enforcement, housing authority, and final arbiter of student-on-student misconduct.

62.     Based upon information and belief, at all times material hereto, RINGLING'S

President Larry Thompson directly supervised the Title IX Department, the Human Resources Department, and the Resident Life Department at RINGLING.

63.     Based upon information and belief, at all times material hereto, Vice President Tammy Walsh directly supervised the Title IX Department, the Human Resources Department, and the Resident Life Department at RINGLING.

64.     Based upon information and belief, RINGLING'S Title IX Department, Human Resources Department, and Associate Dean of Students for Resident Life, SHAFFER, worked in tandem with Larry Thompson and Tammy Walsh to ensure that student and alumni reporters of student-on-student misconduct and student and alumni reports of discrimination were silenced and that applicable reports were not reported to the Department of Education in compliance with Title IX.

65.     Plaintiffs, in reliance upon the representations made by RINGLING regarding its extraordinary on-campus safety and Plaintiffs' reasonable expectations that RINGLING would adhere to the guidelines and operating principles outlined in its code of conduct and charter, agreed to pay tuition to attend RINGLING.

66.     Unbeknownst to Plaintiffs prior to their enrollment, RINGLING through its designated employees was aware that there were multiple students who reported incidents of student-on-student sexual assault, violence, threats of violence, stalking, and was aware of the Misconduct, Discrimination, and abuse of power by SHAFFER.  RINGLING administration knew or should have known about SHAFFER'S Misconduct, Discrimination, and abuse of power.  Despite this knowledge, RINGLING continued to represent to prospective and current students, including the Plaintiffs, that the campus was a safe environment free of Dating Violence, Domestic Violence, Stalking for the years 2016, 2017, and 2018.  RINGLING failed to disclose to prospective and current students, including the Plaintiffs, that there were multiple students who reported incidents of student-on-student sexual assault, threats of

violence, stalking, and was aware of SHAFFER'S misconduct and discrimination.

67.     Through undocumented protocol, RINGLING engaged in a pattern and practice of systematically dissuading student victims who attempted to report to its administration their experiences of student-on-student sexual assault, stalking, threats of violence, and violence from reporting these occurrences.

68.     The methods employed in the pattern and practice of dissuading victim reports involved manipulative tactics including minimization, blaming, and rejecting, to the victim, the victim's perception of their experience.

69.     The effects of such manipulative tactics were that victims were made to feel that they could not and should not file formal complaints against other students, that the conduct complained of was the fault of the victim, or that the victim was imagining the harmfulness of the conducts.

70.     Because RINGLING engaged in this process of systematically covering up instances of student-on-student misconduct, abuse of power, and incidents of discrimination, and directly or indirectly permitted the misconduct and discrimination by SHAFFER, Plaintiffs were further traumatized by the lack of a remedy for their traumatic experiences.

71.     Plaintiffs were further led to believe that their reports submitted to SHAFFER were substantiated and valid claims until they realized that the manipulation tactics used by SHAFFER were systematic and intended to silence students and prevent them from reporting student-on-student misconduct, SHAFFER'S misconduct and discrimination, and other abuses of power.

72.     Plaintiffs did not discover that RINGLING had a habit, pattern, and practice of concealing reports of student-on-student misconduct, SHAFFER'S misconduct and discrimination, and dissuading students from pursuing or effectively making reports until they began to understand that their negative experiences were not isolated experiences and in fact

were commonplace and should have been acted upon.

73.    Through their review of social media posts during the summer of 2020, Plaintiffs began to understand that other students had had similar experiences to their own experiences of the misconduct and discrimination.

74.    During and following the summer of 2020, the Plaintiffs experienced a period of discovery where they learned about the extent of RINGLING'S cover-up of SHAFFER'S Misconduct and Discrimination and subsequently learned that they had been actionably wronged by RINGLING.

## NAMED PLAINTIFFS' FACTUAL ALLEGATIONS

75.    ██████████ a young Black woman, attended RINGLING from August 2016 until she graduated in August 2020.

76.    ██████was employed by RINGLING'S Campus Activities Board from August 2019 through March 2020.

77.    As a freshman at RINGLING, ████lived in a single apartment in the Keating Building on-campus.

78.    During the Fall 2016 semester, ████was sexually assaulted in her apartment by another student (the other student, John Doe is hereafter described as "**JD1**") who attended RINGLING and lived in the Ann & Alfred Goldstein Hall ("**Goldstein**").

79.    In the following days, ████told her friends about the sexual assault.  A few days after ████shared this information with her friends, she received an email from a Residential Coordinator, who asked to meet with her to discuss what had happened to her.

80.    ████promptly reported the sexual assault to the Residential Coordinator and a meeting with SHAFFER was scheduled.

81. When ███ resented to the scheduled meeting, she was surprised to find that in addition to SHAFFER and the Residential Coordinator, JD1 was also in attendance. Furthering the trauma of having to meet with JD1, the meeting room was dimly lit and SHAFFER directed ███ and JD1 to sit right next to each other in chairs across from SHAFFER'S desk. ███ close proximity to JD1 caused her to freeze up rendering her unable to effectively report information about the assault; she was also further traumatized by being forced to sit next to her assailant. ███ nevertheless reported the sexual assault to SHAFFER who was dismissive of her account.

82. SHAFFER concluded the meeting as to ███ told ███ to leave, and instructed ███ o meet with Tammy Walsh. SHAFFER remained in the room talking with JD1 and the Residential Coordinator.

83. ███ met with Tammy Walsh either that day or the following day. ███ described for Walsh the details of the sexual assault. Walsh told ███ that Walsh would "file a report." Walsh asked ███ how Ringling should punish JD1. ███ was surprised by the question and stated that she did not know what JD1's punishment should be. Walsh instructed ███ to go to counseling. She told ███ that she would be meeting with JD1 and that there would be a "hearing" conducted by RINGLING'S administration that would include JD1's parents to discuss JD1's misconduct in the next couple of days. Walsh conveyed to ███ that ███ would not be allowed to participate in the "hearing."

84. ███ never received any report of any further action on her complaint, and on information and belief, no further action was taken. RINGLING did not provide ███ with any written information concerning policies and procedures regarding the investigation and the disciplinary process for student complaints of sexual assault.

85.     Based on the Zero Reports 2016 – 2018, *see* Exhibit "I," RINGLING did not report ███████ complaint of student-on-student assault to the Department of Education as required by Title IX.

86.     As a result of the sexual assault, and particularly as a result of RINGLING'S and SHAFFER'S mishandling of ███████ report of student-on-student sexual assault and discrimination against ███████ based upon her race and gender ███████ was traumatized, and made to feel guilty and ashamed. Thereafter, ███████ was subjected to frequent, close contact with JD1, who was not excluded from campus, which further traumatized her. ███████ attended counseling at RINGLING.  Despite attending counseling, ███████ continued to feel ashamed, powerless, and fearful.

87.     Subsequently, ███████ learned that JD1 had sexually assaulted other female students, which information further traumatized her, exacerbating her feelings of shame and guilt.

88.     ███████ did not discover that RINGLING had a habit, pattern, and practice of concealing reports of student-on-student misconduct, or that SHAFFER had a pattern of mishandling student complaints of sexual assault and of improperly dissuading students from pursuing or effectively making reports until she learned on or after June 22, 2020, of other students' negative experiences with SHAFFER and RINGLING administration.  Previously, ███████ reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

89.     As a result of her sexual assault at RINGLING and due to RINGLING'S and SHAFFER'S mishandling of ███████ report of the sexual assault resulting in her continued exposure to JD1 and secondary traumatization, ███████ was diagnosed with depression by a RINGLING counselor following her sexual assault and has been receiving medical care and has been in therapy since, to the extent her financial situation permits.

***Lauren Wilson***

90.     Lauren Wilson attended RINGLING from August 2016 until she graduated in May 2020.

91.     Lauren was employed as an RA by RINGLING from May 2017 through August 31, 2018.

92.     During her sophomore year, Lauren was diagnosed by RINGLING'S on-campus therapy center with depression, anxiety, and eating disorders. SHAFFER was informed of these diagnoses shortly after they were made.

93.     As a result of Lauren's diagnoses of depression, anxiety, and eating disorders, Lauren is a qualified individual with a disability under the Americans with Disabilities Act and the Florida Civil Rights Act.

94.     At various times during Lauren's employment as an RA, SHAFFER marginalized Lauren while treating other similarly situated employees more favorably. SHAFFER frequently criticized her work performance despite Lauren receiving favorable performance reviews from the Residential Coordinators.

95.     In August of 2018, the beginning of her junior year at RINGLING, there was a conflict between Lauren and her roommates stemming from a miscommunication regarding a potential roommate switch. As a result of the roommate conflict, Lauren communicated the problem to the on-call Residential Coordinator, who advised SHAFFER.

96.     SHAFFER reached out to Lauren via Facebook Messenger to request a meeting. SHAFFER met with Lauren's roommates separately. As an RA, SHAFFER was Lauren's employer and manager. In his position, he oversaw all Resident Life employees, including the Resident Life Residential Coordinators and all of the RAs.

97.     Prior to Lauren's meeting with SHAFFER, Lauren's roommate, who had met with SHAFFER immediately beforehand, told Lauren that Lauren was going to be fired from

her RA position.  Lauren's roommate told Lauren that SHAFFER also told her that she, their other roommate, and Lauren were "the worst of humanity" and "no better than murderers."

98.     The roommate conflict had been resolved prior to the meeting with SHAFFER.  When Lauren presented to SHAFFER'S office, it was dark with the lights off. SHAFFER began the meeting by detailing what was wrong with the roommate conflict and told Lauren that she was a "bully" and a "liar."  Lauren was not given an opportunity to explain her role in the roommate conflict because SHAFFER repeatedly called her a "liar" and interrupted her, stating "bullshit" on multiple occasions.

99.     Without giving Lauren the opportunity to defend herself, SHAFFER admonished and berated her for over an hour.  During that hour, Lauren suffered a panic attack, and was hyperventilating and sobbing, while SHAFFER told her what a "terrible" and "horrible" person she was.  SHAFFER took advantage of Lauren's mental health issues and abused his position of power over her.  SHAFFER told Lauren that she was terminated and told Lauren that as a result of her termination as an RA, that she had no more housing or meal plan at RINGLING.  SHAFFER told Lauren that if she "retaliated" against him, that he would have her "removed" from RINGLING.

100.    During the meeting, SHAFFER called Lauren's therapist at RINGLING'S on-campus therapy center, Nancy Long, to confirm that she was in her office.  He ended the meeting and instructed Lauren to go see Nancy Long.  At that point, Lauren was visibly physically distraught.  She was short of breath, her face was swollen and red and covered in black, streaked make-up.  Lauren was escorted out the back door of the building into the rain.

101.    Prior to terminating Lauren, SHAFFER failed to engage in the required interactive process to address Lauren's purported misconduct, including following the standard progressive discipline template, which is based upon the purpose of correcting, not punishing, work-related behavior.  SHAFFER'S mistreatment of Lauren and mishandling of

the roommate conflict constituted discrimination based upon Lauren's mental health conditions.

102.    Lauren's mother flew to Sarasota from Illinois upon hearing her daughter's report of what happened. She immediately scheduled an appointment with Tammy Walsh, the Vice President of RINGLING.

103.    Lauren and her mother met with Walsh.  Lauren and her mother relayed Lauren's interaction with SHAFFER to Walsh and complained about Lauren's treatment both as an employee and a student.  Walsh took notes during the meeting. Walsh concluded the meeting without agreeing to file a formal report or providing them with any written protocol for formally reporting SHAFFER'S conduct and actions.  Neither Lauren nor her mother received anything in writing from RINGLING'S administration regarding their attempted report of SHAFFER'S conduct or actions.

104.    Immediately after the meeting with Walsh, Lauren and her mother came to SHAFFER'S office to pick up Lauren's keys for her new housing.  SHAFFER told them, "I don't like the way you and your mother depicted me to Tammy."

105.    SHAFFER referred Lauren to Jekeyma Robinson, the Coordinator of Resident Life for Housing Operations who served as Student Conduct Administrator, and directed Mr. Robinson to formally charge Lauren with student misconduct for bullying and harassment. Mr. Robinson disagreed with SHAFFER'S recommendation and told Lauren he thought it was "ridiculous" and instead issued a disciplinary warning.  *See* **Exhibit "N."**

106.    Subsequently, a RINGLING representative directed Lauren to announce her "resignation."  At that time, every Tuesday evening, there were two separate RA meetings. Lauren was directed to stand up and announce, at both meetings, that she was giving her resignation and to say "I am going in a different direction," using that specific phrasing. Lauren complied with these instructions.  Lauren reasonably believed that RINGLING had

the authority to order her to make these false statements based upon her status as a student and that she would be punished and possibly expelled if she did not comply. Lauren's mistreatment, including the coerced false resignation, caused her to suffer humiliation, public embarrassment, and shame for her misrepresentation to her friends and colleagues.

107.    Lauren did not discover that RINGLING had a habit, pattern, and practice of concealing and acquiescing in SHAFFER'S ongoing abusive conduct toward students and student employees of RINGLING, despite knowledge thereof, or that SHAFFER had a pattern of mishandling student and student employee issues, until she learned on or after June 22, 2020, of other students' negative experiences with SHAFFER and the RINGLING administration.

108.    As a result of SHAFFER'S and RINGLING'S wrongful termination of Lauren, Lauren suffered past and future loss of wages and benefits, plus interest.

109.    The trauma from Lauren's interactions with SHAFFER and Walsh, and RINGLING'S failure to address the abuse inflicted upon her by SHAFFER, particularly, resulted in Lauren becoming emotionally and socially withdrawn, self-doubting, and exacerbated her pre-existing mental health conditions. When Lauren saw SHAFFER on campus, she would spiral into an anxiety attack and return immediately to her dormitory room. Lauren attended counseling for over a year to address this trauma and only stopped attending counseling due to financial constraints.

### *Caitlin Henning*

110.    Caitlin Henning ("**Caiti**") attended RINGLING from August 2018 through her graduation in May 2022.

111.    Caiti was employed by RINGLING as an RA from June 2019 through May 2020, during which she had an exemplary performance record.

112.    Caiti has suffered from severe food allergies since she was born. Therefore,

Caiti is a qualified individual with a disability under the Americans with Disabilities Act and the Florida Civil Rights Act. As a result of Caiti's disabilities, major life activities, including her ability to consume food prepared by most private and commercial restaurants, cafeterias, and events, were substantially limited.

113.    Caiti's history of severe food allergies includes hospitalizations for food allergies. In 2016, she stopped breathing due to an anaphylactic reaction from food and received an emergency tracheotomy.

114.    RINGLING advertised its campus as a safe and supportive campus for someone with severe food allergies through its promotional materials and website. During Caiti's meetings with RINGLING'S representatives as a potential student, Caiti received assurances that she would receive reasonable accommodations for her disability. Caiti and her family relied upon these representations and selected RINGLING for her college experience based upon their understanding that the campus environment would be safe for a person with her disabilities.

115.    Upon her arrival to campus, Caiti heard reports of food poisoning and pests in the food provided at Hammonds, RINGLING'S sole cafeteria-style dining hall.

116.    Several people in Caiti's social circle advised her that they personally experienced food poisoning at Hammonds and elected to buy their own groceries and avoid Hammonds in order not to get sick again.

117.    Without a safe cafeteria or the equipment to make her own food, Caiti would be left with an unsustainable diet. Her allergies prevent her from eating most microwaveable foods.

118.    RINGLING requires all freshmen who live on-campus to purchase a meal plan at Hammonds. Thus, any student residing on campus who buys their own groceries is doing so at a cost in addition to the cost of the meal plan.

119.    During her application process to be hired an RA in the Spring of 2019, before being hired as an RA, Caiti alerted the Residential Coordinators to her severe food allergies and informed them that the safest way for her to eat would be for her to have her own personal kitchen.  For the 2019-2020 academic year, Caiti was placed in appropriate housing so she would have access to a personal kitchen.

120.    As a PreCollege RA in the Summer of 2019, Caiti ate food from Hammonds after double-checking with the kitchen staff regarding its preparation.  Immediately thereafter, Caiti went into anaphylactic shock, vomited outside Hammonds, her esophagus began to close, and she struggled to breathe.  Caiti drove herself to the hospital and checked into the Emergency Department. She did not eat from Hammonds again, despite the meal plan being a part of her compensation as an RA.

121.    Prior to beginning her sophomore year at RINGLING in Fall of 2019, Caiti repeatedly voiced her concerns to Wilrich regarding her inability to consume the food provided through RINGLING'S meal plan.  Wilrich dismissed Caiti's concerns, stating that Caiti had access to a personal kitchen.

122.    Caiti requested from SHAFFER that the portion of her compensation via the meal plan be substituted by monetary compensation so she could buy her own groceries to prepare food in her personal kitchen.  SHAFFER told Caiti that this request was "uncalled for" and told her that "it would never happen."

123.    Prior to the 2020-2021 school year, Caiti learned that her RA placement required her to be housed in Goldstein, the freshman dormitory where no rooms had private kitchens or kitchenettes and as to which there are restrictions on what kitchenware can be brought into the dormitory.  Caiti reached out to Wilrich, who dismissed her concerns and advised her, "The RA placement is based on the job, not on a location."

124.    Wilrich suggested that Caiti utilize RINGLING'S shared kitchen.  Caiti

reminded Wilrich that Caiti's allergies are life-threatening and something as relatively minor as a cross-contamination could trigger an anaphylactic reaction.

125.    Caiti reached out to numerous employees and representatives at RINGLING seeking a reasonable accommodation for her deathly food allergies in light of her employee housing placement in Goldstein.  Caiti emailed and met with Patricia Pete, Trent Kiesling, Wilrich, the Hammonds kitchen staff, Human Resources, and SHAFFER.  No medically appropriate solution was proposed by RINGLING.  Caiti was advised that she had to accept the housing where she was placed or RINGLING expected her to submit a notice of resignation.

126.    During a meeting with SHAFFER, he compared Caiti's food allergies to being vegan and implied that Caiti was simply being picky.

127.    SHAFFER discussed Caiti's claimed disability with another RA and told that person that Caiti's food allergies were akin to being Kosher.

128.    SHAFFER repeatedly dismissed Caiti's concerns, including when Caiti described for SHAFFER her 2016 anaphylactic reaction that resulted in the emergency tracheotomy and showed him her tracheotomy scar.  SHAFFER repeatedly told Caiti that she was the problem and that she would not be receiving an accommodation.

129.    During her final meeting with SHAFFER on February 24, 2020, SHAFFER again told Caiti that RINGLING could not move an RA who did not "like" their placement. Caiti explained to SHAFFER that her request was not based upon her disliking her housing assignment.  SHAFFER refused to acknowledge her disability and stated, "no, this is about disliking" her housing placement.  SHAFFER told Caiti that "if someone came to apply as an RA and said, 'but the one thing is I won't live anywhere without a kitchen,' then [RINGLING] wouldn't hire them."  SHAFFER told her that such a request made an applicant unemployable.

130.    Caiti reminded SHAFFER that she had advised RINGLING during her final

interview that she required a reasonable accommodation due to her food allergies.  Caiti

offered an analogy to SHAFFER, stating that her situation was the same as a student who used

a wheelchair being placed in Keating, student housing with no wheelchair access.  She

explained that this was analogous to her request for a reasonable accommodation to have

access to safe food, illustrating that her request was not about her "disliking" her placement

but about her health and wellbeing.  SHAFFER responded, "yeah, but say if I'd seen this kid

[in the wheelchair] get up and run, then I wouldn't hire them."  SHAFFER refused to provide

Caiti a reasonable accommodation for her life-threatening food allergies.   SHAFFER

ultimately gave Caiti two choices, to resign or to wait on a housing transfer that would not be

forthcoming.

131.   Relying on SHAFFER'S statements to her that she had no right to the requested

accommodations, Caiti ultimately resigned from her position as RA at RINGLING because

SHAFFER refused to acknowledge her disability and refused to provide a reasonable

accommodation.

132.   Caiti did not discover that RINGLING had a habit, pattern, and practice of

discriminatory and abusive conduct toward students and student employees of RINGLING, or

of concealing the same, that SHAFFER had a pattern and practice of violating students'

privacy rights by disclosing their protected health information to third-parties in violation of

HIPAA and FERPA, or that SHAFFER in particular had a pattern of mishandling student and

student employee issues, until she learned on or after June 22, 2020, of other students'

negative experiences with SHAFFER and the RINGLING administration.  Previously, Caiti

reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

133.   As a result of RINGLING'S failure to provide a reasonable accommodation to

Caiti based upon her life-threatening food allergies, Caiti experienced past and future lost

wages and benefits, plus interest, pain and suffering, medical care expenses, and exacerbation

of her pre-existing conditions, including her severe food allergies, anxiety, and post-traumatic stress disorder.

134.    As a result of SHAFFER'S mistreatment of Caiti, including his violation of her medical privacy rights, and his refusal to acknowledge her severe food allergies, Caiti suffered anxiety attacks and recurrence of symptoms related to her post-traumatic stress disorder.  Caiti has been in mental health counseling since spring of 2021 to address these mental health symptoms.

135.    ████████████████ attended RINGLING from August 2013 until she graduated in May 2017.

136.    As a freshman at RINGLING, ████ was placed in student housing in Goldstein, the freshman dormitory on the Ringling campus.

137.    During the Fall 2013 semester, on September 12, 2013, ████ was sexually assaulted by another student (the other student is hereafter referred to as John Doe, "**JD2**") who also resided in Goldstein.

138.    The next day, ████ reported the sexual assault to her assigned RA.

139.    On September 13, 2013, JD2 exchanged Facebook messages with ████ in which he acknowledged some awareness of inappropriate actions toward her.  A copy of the Facebook messages is attached hereto as **Exhibit "O."**

140.    Subsequently, ████ and her RA met with SHAFFER in his office where ████ reported to SHAFFER the details of the sexual assault.  SHAFFER asked ████ what she wanted out of coming to him for help.  ████ told SHAFFER that she did not need JD2 to be punished, she just wanted him moved to another floor at Goldstein so that her chances of running into him were much slimmer.  SHAFFER told ████ that he could not force JD2 to move to another room unless she filed an official report with Ringling.  SHAFFER

explained that filing an official report with the college would be a lot of work and effort and told ▮▮▮ "you really don't want to do that."  SHAFFER suggested that instead, ▮▮▮ should send JD2 a very clear message to leave her alone, and that if JD2 did not then leave her alone, then she should come to SHAFFER and let SHAFFER deal with JD2.

141.    ▮▮▮ sent the message that SHAFFER recommended to JD2.  JD2 responded on September 18, 2013, with a Facebook message, a copy of which is attached here as **Exhibit "P."**  JD responded, "What the hell?!! I didn't do anything to you ▮▮▮ Why the hell are you doing this?"

142.    ▮▮▮ brought the messages to SHAFFER and he requested that ▮▮▮ compile all of the information into an email to him, including screenshots of the Facebook messages, which she did.  ▮▮▮ told SHAFFER that she wanted either: (1) JD2 to never speak to her again or come near her again, or (2) JD2 to be moved to another dorm.

143.    ▮▮▮ trusted that SHAFFER would take care of this situation for her. ▮▮▮ moved forward with making an official report to RINGLING based upon her understanding that this was the only way that SHAFFER could relocate JD2.  SHAFFER said to ▮▮▮ "are you sure you want to do this?" and insinuated that the formal report process would be a huge effort on RINGLING'S part.  ▮▮▮ told SHAFFER that, "no, [she didn't] want to do this, but [SHAFFER was] not giving [her] any choices.  If this is the only way to get [JD2] moved, then we have to do it."

144.    SHAFFER told ▮▮▮ that he opened up an official report against JD2.

145.    ▮▮▮ never received a copy of the report but was advised verbally as to the date and time of the "hearing."

146.    Emily Cano, another RINGLING student, attended the "hearing" with ▮▮▮ Emily testified that she witnessed JD2 followed ▮▮▮ to her room the night of the assault and witnessed JD2 harassing ▮▮▮ the following day.  There were approximately 7

RINGLING employees in attendance, including SHAFFER, Tammy Walsh, and the Head of Security. JD2 was not present when ███ was there.

147.    SHAFFER and the Head of Security asked ███ a series of offensive and irrelevant questions. SHAFFER asked ███ what she was wearing at the time of the sexual assault by JD2, indicating that her clothing choice was relevant to the question of the sexual assault.

148.    Based upon information and belief, JD2, his parents, and his lawyers met with RINGLING'S administration separately.

149.    ███ never received any notice of the outcome of the "hearing."

150.    JD2 moved to another dormitory. Based upon information and belief, JD2 did so not at RINGLING'S directive but based upon his lawyer's advice.

151.    Subsequent to this, one day as ███ was walking across campus, SHAFFER approached her and said, "your buddy isn't going to his mandatory therapy." ███ was traumatized at SHAFFER'S reference to JD2 as "her buddy" and felt additional shame and trauma due to this mocking reference to her sexual assault.

152.    During the 2015-2016 academic year, RINGLING permitted JD2 to enroll in a 9-student fine arts class in which ███ was also enrolled, held in a small classroom, further traumatizing ███ by forcing her into regular close contact with her assailant.

153.    ███ did not discover that RINGLING had a habit, pattern, and practice of concealing reports of student-on-student misconduct and improperly failing to protect victims of sexual assault, or that SHAFFER had a pattern of mishandling student complaints of sexual assault and of improperly harassing students who sought to make reports until she learned on or after June 22, 2020 of other students' negative experiences with SHAFFER and the RINGLING administration.   Previously ███ reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

154. ▮▮▮▮ suffered trauma which manifests itself as panic attacks, depression, and low self-esteem. She has attended years of mental health counseling due to both the sexual assault and RINGLING'S mishandling of her report.

▮▮▮▮▮▮▮▮▮▮

155. ▮▮▮▮▮ a gay man, attended RINGLING from August 2009 until he graduated in May 2013.

156. As a freshman at RINGLING, ▮▮▮▮ lived in Goldstein, the freshman dormitory on the Ringling campus.

157. During the beginning of the Fall 2009 semester, ▮▮▮▮ was sexually assaulted by his roommate (his roommate is hereafter referred to as John Doe or "**JD3**") at Goldstein on two occasions.

158. Subsequently, ▮▮▮▮ and JD3 met with SHAFFER to request a roommate change. ▮▮▮▮ reported to SHAFFER the two sexual assaults that JD3 perpetrated on him and described those assaults. JD3 denied that the assaults occurred.

159. During a subsequent meeting, SHAFFER told ▮▮▮▮ that he did not believe ▮▮▮▮ reports of the sexual assaults. SHAFFER told ▮▮▮▮ that, "I'm on [JD3's] side with this one. I always have a tendency to root for the underdog."

160. SHAFFER warned ▮▮▮▮ that he risked being expelled from RINGLING.

161. SHAFFER advised ▮▮▮▮ that JD3's family threatened to sue ▮▮▮▮ for slander if he continued to talk about the sexual assaults.

162. SHAFFER told ▮▮▮▮ that if he wanted to file a formal report of the sexual assaults ▮▮▮▮ had to email him a detailed summary of the sexual assaults. SHAFFER instructed ▮▮▮▮ to copy his parents on the emailed summary despite ▮▮▮▮ being over the age of majority. ▮▮▮▮ sent the summary to SHAFFER and his parents. SHAFFER again told ▮▮▮▮ that he was at risk to be expelled.

163.     Subsequently, in 2009, SHAFFER verbally advised ███ that he conducted a "hearing" to investigate ███ claims that JD3 sexually assaulted him. SHAFFER told ███ that he was not allowed to attend the hearing. ███ did not receive any written policies and procedures on the disciplinary process.

164.     Prior to the date the "hearing" was to occur, JD3 told ███ that his parents made a sizable donation to RINGLING to help build the new library.  JD3 told ███ that because of this donation to RINGLING, JD3 was not worried about there being any consequence to him at the hearing.

165.     ███ did not receive any documentation confirming whether or not the "hearing" occurred, what disciplinary action was taken against JD3, or what findings were made by RINGLING at the "hearing."  SHAFFER verbally advised ███ at the "hearing" had occurred and that ███ that he was very fortunate not to be expelled. SHAFFER verbally communicated to ███ that the outcome of the "hearing" was that JD3 and ███ were supposed to stay away from each other, were assigned different dormitory rooms, and ███ was instructed to see a RINGLING therapist.

166.     ███ did not discover that RINGLING had a habit, pattern, and practice of concealing reports of student-on-student misconduct and improperly failing to protect victims of sexual assault, or that SHAFFER had a pattern of mishandling student complaints of sexual assault and of improperly harassing students who sought to make reports until he learned on or after June 22, 2020 of other students' negative experiences with SHAFFER and the RINGLING administration.  Previously, ███ reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

167.     As a result of RINGLING'S and SHAFFER'S mishandling of ███ report of student-on-student sexual assault, ███ felt traumatized, ridiculed, shamed, and humiliated. ███ felt that Shaffer discriminated against him based upon his homosexuality.

feelings of helplessness and despair created by RINGLING'S and SHAFFER'S mishandling of his report of sexual assaults have affected ▇▇▇▇ work, friendships, and romantic relationships, and caused him to suffer from general anxiety ▇▇▇▇ has been in therapy since RINGLING'S and SHAFFER'S mishandling of his report of the sexual assaults.

### *Nickolas Berger*

168.    Nickolas Berger ("**Nick**") attended RINGLING from August 2016 through his graduation in May 2021.

169.    Beginning in the Fall 2017, Nick sought mental health counseling and treatment at RINGLING'S on-campus counseling center. Nick trusted RINGLING to ensure that his mental health records from the RINGLING on-campus counseling center would be maintained so as to ensure his privacy and protection as an individual suffering from the mental health conditions of depression and anxiety.

170.    In January 2018, RINGLING'S therapy center diagnosed Nick with major depressive disorder, recurrent episode in full remission, and social anxiety disorder.

171.    As a result of Nick's diagnoses of mental health conditions, Nick is a qualified individual with a disability under the Americans with Disabilities Act and the Florida Civil Rights Act.

172.    On February 10, 2018, while living in Goldstein, the freshman dormitory, Nick was suffering committed an act of self-harm.

173.    Nick's then-girlfriend, Destiny Washington, also a RINGLING student, was concerned for his well-being and sought outside help by calling the Suicide Hotline.

174.    Destiny and Nick believed that the Suicide Hotline provided a form of temporary counseling over the phone. They did not know that the Suicide Hotline sent the Sarasota Police Department to the caller's location.

175.    A few minutes after Destiny placed the call to the Suicide Hotline, SHAFFER

arrived at their location with a police officer. A copy of the Police Department Summary is attached hereto as **Exhibit "Q."**

176. The police officer was very polite. SHAFFER, however, admonished and mocked Nick and Destiny for being ignorant that the Suicide Hotline would send a police officer to them. SHAFFER berated them for calling the Suicide Hotline and causing the police to present to RINGLING and for wasting the police officer's and SHAFFER'S time. Based upon specific remarks made by SHAFFER, it was apparent to Nick that SHAFFER had improperly accessed Nick's mental health records from the RINGLING on-campus counseling center in violation of HIPAA and FERPA.

177. SHAFFER'S statements caused Nick to believe that Nick had committed a wrong by calling the Suicide Hotline and was to blame for SHAFFER'S harassment of him.

178. Nick did not discover that RINGLING had a habit, pattern, and practice of concealing and acquiescing in SHAFFER'S ongoing abusive conduct toward students, despite knowledge thereof, that SHAFFER had a pattern and practice of discriminating against students with disabilities, or that SHAFFER had a pattern of mishandling student mental health crises, until he learned on or after June 22, 2020, of other students' negative experiences with SHAFFER and the RINGLING administration. Previously, Nick reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

179. As a result of the abusive mistreatment Nick sustained, Nick experienced an exacerbation of his mental health conditions and the additional cost of medical and mental health care for his disabilities based upon that exacerbation. Nick continues to receive medical care and counseling for his disabilities.

███████████████████

180. ██████████████████ attended RINGLING from August 2008 until

he graduated in May 2012.

181.    At the time of ███████admission into RINGLING, he had been diagnosed with Bipolar-1.

182.    As a result of ███████diagnosis of Bipolar-1,██████is a qualified individual with a disability under the Americans with Disabilities Act and the Florida Civil Rights Act.

183.    During ███████freshman year at RINGLING, in the Fall of 2008 through Spring 2009, he made friends with another student (the other student is hereafter referred to as John Doe or "**JD4**") who became threatening and hostile toward ██████ after he came out as gay to JD4.  JD4 engaged in repeated stalking, threats of violence, sexual harassment, and discrimination based upon ███████LGBTQ+ status.

184.    On multiple occasions, JD4 stalked ██████ on the RINGLING campus.  On multiple occasions, JD4 sexually harassed ██████ by aggressively questioning him about his sexuality and engaging in unwanted discussions regarding ██████homosexuality.   On multiple occasions, JD4 displayed a folding knife to ██████n threatening ways.  ██████called campus security on one occasion because JD4 physically obstructed ██████entry into ███████own student apartment.  ██████elt unsafe and sought help from RINGLING.

185.    ██████presented to RINGLING'S Student Life offices in the Searing Building without an appointment.  He advised the RINGLING representative at the reception desk that he wanted to make a complaint against another student.  ██████was directed to meet with SHAFFER in his office.

186.    ██████explained the situation with JD4 and described the stalking, threats, and sexual harassment to SHAFFER.  SHAFFER dismissed ██████complaint immediately. SHAFFER told ██████hat ██████was to blame for the harassment and accused ██████of being the instigator.  SHAFFER said to ██████"If you don't want people to treat you like that, you shouldn't talk about being gay."

187.   ██████ became very emotionally and physically upset during this exchange with SHAFFER and was crying. ██████ repeated to SHAFFER that JD4 had a knife. SHAFFER replied, "If it was a problem, someone else would have reported it." SHAFFER asked ██████ to leave and ██████ departed SHAFFER'S office while sobbing and feeling traumatized, humiliated, and ashamed.

188.   Another Student Life representative noticed ██████ emotional and physical state as he was leaving SHAFFER'S office.  That representative took ██████ aside and discussed the issue of his harassment and stalking.  After ██████ refused a one-on-one mediation with JD4, that representative told ██████ that she would make some kind of report and/or plan to speak with the student who threatened him.

189.   ██████ was never advised as to whether any representative from RINGLING ever talked to JD4 regarding the harassment and threats made to him or whether any action was taken with regard to his report regarding JD4's sexual harassment and stalking and threats of violence.

190.   As a result of the harassment and threats, and SHAFFER'S mishandling of his report and discrimination based on ██████ homosexuality, ██████ was traumatized and went "back into the closet" to everyone but his closest friends, his therapists, and the few teachers that he trusted until late in his junior year at RINGLING.  ██████ encounter with SHAFFER instilled in him a feeling that his sexual orientation was undesirable and made him unworthy of protection from harassment and/or violence from RINGLING and the community at large.

191.   During his junior year at RINGLING, ██████ was chosen as Trustee Scholar of Photography for his graduating year.  Receiving the award required ██████ to present a speech to RINGLING'S Board of Trustees and donors at a reception dinner in November of his senior year.  He worked with RINGLING administration to prepare promotional materials for the event.  ██████ discussed an early version of his speech with RINGLING representatives

and shared that he was planning to write his speech about struggling with the "otherness" of growing up in the Midwest as a gay man and an artist. ███ was advised that he should not include the parts of his speech talking about his homosexuality because many of the Trustees were conservative and old-fashioned and might be offended. This interaction caused ███ further trauma from RINGLING'S persistent discrimination of him based upon his homosexuality.

192.    ███ did not discover that RINGLING had a habit, pattern, and practice of concealing reports of student-on-student misconduct and improperly failing to protect victims of sexual harassment, stalking, and threats of violence, or that SHAFFER had a pattern of mishandling student complaints of sexual harassment, stalking, and threats of violence, and of improperly harassing students who sought to make reports until he learned on or after June 22, 2020 of other students' negative experiences with SHAFFER and the RINGLING administration.    Previously, ███ reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

193.    As a result of RINGLING'S mistreatment and SHAFFER'S mishandling of ███ report of student-on-student sexual harassment, stalking, and threats of violence, ███ has suffered trauma and been diagnosed with chronic depression, generalized anxiety with panic disorder and social anxiety, post-traumatic stress, and received years of medical treatment and counseling for mental health therapy.



## COUNT I – CONSTRUCTIVE FRAUD
### (against RINGLING by ███████ ███ NICKOLAS BERGER)

194.    Plaintiffs, ███████ ███████ ███████ ███████ and NICKOLAS BERGER ("**Count One Plaintiffs**") re-allege and re-incorporate paragraphs 1 to 74, 75 to 89, 135 to 154, 155 to 167, 180 to 193, and 168 to 179, including all exhibits thereto, as if fully reinstated herein.

195.    RINGLING represented to Count One Plaintiffs that its campus was uniquely and extraordinarily safe.

196.    However, RINGLING had knowledge that such representation was false, as multiple incidences of abuse by its administration, student-on-student misconduct, and misconduct and discrimination by SHAFFER in particular were systematically dismissed, covered up, undocumented, and unreported by SHAFFER and other employees of RINGLING.

197.    RINGLING intended for its prospective and enrolled students and their families to rely on this misrepresentation.  By misrepresenting the safety of RINGLING'S campus, RINGLING induced students to attend its college, induced the students and their families to pay tuition for their education, and induced students and their families to pay for housing and meal plans.

198.    Based upon RINGLING'S failure to properly disclose truthful information regarding its campus safety, Count One Plaintiffs sustained financial, mental, and physical injuries by acting in reliance on such misrepresentations.  As a result of their claims going unreported and/or unresolved by RINGLING, Count One Plaintiffs' experiences at RINGLING were accompanied by feelings of helplessness, fear, and concern that they would be subject to further abuses, further student-on-student misconduct, and/or further discrimination during the remainder of their time at RINGLING.

199.    Exacerbating its fraud, RINGLING, through its agents, including but not limited to SHAFFER, attempted to persuade and/or successfully persuaded Count One Plaintiffs not to file reports of the events that indicated the lack of safety and protection on campus for RINGLING students.  Where Count One Plaintiffs persisted in filing claims reporting such events, RINGLING, through SHAFFER and other employees, worked to convince Count One Plaintiffs that they were to blame for the incidents and that the incidents

would not have occurred if the Count One Plaintiffs had conducted themselves differently.

200.   Count One Plaintiffs were unaware that their reports made to SHAFFER were substantiated until they learned that the manipulation tactics used by SHAFFER were systematic and intended to prevent students from reporting instances of student-on-student misconduct, SHAFFER'S misconduct and discrimination, and other abuses.

201.   As a result of RINGLING'S constructive fraud against Plaintiffs, Count One Plaintiffs suffered the trauma of student-on-student misconduct, trauma from SHAFFER'S misconduct and/or discrimination, trauma from RINGLING'S failure to protect them, financial losses, negative impacts on their mental and/or physical health, loss of enjoyment of life, mental distress, emotional and/or physical pain and suffering, and/or other economic or non-economic damages, for which they are entitled to just compensation.

WHEREFORE, Count One Plaintiffs demands judgment in their favor and against RINGLING for constructive fraud, and seek compensatory damages, attorneys' fees and costs, and such other relief as this Court deems just and proper under the circumstances.

## COUNT II – CONSTRUCTIVE FRAUD
### (against RINGLING by CAITLIN HENNING)

202.   Plaintiffs, CAITLIN HENNING ("**Caiti**") re-allege and re-incorporate paragraphs 1 to 74 and 110 to 134, including all exhibits thereto, as if fully reinstated herein.

203.   RINGLING represented to Caiti and her family that its campus was a safe environment with students with disabilities, including disabilities that require accommodations.

204.   However, RINGLING had knowledge that such representation was false, as multiple incidences of RINGLING'S failure to provide reasonable accommodations to disabled students were covered up, undocumented, and unreported by SHAFFER and other employees of RINGLING.

205.   RINGLING intended for its prospective and enrolled students and their

families to rely on this misrepresentation. By misrepresenting the safety of RINGLING'S campus for students with disabilities, RINGLING induced students with disabilities to attend its college, induced those students and their families to pay tuition for their education, and induced those students and their families to pay for housing and meal plans.

206. Based upon RINGLING'S failure to properly disclose truthful information regarding its campus safety for students with disabilities, Caiti sustained financial, mental, and physical injuries by acting in reliance on such misrepresentations. As a result of her reports and requests for a reasonable accommodation going unresolved by RINGLING, Caiti's college experience was accompanied by a pervasive fear that her life-threatening food allergies would result in her own illness or death due to RINGLING'S failure to provide her with reasonable accommodations.

207. Exacerbating its fraud, RINGLING, through its agents, including but not limited to SHAFFER, encouraged Caiti to resign from her employment as an RA at RINGLING in order to avoid providing Caiti with the reasonable accommodation requested. Where Caiti persisted in pursuing a reasonable accommodation for her severe food allergies so that she could continue her employment as an RA, RINGLING through SHAFFER and other employees, worked to convince Caiti that she was being unreasonable and refused to provide the reasonable accommodation, thus requiring Caiti to resign from her position as an RA, lose the benefits of her compensation by way of on-campus housing, and suffer exacerbation of her mental health conditions.

208. As a result of RINGLING'S constructive fraud against Caiti, she suffered trauma from the loss of her job due to the discrimination based upon her disability, trauama from the mistreatment by SHAFFER, financial losses, negative impacts on her mental and physical health, loss of enjoyment of life, mental distress, emotional and physical pain and suffering, and other economic or non-economic damages, for which she is entitled to just

compensation.

WHEREFORE, CAITLIN HENNING demands judgment in her favor and against RINGLING for constructive fraud, and seeks compensatory damages, attorneys' fees and costs, and such other relief as this Court deems just and proper under the circumstances.

## COUNT III – NEGLIGENT SUPERVISION AND RETENTION
### (against RINGLING by MEGAN ROSE RUIZ)

209. MEGAN ROSE RUIZ re-alleges and re-incorporates paragraphs 1 to 74, including all exhibits thereto, as if fully reinstated herein.

210. In December 2018, while employed as an RA, RUIZ attempted to file a formal report against SHAFFER with Taylor Parker. RUIZ explained to Parker that she did not feel safe at work.

211. On December 4, 2018, RUIZ met with Parker and Christine DeGeorge to report her concerns about SHAFFER's misconduct and discrimination. RUIZ advised them that she did not feel safe at work. DeGeorge advised RUIZ that if she formally reported the complaint about SHAFFER, that DeGeorge could protect her from retaliation, but that DeGeorge could not prevent RUIZ from being fired from her position as an RA if she was not doing a good job. RUIZ cried during this meeting and DeGeorge advised RUIZ that it was not her job to deal with crying students. RUIZ ultimately decided not to file a formal report out of fear that she would be terminated from her job as an RA.

212. Upon her graduation from RINGLING in May 2019, RUIZ contacted both the Office of Student Life and the Human Resource Department at Ringling to report what she had witnessed with regard to SHAFFER'S misconduct, discrimination, and abusive mistreatment of students and student employees, which she had also personally experienced while a student and employee of RINGLING. RUIZ recounted that although she had previously reported some of these experiences to DeGeorge, she was "genuinely too scared to take anymore action about the situation because [she] feared being fired. She continued that

since she was now graduated, she was reporting her experiences and those of others because she "just [didn't] want this to happen to anyone ever again." A copy of RUIZ'S June 24, 2019 email to Parker is attached hereto as **Exhibit "R."**

213.    RINGLING'S administration failed to take any action whatsoever in response to either of RUIZ'S reports about SHAFFER'S misconduct and discrimination.

214.    RINGLING'S administration further failed to prevent SHAFFER from retaliating against RUIZ.

215.    RINGLING had actual knowledge of SHAFFER'S intention to file a lawsuit against RUIZ. Prior to filing the Defamation Lawsuit, SHAFFER advised Larry Thompson and Tammy Walsh that he intended to file a lawsuit against MEGAN ROSE RUIZ for her public statements about SHAFFER while he was employed at RINGLING.

216.    RINGLING had actual knowledge of the Defamation Lawsuit filed on August 3, 2020 at the time that RINGLING transmitted the August 25, 2020 correspondence to SHAFFER wherein RINGLING agreed to continue SHAFFER'S employment.

217.    Accordingly, RINGLING was negligent in the supervision and retention of SHAFFER at all material times referenced herein in the following ways:

      a.    failing to determine whether SHAFFER was adequately trained in the supervision and care of students and student employees;

      b.    failing to adequately train or to require SHAFFER to obtain adequate training in the supervision of students and staff;

      c.    failing to ensure that SHAFFER complied with Florida and Federal law;

      d.    continuing to employ SHAFFER after he demonstrated his lack of knowledge with regard to the supervision and care of students;

      e.    continuing to employ SHAFFER after he demonstrated his lack of knowledge with regard to the supervision and care of student employees; and

f.      continuing to employ SHAFFER after he retaliated against RUIZ for

her truthful public statements regarding SHAFFER and RINGLING.

218.    As a direct and proximate result of the aforesaid negligence in the supervision

and retention of SHAFFER by RINGLING, RUIZ has sustained the following damages:

negative impacts on her mental and physical health, financial losses associated with medical

treatment for her mental and physical health, loss of enjoyment of life, inconvenience, insult,

mental distress, humiliation, anxiety, lost wages, attorneys' fees and costs, and other economic

or non-economic damages, for which she is entitled to just compensation.

WHEREFORE, MEGAN ROSE RUIZ demands judgment in her favor and against

RINGLING for negligent supervision and retention, and seeks compensatory damages,

reimbursement of her attorneys' fees and costs in the Defamation Lawsuit, her attorneys' fees

and costs in bringing this lawsuit, and such other relief as this Court deems just and proper

under the circumstances.



### COUNT IV– NEGLIGENT SUPERVISION AND RETENTION
**(against RINGLING by** ████████████████ │ ████████
████████████████████**and**

219.    Plaintiffs ████████ ████████████ ████████████ and

████████████████████ re-allege and re-incorporate paragraphs 1 to 74, 75 to 89, 135

to 154, 155 to 167, 180 to 193, including all exhibits thereto, as if fully reinstated herein.

220.    ████████████████████████ and ████████████

suffered the mishandling of their reports of student-on-student sexual assault and/or sexual

harassment and/or threats of violence, and discrimination based upon their disabilities and/or

gender and/or race and/or status as LGBTQ+ individuals by SHAFFER.

221.    ████████████████████████ and ████

suffered manipulation tactics by SHAFFER and were made to believe that they had not been

the victims of student-on-student misconduct. They did not receive any confirmation from

RINGLING validating their reports of student-on-student misconduct and, in fact, were verbally advised that the incidents they reported to SHAFFER were the result of their own faults. As a result, these plaintiffs did not discover that RINGLING had a habit, pattern, and practice of concealing reports of student-on-student misconduct, or that SHAFFER had a pattern of mishandling student complaints and of improperly dissuading students from pursuing or effectively making reports until they learned on or after June 22, 2020 of other students' negative experiences with SHAFFER and the RINGLING administration. Previously, they reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

222. At all relevant times, RINGLING employed and exercised control and supervision over SHAFFER.

223. At all relevant times, RINGLING had actual knowledge of, and/or was deliberately indifferent to, SHAFFER'S misconduct, concealment of reports of student-on-student misconduct, harassment of students who brought such reports to SHAFFER, discrimination against students based upon their gender, race, LGBTQ+ status, and/or disabilities, and SHAFFER'S pattern and practice of systemically mistreating students who made such reports.

224. SHAFFER'S pattern and practice of misconduct and discrimination and practice and pattern as an employee of RINGLING was created and furthered by RINGLING'S repeated failure to protect ███████████████████████ ███████████████ and other unidentified students, and by RINGLING'S failure to follow its own policies and procedures, and by RINGLING'S implementation of undocumented policies and procedures that permitted SHAFFER to engage in such conduct and actions.

225. RINGLING acted with deliberate indifference to SHAFFER'S conduct and actions by failing to take any action to prevent them, deter SHAFFER, and/or protect ██████ ███████████████████████████████ and other unidentified

students.

226.    RINGLING was negligent in the supervision and retention of those employees, including but not limited to, SHAFFER and Tammy Walsh, working during the time of the incidents referenced in this Count in the following ways:

        g.    failing to determine whether said employees were adequately trained in the supervision and care of students with complaints of sexual assault, sexual harassment, threats of violence, and stalking;

        h.    failing to determine whether said employees were adequately trained in the supervision and care of students so as to avoid discrimination against students based on their disabilities, race, gender, and LGBTQ+ status;

        i.    failing to adequately train or to require the employees to obtain adequate training requisite to fulfill their job duties and responsibilities;

        j.    failing to ensure that said employees complied with Federal and Florida law;

        k.    failing to ensure that said employees knew how to recognize when a student is in distress and how to appropriately respond to that situation; and

        l.    continuing to employ said employees after they had demonstrated their lack of knowledge with regard to the supervision and care of such students in such situations.

227.    As a direct and proximate result of the aforesaid negligence in the supervision and retention of said employees by RINGLING, ███████████████ ██████ and ████████████ have sustained the following damages: medical expenses associated with mental health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, loss of enjoyment of life, economic damages, and other economic or non-economic damages, for which they are entitled

to just compensation.

WHEREFORE, ███████████████████████████ and

███████████████████ demand judgment in their favor and against RINGLING for

negligent supervision and retention, and seek compensatory damages, attorneys' fees and

costs, and such other relief as this Court deems just and proper under the circumstances.

### COUNT V– NEGLIGENT SUPERVISION AND RETENTION
### (against RINGLING by CAITLIN HENNING)

228.    Plaintiff, CAITLIN HENNING ("**Caiti**") re-alleges and re-incorporates

paragraphs 1 to 74 and 110 to 134, including all exhibits thereto, as if fully reinstated herein.

229.    Caiti suffered the loss of her employment, mistreatment by SHAFFER, and

discrimination based upon her disabilities due to RINGLING'S failure to provide her with a

reasonable accommodation for her life-threatening food allergies.

230.    Through SHAFFER, RINGLING'S conduct and mishandling of Caiti's request

for a reasonable accommodation resulting in Caiti's forced resignation from her employment

as an RA at RINGLING constitute violations of the American with Disabilities Act, as

amended by the ADA Amendments Act ("**ADAAA**"), 42 U.S. C. §§ 12101 to 12213

(collectively, the "**ADA**") and the Florida Civil Rights Act, Florida Statutes §§ 760.01 –

760.11 and Florida Statute § 509.092, (collectively, the "**FRCA**").

231.    Based upon RINGLING'S failure to provide a reasonable accommodation for

Caiti, a student with disabilities, Caiti sustained financial, mental, and physical injuries. As a

result of her claims going unreported and/or unresolved by RINGLING, Caiti's college

experience was accompanied by a pervasive fear that her life-threatening food allergy would

result in her own illness or death due to RINGLING'S failure to provide her with reasonable

accommodations.

232.    RINGLING, through its agents, encouraged Caiti to resign from her

employment as an RA at RINGLING in order to avoid providing Caiti with the reasonable

accommodation requested.  Where Caiti persisted in pursuing a reasonable accommodation for her severe food allergies so that she could continue her employment as an RA, RINGLING through SHAFFER and other employees, used manipulation tactics and mistreated Caiti to convince her that she was being unreasonable and continued to refuse to provide the reasonable accommodation, thus requiring Caiti to resign from her position as an RA, lose the benefits of her compensation by way of on-campus housing, and suffer exacerbation of her mental health conditions.

233.    At all relevant times, RINGLING employed and exercised control and supervision over SHAFFER.

234.    At all relevant times, RINGLING had actual knowledge of, and/or was deliberately indifferent to, SHAFFER'S failure to provide Caiti with a reasonable accommodation as required by Florida and federal law, SHAFFER'S discrimination of Caiti as a student with disabilities, and SHAFFER'S pattern and practice of mistreating students and student employees.

235.    SHAFFER'S misconduct, including failing to fulfill his obligations to provide reasonable accommodations to a student RA with disabilities, the discrimination as to a student with disabilities, and SHAFFER'S practice and pattern of mistreating students as an employee of RINGLING, was created and furthered by RINGLING'S repeated failure to protect Caiti and other unidentified students, by RINGLING'S failure to follow its own policies and procedures, and by RINGLING'S implementation of undocumented policies and procedures that permitted SHAFFER to commit the misconduct, discrimination, and abuse of power.

236.    RINGLING acted with deliberate indifference to the acts of misconduct and discrimination by failing to take any action to prevent them, deter SHAFFER, and/or protect Caiti.

237.   RINGLING was negligent in the supervision and retention of those employees, including but not limited to, SHAFFER and Tammy Walsh, working during the time of the incidents referenced in this Count in the following ways:

      a.   failing to determine whether said employees were adequately trained in the supervision and care of student and employee complaints of failure to provide reasonable accommodations as required by Federal and Florida law;

      b.   failing to determine whether said employees were adequately trained in the supervision and care of students and employees so as to avoid discrimination against students based on their disabilities;

      c.   failing to adequately train or to require the employees to obtain adequate training requisite to fulfill their job duties and responsibilities;

      d.   failing to ensure that said employees knew how to recognize when a student is in distress and how to appropriately respond to that situation; and

      e.   continuing to employ said employees after they had demonstrated their lack of knowledge with regard to the supervision and care of such students in such situations.

238.   As a direct and proximate result of the aforesaid negligence in the supervision and retention of said employees by RINGLING, Caiti has sustained the following damages: trauma from the loss of her job and her mistreatment by Shaffer, financial losses, negative impacts on her mental and physical health, medical expenses associated with physical health treatment and mental health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, loss of enjoyment of life, economic damages, and other economic or non-economic damages, for which she is entitled to just compensation.

WHEREFORE, CAITLIN HENNING demands judgment in her favor and against

RINGLING for negligent supervision and retention, and seeks compensatory damages, attorneys' fees and costs, and such other relief as this Court deems just and proper under the circumstances.

### COUNT VI– NEGLIGENT SUPERVISION AND RETENTION
### (against RINGLING by LAUREN WILSON)

239.    Plaintiff, LAUREN WILSON, re-alleges and re-incorporates paragraphs 1 to 74 and 90 to 109, including all exhibits thereto, as if fully reinstated herein.

240.    Title III of the ADA prohibits discrimination against students with disabilities in any private college, including RINGLING. RINGLING had actual knowledge of Lauren's disability at the time of her admission to the college; moreover, RINGLING had actual knowledge of Lauren's disability at the time of her hiring as an RA at the college.

241.    RINGLING, through SHAFFER, discriminated against Lauren and harassed Lauren by creating a hostile work environment that targeted Lauren's areas of sensitivity due to her medical condition, thereby violating the American with Disabilities Act, as amended by the ADA Amendments Act ("**ADAAA**"), 42 U.S. C. §§ 12101 to 12213 (collectively, the "**ADA**") and the Florida Civil Rights Act, Florida Statutes §§ 760.01 – 760.11 and Florida Statute § 509.092, (collectively, the "**FRCA**").

242.    As a result of RINGLING'S violations of Title III of the ADA and the FCRA, Lauren sustained past and future lost wages and benefits, plus interest, and mental injury.

243.    At all relevant times, RINGLING employed and exercised control and supervision over SHAFFER.

244.    At all relevant times, RINGLING had actual knowledge of, and/or was deliberately indifferent to, SHAFFER'S creation of a hostile work environment in violation of Florida and Federal law, of SHAFFER'S discrimination of Lauren as a student with disabilities, and of SHAFFER'S pattern and practice of systemically mistreating students and student employees with disabilities.

245.   SHAFFER'S discrimination of Lauren as an employee of RINGLING with disabilities, discrimination of Lauren based upon her status as a student with disabilities and her gender, and SHAFFER'S mistreatment of Lauren was created and furthered by RINGLING'S repeated failure to protect Lauren and other unidentified students, by RINGLING'S failure to follow its own policies and procedures, and by RINGLING'S implementation of undocumented policies and procedures that permitted SHAFFER to commit the misconduct, discrimination, and abuse of power.

246.   RINGLING acted with deliberate indifference to the acts of misconduct and discrimination by failing to take any action to prevent them, deter SHAFFER, and/or protect Lauren.

247.   RINGLING was negligent in the supervision and retention of those employees, including but not limited to, SHAFFER and Tammy Walsh, working during the time of the incidents referenced in this Count in the following ways:

f.   failing to determine whether said employees were adequately trained in the supervision and care of student and employees as required by Federal and Florida law;

g.   failing to determine whether said employees were adequately trained in the supervision and care of students and employees so as to avoid discrimination against students based on their gender and disabilities;

h.   failing to adequately train or to require the employees to obtain adequate training requisite to fulfill their job duties and responsibilities;

i.   failing to ensure that said employees complied with Florida and Federal law;

j.   failing to ensure that said employees knew how to recognize when a student is in distress and how to appropriately respond to that situation; and

k.    continuing to employ said employees after they had demonstrated their lack of knowledge with regard to the supervision and care of such students in such situations.

248.    As a direct and proximate result of the aforesaid negligence in the supervision and retention of said employees by RINGLING, Lauren has sustained the following damages: trauma and exacerbation of her pre-existing mental health conditions, financial losses including past and future lost wages and benefits, plus interest, negative impacts on her mental health, medical expenses associated with mental health treatment, inconvenience, insult, mental distress, humiliation, anxiety, emotional pain and suffering, loss of enjoyment of life, economic damages, and other economic or non-economic damages, for which she is entitled to just compensation.

WHEREFORE, LAUREN WILSON demands judgment in her favor and against RINGLING for negligent supervision and retention, and seeks compensatory damages, attorneys' fees and costs, and such other relief as this Court deems just and proper under the circumstances.

## COUNT VII– NEGLIGENT SUPERVISION AND RETENTION
### (against RINGLING by NICKOLAS BERGER)

249.    Plaintiff NICKOLAS BERGER ("**Nick**") re-alleges and re-incorporates paragraphs 1 to 74 and 168 to 179, including all exhibits thereto, as if fully reinstated herein.

250.    Nick suffered discrimination and harassment based upon his disabilities, an invasion of privacy, and the inappropriate transmission of his protected health information by SHAFFER and other RINGLING employees.

251.    Title III of the ADA prohibits discrimination against students with disabilities in any private college, including RINGLING.  RINGLING had actual knowledge of Nick's disability at the time of SHAFFER'S discrimination and creation of a hostile environment for Nick.

252.    RINGLING, through SHAFFER, discriminated against Nick and harassed Nick by mistreating Nick during a mental health crisis, thereby violating the American with Disabilities Act, as amended by the ADA Amendments Act ("**ADAAA**"), 42 U.S. C. §§ 12101 to 12213 (collectively, the "**ADA**") and the Florida Civil Rights Act, Florida Statutes §§ 760.01 – 760.11 and Florida Statute § 509.092, (collectively, the "**FRCA**").

253.    Nick did not discover that he was a victim of discrimination and harassment by SHAFFER until he learned on or after June 22, 2020 of other students' negative experiences with SHAFFER and RINGLING, RINGLING'S habit, patter, and practice of allowing SHAFFER to mishandle student issues, discriminate against students with disabilities, and harass students who sought to make reports that could become public.

254.    At all relevant times, RINGLING employed and exercised control and supervision over SHAFFER.

255.    At all relevant times, RINGLING had actual knowledge of and/or was deliberately indifferent to SHAFFER'S misconduct and discrimination and mistreatment of students.

256.    SHAFFER'S misconduct, discrimination, and practice and pattern of mistreating students as an employee of RINGLING was created and furthered by RINGLING'S repeated failure to Nick and other unidentified students, by RINGLING'S failure to follow its own policies and procedures, and by RINGLING'S implementation of undocumented policies and procedures that permitted SHAFFER to commit the Misconduct, Discrimination, and abuses of power.

257.    RINGLING acted with deliberate indifference to the SHAFFER'S conduct and actions by failing to take any action to prevent them, deter SHAFFER, and/or protect Nick.

258.    RINGLING was negligent in the supervision and retention of those employees, including but not limited to SHAFFER, who were working during the time of the incidents

referenced in this Count in the following ways:

        m.      failing to determine whether said employees were adequately trained in the supervision and care of students with disabilities;

        n.      failing to determine whether said employees were adequately trained in the supervision and care of students so as to avoid discrimination against students based on their mental health status and disabilities;

        o.      failing to adequately train or to require the employees to obtain adequate training requisite to fulfill their job duties and responsibilities;

        p.      failing to ensure that said employees acted in compliance with Federal and Florida law;

        q.      failing to ensure that said employees knew how to recognize when a student is in distress and how to appropriately respond to that situation; and

        r.      continuing to employ said employees after they had demonstrated their lack of knowledge with regard to the supervision and care of such students in such situations.

259.    As a direct and proximate result of the aforesaid negligence in the supervision and retention of said employees by RINGLING, NICKOLAS BERGER has sustained the following damages: medical expenses associated with mental health treatment, inconvenience, insult, mental distress, humiliation, anxiety, emotional pain and suffering, loss of enjoyment of life, economic damages, and other economic or non-economic damages, for which he is entitled to just compensation.

WHEREFORE, NICKOLAS BERGER demands judgment in his favor and against RINGLING for negligent supervision and retention, and seeks compensatory damages, attorneys' fees and costs, and such other relief as this Court deems just and proper under the circumstances.



**COUNT VIII – BREACH OF IMPLIED CONTRACT**
**(against RINGLING by ▌▌▌▌▌ CAITLIN HENNING,**
**LAUREN WILSON, ▌▌▌▌▌▌▌▌▌▌▌▌▌**
**▌▌▌▌, and NICKOLAS BERGER)**

260.    Plaintiffs, ▌▌▌▌▌, Caitlin Henning, Lauren Wilson ▌▌▌▌▌

▌▌▌▌▌▌ and ▌▌▌▌▌▌▌ and Nickolas Berger ("**Count Eight Plaintiffs**") re-

allege and re-incorporate paragraphs 1 to 74, 75 to 89, 110 to 134, 90 to 109, 135 to 154, 155

to 167, 180 to 193, and 168 to 179, including all exhibits thereto, as if fully reinstated herein.

261.    This is an action for damages as a result of a breach of implied contract.

262.    Count Eight Plaintiffs each entered into a contract of enrollment as a student at

RINGLING and accepted RINGLING'S policies and procedures as delivered to them and as

maintained on RINGLING'S website within their respective Student Handbooks, including

*inter alia*, the "Core Values" of respecting "diversity and equity" of the student community,

RINGLING'S promise to provide "a supportive, caring environment," and RINGLINGS'

policies prohibiting discrimination and harassment against students based on their race, origin,

ancestry, disability, and gender.

263.    RINGLING breached this agreement through its deliberate indifference of

SHAFFER'S and other employees' misconduct and discrimination against students identifying

as LGBTQ+, students based on race, disability, invisible disability, and gender, and

SHAFFER'S and other employees' mishandling and misconduct related to student-on-student

reports of sexual assault, sexual harassment, stalking, and threats of violence, and misconduct

and mishandling and inappropriate transmission of students' private information, including

information protected by HIPAA and FERPA.

264.    RINGLING knew or should have known that SHAFFER and other employees

were actively engaging in misconduct and discrimination against students identifying as

LGBTQ+, students based on race, disability, invisible disability, and gender, and mishandling

and misconduct related to student-on-student reports of sexual assault, sexual harassment, stalking, and threats of violence, and misconduct and mishandling and inappropriate transmission of students' private information, including information protected by HIPAA and FERPA.

265.   However, RINGLING did not address or work to prevent the misconduct and discrimination by its employees.  Instead, RINGLING engaged in a cover-up of student and alumni reports of misconduct and discrimination by its employees and agents. RINGLING'S administration worked in tandem with the offending employees and agents to conceal such reports and prevent students, parents, alumni, and former students from coming forward with such reports.

266.   As a result of RINGLING'S breach of its implied contract with Count Eight Plaintiffs, Count Eight Plaintiffs suffered damages including but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, psychological damages, humiliation, physical assault, anxiety, emotional pain and suffering, loss of income or other compensation, loss of employment, and other economic and non-economic damages for which they are entitled to just compensation.

WHEREFORE, Count Eight Plaintiffs demand judgment in their favor and against RINGLING for breach of implied contract, and seek compensatory damages, attorneys' fees and costs, and such other relief as this Court deems just and proper under the circumstances.



**COUNT IX – BREACH OF FIDUCIARY DUTY**
**(against RINGLING by** ████████ **CAITLIN HENNING,**
**LAUREN WILSON,** ████████████
████████ **and NICKOLAS BERGER)**

267.   Plaintiffs, ████████ Caitlin Henning, Lauren Wilson, ████████████
████████ , ████████████ and Nickolas Berger ("**Count Nine Plaintiffs**")  re-allege and re-incorporate paragraphs 1 to 74, 75 to 89, 110 to 134, 90 to 109, 135 to 154, 155 to 167, 180 to 193, and 168 to 179, including all exhibits thereto, as if fully reinstated herein.

268.    As a private, not-for-profit college, RINGLING promoted and marketed itself to Count Nine Plaintiffs as providing its students with a safe, caring and nurturing learning environment wherein Count Nine Plaintiffs could rely upon and trust that RINGLING would provide an environment free of discriminatory practices and serve as a fiduciary to its students.

269.    RINGLING'S promotional and marketing materials state that RINGLING will foster the social development of its student body; that it will not tolerate harassment based on sex, age, gender, color, race, national or ethnic origin, religion, marital status, sexual orientation, sexual identity, disability, veteran status, genetic information, or any other basis prohibited by law; that it will not tolerate amongst its student body any unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is aimed at coercing an unwilling person into a sexual relationship whether or not int involves physical contact, or any sexual harassment that  unreasonably interferes with the student's work or academic performance by creating an intimidating, hostile, or offense environment for learning; that it will not tolerate sexual harassment including attacks, sexual violence, the requesting of sexual favors accompanied by implied or overt threats concerning one's job, grade, letter of recommendation, or similar activities, verbal abuse of a sexual nature, physical contact such as patting,  pinching, or unnecessary touching, subtle pressure for sexual activity, sexist remarks regarding a person's body, clothing or sexual activity, or derogatory comments about a person's sexual orientation; that it conducts Title IX Compliance pursuant to Title IX of the Educational Amendments of 1972; that it conducts Violence Against Women Act (VAWA) Compliance; and that it overall maintains an extraordinarily safe and welcoming campus for students regardless of their race, gender, socioeconomic status, LGBTQ+ identity, and disabilities.

270.    Through its marketing and promotional materials, and its status as a private, not-

for-profit college, RINGLING has a fiduciary duty to its student body to implement appropriate policies and procedures and comply with its own policies and procedures and to maintain a safe and protective environment for its students.

271.   Generally, students, particularly those living in dormitories, rely on colleges for assistance and protection, and colleges are in the best, if not the only, position to assist.

272.   A special relationship exists between a college and its students, meaning that higher education institutions must take steps to ensure students are protected.

273.   College students are comparatively vulnerable to other members of the population at large and are dependent upon their colleges for a safe environment.  Colleges have a superior ability to provide that safety with respect to activities they sponsor and facilities they control.

274.   RINGLING'S policies and procedures and implementation of its day-to day operations result in the vast majority of its students residing in on-campus housing, sustaining themselves on campus dining facilities through their meal plans, relying on RINGLING'S administration and staff to handle and arbitrate all complaints of student-on-student misconduct and protect them from discrimination, and generally relying on RINGLING to provide all of their housing, food, academic, social, and safety needs.  RINGLING'S fiduciary duty is therefore a heightened and special duty owed to its student population.

275.   Count Nine Plaintiffs vested confidence in RINGLING in good faith and accepted this invitation of trust and relied upon RINGLING to provide them with a safe, caring and nurturing environment. As RINGLING'S employee and Associate Dean of Students, SHAFFER invited Count Nine Plaintiffs' utmost trust and confidence as Plaintiff's fiduciary, pursuant to which SHAFFER had a duty to provide Count Nine Plaintiffs with an environment free of discrimination and harassment. Count Nine Plaintiffs had utmost of trust and confidence in SHAFFER and RINGLING as their fiduciary.

276.   RINGLING'S administration, including its employees, faculty, administration, and staff, and including SHAFFER, pursuant to a special relationship between the university administration and its students, had a duty to ensure that the campus environment was safe pursuant to their representations.

277.   With regard to campus safety and the handling of student-on-student reports of misconduct, RINGLING, through unwritten protocol directed SHAFFER to handle all such reports, regardless of whether a Title IX Compliance Officer was in place.  Through unwritten protocol, RAs and Resident Coordinators were directed to send any student with a complaint of student-on-student misconduct directly to SHAFFER, as the Associate Dean of Students for Resident Life.

278.   SHAFFER, along with other RINGLING administration and staff, routinely failed to appropriately handle these reports, failed to appropriately document these reports, failed to discipline students for misconduct, and failed to provide the complaining student with appropriate notice establishing the disciplinary process and notice of the outcome of the disciplinary process.

279.   SHAFFER further, with the knowledge and support of Larry Thompson and Tammy Walsh, among others, engaged in the abuse and mistreatment of RINGLING students and caused numerous breaches of RINGLING'S heightened duty owed to its students, including Count Nine Plaintiffs.   SHAFFER'S conduct and actions, along with other RINGLING employees' conduct, was the proximate cause of the harm suffered by Count Nine Plaintiffs.   Through SHAFFER, RINGLING engaged in a pattern and practice of systematically dissuading student victims who attempted to report their experiences of student-on-student sexual assault, sexual harassment, stalking, and threats of violence from reporting these occurrences.  SHAFFER routinely used manipulation tactics to accomplish the goal of silencing such reports, which is known to cause long-term effects including trauma,

anxiety, and depression.

280.    Alternatively, where students insisted upon reporting student-on-student sexual assault, sexual harassment, threats of violence, violence, and/or stalking, SHAFFER, contrary to his employer's special relationship with its students, ensured that such reports were not appropriately handled by official channels so that no documentation exists.

281.    These actions constitute RINGLING'S breach of its duty to warn the Count Nine Plaintiffs of unsafe conditions, breach of its duty to protect Count Nine Plaintiffs from known hazards, and breach of its duty to report incidences of student-on-student reports of misconduct pursuant to state and Federal law.

282.    As a result of RINGLING'S and SHAFFER'S manipulative tactics, Count Nine Plaintiffs were unaware that their claims were substantiated and valid until they discovered that RINGLING had a habit, pattern, and practice of using manipulation tactics to conceal reports of student-on-student misconduct, that SHAFFER had a pattern and practice of mishandling student complaints and issues, that SHAFFER had a pattern of discriminating against students and student employees based on race, gender, disability, and LGBTQ+ status, based upon their gaining knowledge of other students' negative experiences with SHAFFER and the RINGLING administration on or after June 22, 2020..

283.    As a result of RINGLING'S breach of its special fiduciary duty to Count Nine Plaintiffs, Count Nine Plaintiffs suffered damages including but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, psychological damages, humiliation, physical assault, anxiety, emotional pain and suffering, loss of income or other compensation, loss of employment, and other economic and non-economic damages for which they are entitled to just compensation.

WHEREFORE, Count Nine Plaintiffs demands judgment in their favor and against RINGLING for breach of fiduciary duty, and seek compensatory damages, attorneys' fees

and costs, and such other relief as this Court deems just and proper under the circumstances.

## **PRAYER FOR JURY TRIAL**

Plaintiffs pray for a jury trial on all issues so triable.

Respectfully Submitted,

*/s/ Starlett M. Massey*
Starlett M. Massey
Florida Bar No. 44638
**Massey Law Group, P.A.**
P.O. Box 262
St. Petersburg, Florida 33731-0262
(813) 868-5601 (Tel)
Designated Email:
smassey@masseylawgrouppa.com;
service@masseylawgrouppa.com
**Attorneys for Plaintiffs**



**Megan Rose Ruiz**
@MeganRoseRuiz1                                         ⌄

Since we're talking about dangerous men in art schools...
If you're a woman going to Ringling, or planning on going
to Ringling, stay the FUCK away from Chris Shaffer.

2:36 PM · Jun 22, 2020 · Twitter Web App

ılı View Tweet activity

**2.1K** Retweets    **6.1K** Likes

EXHIBIT A

**derek@lawbernstein.com**

| | |
|---|---|
| **From:** | Chris Shaffer <cshaffer@ringling.edu> |
| **Sent:** | Tuesday, July 28, 2020 1:42 PM |
| **To:** | derek@lawbernstein.com |
| **Subject:** | Fw: An Open Letter To Ringling College |
| **Attachments:** | Stories.pdf |

From: Megan Ruiz <justiceforringlingstudents@gmail.com>
Sent: Wednesday, June 24, 2020 10:34 AM
To: lthompso@c.ringling.edu <lthompso@c.ringling.edu>; Larry Thompson <lthompso@ringling.edu>;
pmcallis@c.ringling.edu <pmcallis@c.ringling.edu>; Tammy Walsh <twalsh@ringling.edu>; twalsh@c.ringling.edu
<twalsh@c.ringling.edu>; Stacey Corley <scorley@ringling.edu>; twagner@c.ringling.edu <twagner@c.ringling.edu>;
djackson@c.ringling.edu <djackson@c.ringling.edu>; jschwart@c.ringling.edu <jschwart@c.ringling.edu>; Jeff Schwartz
<jschwart@ringling.edu>; lmoody@c.ringling.edu <lmoody@c.ringling.edu>; kbeachle@c.ringling.edu
<kbeachle@c.ringling.edu>; Amy Pettengill <apetteng@ringling.edu>; apetteng@c.ringling.edu
<apetteng@c.ringling.edu>; Carl Powell <cpowell@ringling.edu>; cpowell@c.ringling.edu <cpowell@c.ringling.edu>;
Justin Selph <jselph@ringling.edu>; blebras@ringling.edu <blebras@ringling.edu>; edurranc@c.ringling.edu
<edurranc@c.ringling.edu>; Amanda Shurtleff <ashurtle@ringling.edu>; pjawitz@c.ringling.edu
<pjawitz@c.ringling.edu>; whuang1@c.ringling.edu <whuang1@c.ringling.edu>; slederer@ringling.edu
<slederer@ringling.edu>; aleed@c.ringling.edu <aleed@c.ringling.edu>; tjaeger@c.ringling.edu
<tjaeger@c.ringling.edu>; jmumford@c.ringling.edu <jmumford@c.ringling.edu>; hantosze@c.ringling.edu
<hantosze@c.ringling.edu>; dzorn@c.ringling.edu <dzorn@c.ringling.edu>; Samantha Parkinson
<sparkins@c.ringling.edu>; sparkins@c.ringling.edu <sparkins@c.ringling.edu>; kwetherb@c.ringling.edu
<kwetherb@c.ringling.edu>; belmer@c.ringling.edu <belmer@c.ringling.edu>; nnassiff@c.ringling.edu
<nnassiff@c.ringling.edu>; kstroth1@c.ringling.edu <kstroth1@c.ringling.edu>; jdean@c.ringling.edu
<jdean@c.ringling.edu>; gprigers@c.ringling.edu <gprigers@c.ringling.edu>; Curtis Anderson <canders1@ringling.edu>;
kwhite2@c.ringling.edu <kwhite2@c.ringling.edu>; kzeile@c.ringling.edu <kzeile@c.ringling.edu>; Lora Wey
<lwey@ringling.edu>; sborozan@c.ringling.edu <sborozan@c.ringling.edu>; Susan Borozan <sborozan@ringling.edu>;
scritten@c.ringling.edu <scritten@c.ringling.edu>; squaid@c.ringling.edu <squaid@c.ringling.edu>; Dina Sorrentino
<dsorrent@ringling.edu>; dsorrent@c.ringling.edu <dsorrent@c.ringling.edu>; agarling@c.ringling.edu
<agarling@c.ringling.edu>; Miqui Lora <mlora@ringling.edu>; mlora@c.ringling.edu <mlora@c.ringling.edu>;
tmire@c.ringling.edu <tmire@c.ringling.edu>; jslusser@c.ringling.edu <jslusser@c.ringling.edu>; vlynch@c.ringling.edu
<vlynch@c.ringling.edu>; mwaid@c.ringling.edu <mwaid@c.ringling.edu>; Lee Harrell <lharrell@ringling.edu>;
lharrell@c.ringling.edu <lharrell@c.ringling.edu>; jwalsh@c.ringling.edu <jwalsh@c.ringling.edu>; Ruth Chavez
<rchavez@ringling.edu>; Robert Graham <rgraham@ringling.edu>; rgraham@c.ringling.edu <rgraham@c.ringling.edu>;
Dan Greene <dgreene@ringling.edu>; dgreene@c.ringling.edu <dgreene@c.ringling.edu>; aschrein@c.ringling.edu
<aschrein@c.ringling.edu>; Ashley Schreiner <aschrein@ringling.edu>; dstrom@c.ringling.edu <dstrom@c.ringling.edu>;
Cindy Weiss <cweiss@ringling.edu>; pmizak@c.ringling.edu <pmizak@c.ringling.edu>; dmathews@c.ringling.edu
<dmathews@c.ringling.edu>; jgrove@c.ringling.edu <jgrove@c.ringling.edu>; kpegah@c.ringling.edu
<kpegah@c.ringling.edu>; kmiller@c.ringling.edu <kmiller@c.ringling.edu>; ralberts@c.ringling.edu
<ralberts@c.ringling.edu>; Chris Shaffer <cshaffer@ringling.edu>; cshaffer@c.ringling.edu <cshaffer@c.ringling.edu>;
Jekeyma Robinson <jrobinso@ringling.edu>; jrobinso@c.ringling.edu <jrobinso@c.ringling.edu>; Erin Robinson
<erobinso@ringling.edu>; erobinso@c.ringling.edu <erobinso@c.ringling.edu>; Charles Kovacs (ckovacs@c.ringling.edu)
<ckovacs@c.ringling.edu>; Rachel Levey <rlevey@ringling.edu>; Yoleidy Rosario <yrosario@ringling.edu>;
noneil@c.ringling.edu <noneil@c.ringling.edu>; Cynthia Flanagan <cflanaga@ringling.edu>; cflanaga@c.ringling.edu
<cflanaga@c.ringling.edu>; Rew Woodruff <rwoodruf@ringling.edu>; rwoodruf@c.ringling.edu

EXHIBIT ___B___

<rwoodruf@c.ringling.edu>; alcalder@c.ringling.edu <alcalder@c.ringling.edu>; Nancy Long <nlong@ringling.edu>;
cbrantle@c.ringling.edu <cbrantle@c.ringling.edu>; Jessica Nagy <jnagy@ringling.edu>; btrejo@c.ringling.edu
<btrejo@c.ringling.edu>; Candice Johnson <cjohnso2@ringling.edu>; cjohnso2@c.ringling.edu
<cjohnso2@c.ringling.edu>; eramey@c.ringling.edu <eramey@c.ringling.edu>; E Ramey <eramey@ringling.edu>; Trent
Keisling <tkeislin@ringling.edu>; tkeislin@c.ringling.edu <tkeislin@c.ringling.edu>; ppete@c.ringling.edu
<ppete@c.ringling.edu>; ppete1@c.ringling.edu <ppete1@c.ringling.edu>; Susan Saulnier <ssaulnie@ringling.edu>;
ssaulnie@c.ringling.edu <ssaulnie@c.ringling.edu>; hmurray@c.ringling.edu <hmurray@c.ringling.edu>; Lauren Levine
<llevine@ringling.edu>; sguillor@c.ringling.edu <sguillor@c.ringling.edu>; mgarman@c.ringling.edu
<mgarman@c.ringling.edu>; ksobr@c.ringling.edu <ksobr@c.ringling.edu>; jmccampb@c.ringling.edu
<jmccampb@c.ringling.edu>; jcantor@c.ringling.edu <jcantor@c.ringling.edu>; gcgodyck@c.ringling.edu
<gcgodyck@c.ringling.edu>; pdowns@c.ringling.edu <pdowns@c.ringling.edu>; jfarris@c.ringling.edu
<jfarris@c.ringling.edu>; egavin@c.ringling.edu <egavin@c.ringling.edu>; vgorman@c.ringling.edu
<vgorman@c.ringling.edu>; phargrav@c.ringling.edu <phargrav@c.ringling.edu>; dhealy@c.ringling.edu
<dhealy@c.ringling.edu>; sleith@c.ringling.edu <sleith@c.ringling.edu>; smclaugh@c.ringling.edu
<smclaugh@c.ringling.edu>; bmerritt@c.ringling.edu <bmerritt@c.ringling.edu>; gschumer@c.ringling.edu
<gschumer@c.ringling.edu>; hthomson@c.ringling.edu <hthomson@c.ringling.edu>; awelihoz@c.ringling.edu
<awelihoz@c.ringling.edu>; rzeitler@c.ringling.edu <rzeitler@c.ringling.edu>; mjohnso2@c.ringling.edu
<mjohnso2@c.ringling.edu>; palexand@c.ringling.edu <palexand@c.ringling.edu>; bbatters@c.ringling.edu
<bbatters@c.ringling.edu>; shaler@c.ringling.edu <shaler@c.ringling.edu>; cjulian@c.ringling.edu
<cjulian@c.ringling.edu>; dmaulucc@c.ringling.edu <dmaulucc@c.ringling.edu>; vowen@c.ringling.edu
<vowen@c.ringling.edu>; mparry@c.ringling.edu <mparry@c.ringling.edu>; tborst@c.ringling.edu
<tborst@c.ringling.edu>; lfjones@c.ringling.edu <lfjones@c.ringling.edu>; cbyron@c.ringling.edu
<cbyron@c.ringling.edu>; jchamble@c.ringling.edu <jchamble@c.ringling.edu>; eflansbu@c.ringling.edu
<eflansbu@c.ringling.edu>; vsimpkin@c.ringling.edu <vsimpkin@c.ringling.edu>; jfig@c.ringling.edu
<jfig@c.ringling.edu>; ccjones@c.ringling.edu <ccjones@c.ringling.edu>; nskiles@c.ringling.edu
<nskiles@c.ringling.edu>; esziksz@c.ringling.edu <esziksz@c.ringling.edu>; mwyshock@c.ringling.edu
<mwyshock@c.ringling.edu>; Jennifer Jones <jjones@c.ringling.edu>; vrandall@c.ringling.edu
<vrandall@c.ringling.edu>; mjanssen@c.ringling.edu <mjanssen@c.ringling.edu>; trobenal@c.ringling.edu
<trobenal@c.ringling.edu>; mwoolver@c.ringling.edu <mwoolver@c.ringling.edu>; walhadad@c.ringling.edu
<walhadad@c.ringling.edu>; scarroll@c.ringling.edu <scarroll@c.ringling.edu>; ddannell@c.ringling.edu
<ddannell@c.ringling.edu>; egingric@c.ringling.edu <egingric@c.ringling.edu>; jjobst@c.ringling.edu
<jjobst@c.ringling.edu>; rlonchar@c.ringling.edu <rlonchar@c.ringling.edu>; mmurphy@c.ringling.edu
<mmurphy@c.ringling.edu>; mphillip@c.ringling.edu <mphillip@c.ringling.edu>; crodrigu@c.ringling.edu
<crodrigu@c.ringling.edu>; rbates@c.ringling.edu <rbates@c.ringling.edu>; jbleitz@c.ringling.edu
<jbleitz@c.ringling.edu>; kelam@c.ringling.edu <kelam@c.ringling.edu>; aharriso@c.ringling.edu
<aharriso@c.ringling.edu>; dhiggins@c.ringling.edu <dhiggins@c.ringling.edu>; pjohnson@c.ringling.edu
<pjohnson@c.ringling.edu>; mreilly@c.ringling.edu <mreilly@c.ringling.edu>; jambrose@c.ringling.edu
<jambrose@c.ringling.edu>; ycampbel@c.ringling.edu <ycampbel@c.ringling.edu>; bcarlock@c.ringling.edu
<bcarlock@c.ringling.edu>; sgordley@c.ringling.edu <sgordley@c.ringling.edu>; kbetz@c.ringling.edu
<kbetz@c.ringling.edu>; aboard@c.ringling.edu <aboard@c.ringling.edu>; dbrandes@c.ringling.edu
<dbrandes@c.ringling.edu>; mcaloiar@c.ringling.edu <mcaloiar@c.ringling.edu>; tcasmer@c.ringling.edu
<tcasmer@c.ringling.edu>; rdunnick@c.ringling.edu <rdunnick@c.ringling.edu>; jfoster@c.ringling.edu
<jfoster@c.ringling.edu>; dgardner@c.ringling.edu <dgardner@c.ringling.edu>; shenders@c.ringling.edu
<shenders@c.ringling.edu>; jherzog@c.ringling.edu <jherzog@c.ringling.edu>; djuengel@c.ringling.edu
<djuengel@c.ringling.edu>; jmartin2@c.ringling.edu <jmartin2@c.ringling.edu>; mmarsica@c.ringling.edu
<mmarsica@c.ringling.edu>; imirochn@c.ringling.edu <imirochn@c.ringling.edu>; smurray@c.ringling.edu
<smurray@c.ringling.edu>; operez@c.ringling.edu <operez@c.ringling.edu>; gpratt@c.ringling.edu
<gpratt@c.ringling.edu>; cprochno@c.ringling.edu <cprochno@c.ringling.edu>; asnyder@c.ringling.edu
<asnyder@c.ringling.edu>; kspirdus@c.ringling.edu <kspirdus@c.ringling.edu>; jthiel@c.ringling.edu
<jthiel@c.ringling.edu>; rzomchek@c.ringling.edu <rzomchek@c.ringling.edu>; davant@c.ringling.edu
<davant@c.ringling.edu>; kcundiff@c.ringling.edu <kcundiff@c.ringling.edu>; odomingu@c.ringling.edu
<odomingu@c.ringling.edu>; kkarussi@c.ringling.edu <kkarussi@c.ringling.edu>; mmyers@c.ringling.edu

<mmyers@c.ringling.edu>; gbarker@c.ringling.edu <gbarker@c.ringling.edu>; hsoileau@c.ringling.edu <hsoileau@c.ringling.edu>; sstrenk@c.ringling.edu <sstrenk@c.ringling.edu>; efreeber@c.ringling.edu <efreeber@c.ringling.edu>; bolivare@c.ringling.edu <bolivare@c.ringling.edu>; bmarini@c.ringling.edu <bmarini@c.ringling.edu>; jeleazer@c.ringling.edu <jeleazer@c.ringling.edu>; snam@c.ringling.edu <snam@c.ringling.edu>; amoore2@c.ringling.edu <amoore2@c.ringling.edu>; echeetha@c.ringling.edu <echeetha@c.ringling.edu>; palfano@c.ringling.edu <palfano@c.ringling.edu>; dbrodeur@c.ringling.edu <dbrodeur@c.ringling.edu>; jdonalds@c.ringling.edu <jdonalds@c.ringling.edu>; ngaffney@c.ringling.edu <ngaffney@c.ringling.edu>; jgreenle@c.ringling.edu <jgreenle@c.ringling.edu>; drinaldi@c.ringling.edu <drinaldi@c.ringling.edu>; jtaffet@c.ringling.edu <jtaffet@c.ringling.edu>; mwilliam@c.ringling.edu <mwilliam@c.ringling.edu>; gclark@c.ringling.edu <gclark@c.ringling.edu>; tcarabas@c.ringling.edu <tcarabas@c.ringling.edu>; wkline@c.ringling.edu <wkline@c.ringling.edu>; nmccleaf@c.ringling.edu <nmccleaf@c.ringling.edu>; csaah@c.ringling.edu <csaah@c.ringling.edu>; dchismar@c.ringling.edu <dchismar@c.ringling.edu>; cbruner@c.ringling.edu <cbruner@c.ringling.edu>; ncaron@c.ringling.edu <ncaron@c.ringling.edu>; rdakan@c.ringling.edu <rdakan@c.ringling.edu>; sdoll@c.ringling.edu <sdoll@c.ringling.edu>; jaleen@c.ringling.edu <jaleen@c.ringling.edu>; ghilltho@c.ringling.edu <ghilltho@c.ringling.edu>; ckeener@c.ringling.edu <ckeener@c.ringling.edu>; cmougali@c.ringling.edu <cmougali@c.ringling.edu>; trice@c.ringling.edu <trice@c.ringling.edu>; trumage@c.ringling.edu <trumage@c.ringling.edu>; dsteilin@c.ringling.edu <dsteilin@c.ringling.edu>; rvcleave@c.ringling.edu <rvcleave@c.ringling.edu>; cwilson@c.ringling.edu <cwilson@c.ringling.edu>; swhitma1@c.ringling.edu <swhitma1@c.ringling.edu>; jcondor@c.ringling.edu <jcondor@c.ringling.edu>; djacobs@c.ringling.edu <djacobs@c.ringling.edu>; nmarinov@c.ringling.edu <nmarinov@c.ringling.edu>; cnank@c.ringling.edu <cnank@c.ringling.edu>; anazaria@c.ringling.edu <anazaria@c.ringling.edu>; rrocklei@c.ringling.edu <rrocklei@c.ringling.edu>; mseguin@c.ringling.edu <mseguin@c.ringling.edu>; aboyes@c.ringling.edu <aboyes@c.ringling.edu>; bbozzone@c.ringling.edu <bbozzone@c.ringling.edu>; mdahlen@c.ringling.edu <mdahlen@c.ringling.edu>; sdvalle@c.ringling.edu <sdvalle@c.ringling.edu>; vdemers@c.ringling.edu <vdemers@c.ringling.edu>; sderfler@c.ringling.edu <sderfler@c.ringling.edu>; bdienes@c.ringling.edu <bdienes@c.ringling.edu>; eeichenb@c.ringling.edu <eeichenb@c.ringling.edu>; bgentry@c.ringling.edu <bgentry@c.ringling.edu>; kgoddard@c.ringling.edu <kgoddard@c.ringling.edu>; yjackson@c.ringling.edu <yjackson@c.ringling.edu>; lkennedy@c.ringling.edu <lkennedy@c.ringling.edu>; chenders@c.ringling.edu <chenders@c.ringling.edu>; bkosanov@c.ringling.edu <bkosanov@c.ringling.edu>; apalmer@c.ringling.edu <apalmer@c.ringling.edu>; hpizzurr@c.ringling.edu <hpizzurr@c.ringling.edu>; rprzekwa@c.ringling.edu <rprzekwa@c.ringling.edu>; gschudel@c.ringling.edu <gschudel@c.ringling.edu>; cruffner@c.ringling.edu <cruffner@c.ringling.edu>; jsimmon2@c.ringling.edu <jsimmon2@c.ringling.edu>; jsmith@c.ringling.edu <jsmith@c.ringling.edu>; csparrow@c.ringling.edu <csparrow@c.ringling.edu>; jvreelan@c.ringling.edu <jvreelan@c.ringling.edu>; awatkin2@c.ringling.edu <awatkin2@c.ringling.edu>; manderso@c.ringling.edu <manderso@c.ringling.edu>; cbloomer@c.ringling.edu <cbloomer@c.ringling.edu>; rcody@c.ringling.edu <rcody@c.ringling.edu>; pfiore@c.ringling.edu <pfiore@c.ringling.edu>; mfoltz@c.ringling.edu <mfoltz@c.ringling.edu>; nhervieu@c.ringling.edu <nhervieu@c.ringling.edu>; dhood@c.ringling.edu <dhood@c.ringling.edu>; skaplan@c.ringling.edu <skaplan@c.ringling.edu>; plindhar@c.ringling.edu <plindhar@c.ringling.edu>; Kathleen List (klist@c.ringling.edu) <klist@c.ringling.edu>; rmelvill@c.ringling.edu <rmelvill@c.ringling.edu>; anovak@c.ringling.edu <anovak@c.ringling.edu>; esamuels@c.ringling.edu <esamuels@c.ringling.edu>; rstanton@c.ringling.edu <rstanton@c.ringling.edu>; staft@c.ringling.edu <staft@c.ringling.edu>; mweiler@c.ringling.edu <mweiler@c.ringling.edu>; jwilliam@c.ringling.edu <jwilliam@c.ringling.edu>; michael3100@icloud.com <michael3100@icloud.com>; Rosemary Oberndorf <roberndorf@gmail.com>; Ali Bahaj <srqbahaj@gmail.com>; smp9951@gmail.com <smp9951@gmail.com>
**Subject:** An Open Letter To Ringling College

Dear Ringling College of Art and Design,

We, the students and alumni of Ringling College of Art & Design formally and publicly request an investigation into Christopher Shaffer, Dean of Students, for alleged misconduct, intimidation, blackmail, negligence, and abuse of power. When individual students have reported in the past, our voices have been ignored. We have taken it upon ourselves to

collect 30 reported incidents where Mr. Shaffer has acted inappropriately in his position as Dean of Students for your review. These are just some of the reports we have gathered over the course of twenty-four hours, showing only a small sample of the abuse from Mr. Shaffer to the student body.

As Dean of Students, it is his job to oversee, aid, and support the student population of Ringling College. Mr. Shaffer has allegedly blackmailed students, ignored stalking reports, dismissed sexual assault allegations, belittled students and parents alike, dismissed safety concerns, forced people to quit their jobs in Resident Life, broken HIPAA laws and overall treats individuals with the least amount of respect and sympathy possible.

Ringling College must provide a safe environment for the students. The school has not only failed this but also has failed to report such cases. Whether the reports didn't make it to the proper channels or were simply swept under the rug, what has happened is an egregious mishap on the school's part. People have reported stalking and dating violence to Mr. Shaffer. According to the school's 2019 Annual Security and Fire Safety Report published in September 2019, the years 2016, 2017, and 2018, report zero cases of domestic violence or stalking. This is false information to incoming students who believe that Ringling is a safe campus and a violation of Title IX.

There is a very public conversation among art college students right now. Students from these art schools have publicly called out faculty who have abused positions of power and are still employed at these institutions. This conversation sparked remarks about Ringling Faculty. There are a lot of eyes on this situation. The actions and lack of accountability regarding Chris Shaffers' misconduct reflect not only on him but on the entirety of Ringling's leadership. Countless students and alumnis have shared their encounters with Mr. Shaffer online. One online post, specifically, has thousands of interactions. It has already reached incoming and prospective students.

 **Megan Rose Ruiz**
@MeganRoseRuiz1

Since we're talking about dangerous men in art schools…
If you're a woman going to Ringling, or planning on going
to Ringling, stay the FUCK away from Chris Shaffer.

2:36 PM · Jun 22, 2020 · Twitter Web App

View Tweet activity

**2.1K** Retweets   **6.2K** Likes

The PDF attached contains just a fraction of the reports of misconduct students and alumni have had with Mr. Shaffer and administration. Other reports have been made confidentially to us because students and alumni are afraid to come forward with their stories. Alumni who have already graduated do not want to relive the trauma they've faced because of Mr. Shaffer and lack of action from the school. It's simply unacceptable on how long this has happened and we want to ensure future students are safe.

We expect a timely response and public apology. We will not let these reports be silenced, like many of these reports have been in the past. We hope it will not resort to this, but we will be going to the media and newspapers with stories if there isn't a timely response to these allegations.

After reviewing the repeated offenses and complete abuse of power by Chris Shaffer over the course of his career, as well as the negligence from HR and the school, we ask that:

…A direct apology from the school and Christopher Shaffer publicly issued to all the current students and alumni.
…There needs to be a priority of helping students who are reporting, over stamping out reports before they rise up to bosses and employers. Dr. Tammy Walsh was looped into many of these incidents, only for it to be ignored. Students have been failed time and time again.
…There must be immediate changes to the written policy to prevent anyone else from committing the harassment,

intimidation and overall abuse of power.

...There must be more training in place for pro staff in the areas Chris failed to take seriously. (ie; sexual harassment, gender issues)

...Legal advocates must be provided for students in HR whose sole job is to protect students from the school and not the other way around.

...The public reporting system must be updated. Public reporting from previous years needs to be altered to reflect the real number of students coming forward about sexual assault, stalking, dating violence etc.

...Christopher Shaffer must be held accountable for his actions throughout his career at Ringling College of Art and Design.

...and finally Christopher Shaffer must be fired for his repeated history of negligence, abuse of power, and putting the students he is supposed to protect in danger.

Please read the stories submitted by Ringling Students, parents, Alumis, and previous Ringling employees.

Anonymous

Class Year: 2017

*"My freshmen year in Goldstein (2013) my roommate vindictively put all of my information on Craigslist under an ad for a prostitute. My name, my picture, my phone number, where I would be on campus and how I would "be ready for sex at any given time...just come up to me!" I had dudes calling me saying they were on campus trying to find me and sending me pictures trying to schedule time with me. I called the police and Chris Shaffer immediately shut that down. He knew I was a survivor of sexual assault and the fact that local men knew where to come find me for sex...he didn't seem to care much about. He said "this is what kids these days do!" And proceeded to berate me about how I wasted his time and the police's time. She faced no punishment and I wasn't given any peace of mind. I knew after that, that Chris Shaffer doesn't care about students and doesn't care about women.*

*Also...the last time I had any sort of interaction with Shaffer was when Katrina Stapleton and I were planning a Take Back The Night on campus (a candlelight vigil for sexual assault survivors, an information session and school counselor help). Shaffer told us that this was a "stupid idea" and that no one would come or care. We also tried to get a whole section on consent added to the freshmen orientation and he refused. Ringling has a BIG problem with campus sexual assaults and I have never heard ONCE that the victims have gotten retribution or support. Chris seems to think that because it's an art school with no fraternities that there are no sex crimes or sexual predators. He needs to be removed. There's no more room under the rug for anything else to be swept there.*

*For the first instance my mom and I talked to JJ, Campus security and Tammy. The second time Tammy knew and the counseling center knew.*

*Students do NOT feel safe around him or with him as the person they're supposed to go to with problems. Things have to change."*

Anonymous

Class Year: 2017

"*[Redacted] was a freshman living on the 4th floor of the freshman residence building. There was a pretty tight knit group of people that lived on the left wing that was much smaller than the other halls. We'd often leave our doors open when we were all hanging out together. Somewhere around 9/13/2013 after classes, we were all hanging around casually. I had made several remarks already about being tired and probably going to bed early. [Redacted] had asked me for some help in photoshop since I was already proficient in it before coming to Ringling. We went into his room, I sat on his desk chair and guided him through the help. Afterwards, he sat down on the chair but I was already sitting with my feet on the chair, sorta hugging my knees. I'm a very small person so there was technically still room for him and he sat on my toes. I'd told him, again, that I was feeling tired and that I'm trying to wrap this up so if he's satisfied with the help then we're good. He nods, gets up, and I head to my room. He followed me out of his room, which I thought was normal, a fair amount of people were still up and hanging out. He then followed me into MY room, which, had I been the person that I am now, I would have told him to back the fuck up and go away. But I didn't, I didn't want to be rude. We end up talking about normal things, school and video games probably, while sitting on my bed. I don't remember exactly what it was. I eventually fell asleep briefly. I woke up to his hand in my pants, in my underwear, and touching me. His fingers didn't penetrate me but I'm sure they would have if I hadn't woken up and started frantically saying "no." I didn't yell it at him but I remember saying "no" maybe 15 times in a row. He awkwardly got off my bed, complimented a poster I had hanging up, and then left the room. I told my fellow neighbors the following night and they all urged me to tell our RA. I told her, I was directed to go to Chris Shaffer. I went to Chris Shaffer. He asked me what I wanted done and I said I just wanted him to be moved to another floor so I wouldn't have to run into him. Chris informed me that he's not allowed to move anyone unless I file a case against him and take it up the ladder. I did this, I filed a report, got the campus security involved, I was sat down in a room at a big round table with probably 8 other people.*

*The only names I remember that were there was the head of security whitehead something maybe? Tammy Walsh, and Chris Shaffer. I had printed out screenshots of [redacted] ADMITTING to what he did and Chris still belittled me and asked me invasive and blaming questions like "were you on drugs?" (spoiler alert: I wasn't.) They took my statement. As I left, I saw [redacted] with his parents and TWO lawyers go into the room to "tell his side." He got off with absolutely 0 repercussions and there isn't any record of this meeting taking place. "*

Anonymous

Class Year: 2022

*"I have three, separate but related events.*

*On the morning of February 24th, 2020, I received an email (which I attached to this form) from Chris Schaffer asking me to come into his office at 11:30 am. He had also emailed several other members of the RA staff to meet him at the same time, but emailed us all individually. I only found out other RAs were called down as well after reaching out to them. There were 5 RAs present during this meeting (Myself included) During this meeting, he had discussed with us emails that we had sent in to either Patricia Pete or Trent Keisling regarding accommodations not being met for a then member of our staff, [redacted]. He asked if [redacted] had asked us to send these messages, to which we all said no. [redacted] had never asked us to send in emails, she did know about them and said that if we felt strongly we could, but she never campaigned or forced us to send anything. Chris asked us what our thought process was and when we explained he consistently ignored what we were saying, comparing [redacted]'s life threatening allergies to being Kosher or being a vegetarian, suggesting that her not eating dairy was a choice. He went on about how we treat working with freshmen as a punishment, and how us as RA's are placed where we are so that we have the ability to grow. When I confronted him with the fact that while unhappy with being assigned to Goldstein hall, I had still specifically asked to be placed with freshmen and recognized that I was hired for a job and just a spot in a specific residence hall, he seemed content. I then asked why, if our main goal as RA's was to grow and*

*learn new skills, I was placed in the same building for a second time in a row, he told me he was unable to answer that as he was not the one who made the decision. He then asked where all of us had been placed for the 2020-2021 school year. After he found out where we had been placed, he asked if any of those assigned to apartment-style housing would be willing to switch places with her, he appeared surprised when an RA, (name omitted), told him she had offered to switch weeks ago. When she asked why he wouldn't allow it, he said that it had never been brought forward to him and that now it was much too late.*

*On the night of February 24th, and the morning of February 25th, 2020, Chris Shaffer spoke to myself and a group of students about  one of my residents who had been taken into custody of the police under the Baker Act. To my knowledge Chris was not present during the majority of the incident, rather arrived shortly after the student was taken into police custody, but both myself and the students involved had witnessed the entire event. Before Chris spoke with us, an officer of the Sarasota Police spoke with myself and the students involved. The Police officer we had spoken to told us that the student had been 'Baker Act'd', and explained what that meant.  When asked, he told us that he was unable to tell us which facility the student was going to or when he would be released due to HIPAA.*

*During our discussion with the group of students, one of them asked if it would be okay for her to skip class in the morning. Chris then made a comment regarding the level of 'drama' with our generation, and how this is not an excuse to skip class. Chris also made a remark about how this student would be taken somewhere where he could be put in a 'straight jacket and padded room' if needed. This comment was completely unprovoked. At this time, Chris also informed us that the student would be taken to 'one of two places', and that he could not give any more information regarding his release or specifics about where he had gone, again due to HIPAA. There were 5 freshmen students in the room, myself, and Trent Keisling. At the time of these statements, nobody had said anything in rejection. I chose not to stay quiet as I believed Chris was already annoyed with me due to the nature of my meeting with him earlier that day, and I did not want for my concern to be mistaken as disrespect and consequently be fired for insubordination.*

*On February 26th, 2020, during a debriefing about the events that had taken place on the night of the 24th and morning of the 25th, Chris Schaffer stated that he believed the student who had been Baker Acted was 'Pathetic' and that he felt sad for him. I chose not to respond to this comment. He again brought up the level of 'Drama' in the situation, to which I responded by saying that I didn't believe drama was the correct word to address this situation. He did not take my comment into account, again referring to the situation as being dramatic.*

*It was also during this meeting that Chris Schaffer informed me of the facility the student was brought to, what day he would be released, and information regarding the whereabouts of his family. This directly contradicted what he had told me and the rest of the students involved on the night of February 24th into the morning of February 25th.*

*I was told this information after I asked what day the dean's panel would be held and when or if the student would be returning to pick up his things. I did not ask where the student had been taken because I knew that with HIPAA, he could not tell me. The people present during this time were myself, Chris Schaffer, Patricia Pete, and Trent Keisling. I chose not to discuss the nature of this information being disclosed to me, as well as correct Chris Schaffer on his HIPAA violation in fear of it being interpreted as disrespectful and terminated for insubordination.*

*I was warned about Chris by other women on the RA staff after working for only a month. I was told that if he ever called me into his office, make sure to have another person in there with you. He is consistently disrespectful to his student employees and his behavior is unacceptable. Chris constantly holds our jobs over our heads, and loves reminding the RA staff that in the state of Florida, you can be fired and your employer doesn't have to tell you why. He has not once ever spoken about his job in a way that would make me believe he actually likes doing it. "*

Anonymous

Class Year: 2022

*"As an incoming RA in the spring of 2019 I alerted the RA coordinators to my deathly food allergies during my final interview, and informed them that the safest way for me to eat would be to have my own personal kitchen. I was placed as an RA in houses in part due to this. When I accepted the position for my second year, what would be 2020-2021, I requested only housing that had kitchens. When I found out that I was placed in Goldstein, dorms that had no private kitchens, I requested a meeting with my supervisor Trent Kiesling to bring up my concerns and request to be switched anywhere with my own kitchen. What followed was being strung along and gaslighted from multiple pro staff members, I was sent in circles between Patricia Pete and Trent Kiesling, to Claire in accommodations, to the kitchen staff, to Chris Schaffer. In my meetings with Chris my concerns were dismissed and belittled. He compared my DEATHLY food allergies to being vegan, he implied I was simply being picky. He dismissed me when I told him about a previous allergic reaction I had due to Hammonds and acted as if I was being dramatic. I was told I would not be a good RA if I didn't eat at hammonds or comply. He said I wasn't being grateful for my position and I would not be moved from housing placement because it would not be fair to those who were already placed, despite people volunteering to switch with me. I provided documentation from an allergist reiterating the severity of my allergies and necessity of my own kitchen (something I legally did not have to provide). I showed him the scar from when I got a tracheotomy due to a near deadly allergic reaction, he still dismissed my safety concerns with my housing placement. I jumped through the numerous circles that were set up and at the end of it I was told I would not be moved, I could either stay in a housing placement that put my life at risk daily or quit. Every meeting I left with Chris left me feeling intimidated and unsafe. I was told I was a problem. This man does not take the safety concerns of the students who pay his bills and run his department seriously, and should not be in a position of such power. I was targeted, bullied, and discriminated against by Chris Shaffer. "*

Anonymous

Class Year: 2019

*It was move in day last year, so this took place on August 21, 2019. I didn't know where my dorm was located. I went into the housing office in Goldstein and Chris Schaffer was there. I asked him where my dorm was and he said "You realize you're the only person who's come in here and asked me that question?" I said, "I know, but I don't know where to go." I continued to ask where my dorm was, but he interrupted me again and again and repeated both: "You realize you're the only person who's come in here and asked me that question?" and "But DID you read the email I sent?" I believe that this email was sent the day before, but I had been packing the whole day. My mom stepped in and he started speaking slowly to us the way an adult would speak to a child. We considered this offensive because we are Hispanic and my mom has an accent when she speaks English. He told my mom what was going on from his perspective and painted me as irresponsible, when my mom had actually overheard the conversation and knew this wasn't true. For some reason, instead of sending me to my dorm, he told me to go through the back exit where there was some construction going on at the time. I withdrew from Ringling after a couple months into the first semester, so I am no longer a student.*

Anonymous

Class Year: 2018

*"During my Junior year I began to have issues with a fellow student that seemed to be stalking me, constantly trying to "hang out" with me. I was in a long distance relationship at the time, and things got hostile when I started to receive very inappropriate messages sent to me anonymously on social media, making comments about my boyfriend and I as well as just blatant attacks on my character. I spoke with other students and also IP tracked who was visiting my social media at the time the messages were being sent and it came up as being accessed by the phone of the student who had been stalking me.*

*I believe I first brought this up with a friend at the time of whether I should speak to the RA of my building, and was told to go directly to Chris instead as the school had a zero tolerance policy for harassment. I presented the events to Chris as well as the evidence I had gathered, and was told that "if this was a Florida court, this wouldn't hold" or something similar. I was also told that since there was no threat against my safety, and that my work in classes did not seem to be negatively affected, there was nothing that could really be done. I was told that I could either "deal with it myself" or that Chris could bring the student in to "have a talk with him", but I felt that this would just make things worse for me if there wasn't going to be official action taken by the school, and I felt like I was being encouraged to simply take the matter into my own hand. I and later my new boyfriend who was also a student ended up having more problems with the stalker even after graduation, when my boyfriend said he felt he had had a tracker placed onto his phone. We both cut off the stalker and blocked him everywhere, and we have not spoken about him since shortly after graduation. In the end, there was no action taken officially by the school, which may partially have been my fault, but I felt encouraged to "deal with the problem myself" even when I provided evidence at the meeting when I tried to file a report of harassment".*

Anonymous

Class Year: 2017

*"My roommate and I had gone to Chris Shaffer for help with a roommate situation dealing with an accommodation. Our other two roommates had stopped talking to us, ignoring us right in front of them, and refused to clean any of the dishes they used and we had no idea why. The RA couldn't fix it so we went to Chris as a final help. It's been a while so I can't fully remember what was said, but Chris made me cry. I have type 2 bipolar and ptsd which I had been diagnosed since 2009, treated for by psychs with medications... and so when I apologized for my uncontrollable crying because of the disability he said "there's no such thing it's just feelings." My roommate comforted me and told him that's not true??? We didn't go in there to talk about my disability yet he decided to sit there and berate me about how my "girl feelings are just mood*

*swings". I went to my father who dealt with him and I never spoke to him again. Even before the confrontation in 2017, he had always been rude and dismissive about my problems. He doesn't care, and should not have the power to make disability choices. For me to bravely tell him I had a disability and was trying to explain myself he tells me it's all in my head... As soon as my father talks to him he is nothing but friendly and avoids interactions with me... luckily I graduated that year."*

Anonymous

*"Multiple events, where Chris threatened my daughter and other students by blackmailing them when they needed assistance with something. He uses video and other information he collects to hold over the student's head when they have a Res Life issue. He threatened legal action and terrorized several students inappropriately a few times that I am aware of. I have multiple events and can document them all. I need to get permission, as I am the mother of a student and do not want to disclose personal information about my daughter nor the other students until I am sure the information is confidential and I have permission to do so. My daughter's very first day moving in her first year, he stepped up behind me inappropriately close ,and breathed down my neck and asked what was up. I whipped around and asked who the hell are you? I think he thought I was a student. Not a parent. He found out quickly he was mistaken. That day he was unprofessional and every single encounter since has been as inappropriate as the first. I have repeatedly reported these actions. I will be happy to further elaborate I just need to ensure privacy for students involved as it also involves a student with disability. He was very demeaning and eluded to me not respecting him when I was seeking housing for my daughter, he said I was 'asking for a favor' from him and talking to him inappropriately, which I was not at all. I informed him his control of us was not a favor and I pay for my daughter to attend that school and for housing. He seems to be a narcissist and loves to control with his power and it breaks my heart. I told my daughter to never be alone with him from the very beginning. I have been known to drive over to Larry Thompson's office to settle issues. I have no problem doing it again. I am highly concerned this man is dangerous to the girls. It also appears most complaints are from girls. This is a very concerning issue, the previous times I have addressed it no action was taken*

*that I am aware of. Except to solve my immediate issue with housing, as far as discipline I am*
*not aware of any. I did inform the president's office I refuse to deal with him further quite some*
*time ago. I also have some emails documenting some of this. Something needs to be done. If I*
*can update this file I will. Or please let me know how I can help further.*

*[I reported this to] Larry Thompson."*

Anonymous

Class Year: 2020

*" I have a few:*

*1: a head RA had a fake gun in his room and made multiple videos showing it off in his dorm.*
*When I reported, they did nothing about it and proceeded to tell the RA that I informed them*
*even though it was supposed to be confidential to prevent retaliation.*

*2. When I was a sophomore I had a class run by the school that interfered with RA training.*
*When I went to Chris about it he would not stop trying to tell me to drop the class that I spent*
*money on and continuously told me I was going to lose my job. And made me do extra even*
*though our contracts specifically state that school work comes first.*

*3  Not only that, but I have a panic disorder that can make me more emotionally Vulnerable in*
*stressful situations and he continuously exploits that by verbally berating me and getting into my*
*face.*

*4. I had a person at the school harassing at my dorm as an RA and when i had a meeting with*
*him, he made it a non problem because i "didnt know for sure who it could be/ it could be*

*multiple people" and questioned my integrity and even with my proof of who did it further down the road no action was taken or moved to the correct people.*

*5 On multiple occasions I have seen and heard him try to discredit the population of the school by making remarks that are "read between the lines" in a derogatory way towards students.*

*I reported to RA coordinators and nothing followed"*

Anonymous

Class Year: 2020

*"As a former RA, we were asked to stay back a few days every year before summer let out, to help close up the campus. As campus was closed, so would our dining halls. I was told by a head RA at the time that Chris had said that he'd run and buy groceries for us; I was under the assumption these groceries would be large, multiple day meals (for example, spaghetti) to be made by RA's. When I reached out, just confirming if this were the case, he hesitated at first, asking if I was hungry. I responded, "I will be over the next few days, as things are closed." I was then asked, verbatim: "are you poor?". It felt extremely disrespectful and out of place. Money shouldn't have been brought up at all. I simply asked for clarification on our food situation. Since RAs had been fed by Prostaff during training/closing campus previously, I didn't think I was out of line."*



Class Year: 2021

"When my room mate and I were looking at housing, we had found registered sex offenders in the same complexes as some housing. We went to JJ and Chris Shaffer at the time to express our concern. We were told that 'They could've been registered for a 'stupid' reason' or 'That doesn't mean they're going to offend again'. our concerns were totally blown off and they even sided with sex offenders."

Anonymous

Class of 2020

"When I returned to campus on a Friday after the short hurricane Irma break, the first day they said we could come back, both my father and I were told that my building wasn't going to get

*power until Monday at the earliest and that the school wasn't back on the grid and without power when they informed everyone to return to campus. He then told us that I would have to find someone's couch to sleep on or I was going to be sleeping on the couches in Ulla. The entire situation was ridiculous and I ended up driving back home, luckily for me my house is roughly two hours from the school but I do know that other people struggled to find a place so they just stayed in the building."*

Anonymous

*"While living on campus I was asked to relocate from a residence hall to one of the campus houses. The house was under construction and I had to wait for it to be completed. When it was "completed" I was rushed by housing to move out of my space and into the new space. When moving I noticed that the place didn't seem finished to the point where I even had facilities come in unannounced while I was sleeping and told me they didn't think anyone lived there yet because it wasn't finished. I sent an email to Tammy Walsh, Chris Shaffer, and facilities listing numerous issues with the property including a lack of fire alarms. Facilities came and addressed one or two of the minor issues, but otherwise my complaints went ignored. A few weeks later my AC cut out. Facilities was called and I was told that the outside wiring of the house was so old, bad, and stripped that the house could have caught on fire at any moment. The house had to be cut off from the city grid so that the entire place could be safely re-wired. I was moved into a vacant space on campus and even that was treated like an inconvenience even though I had warned everyone that the house hadn't seemed to be ready. When I was able to move back in there were still no smoke/carbon monoxide alarms. I bought my own and took them with me when I moved. As far as I know the house may still not be completely finished.*

*[Reported to] Chris Shaffer, Tammy Walsh, Facilities...only received an email response from facilities"*

Anonymous

*Class Year: 2020*

*I became an RA in my sophomore year. I had heard reports from mostly female staff members that Shaffer was rude and condescending and to avoid him. I took what they said into consideration, but tried to wait before I passed judgment. In my sophomore year as an RA, I flew under the radar any chatter (since I hadn't witnessed it firsthand) I mostly ignored. The summer between my sophomore and junior year, I worked at Pre College. During that summer, I was made aware of a student that was facing homelessness. I'm not reporting Mr. Shaffer for not helping the student. That isn't the issue at hand. The problem is when we met in his office for what should have been a 15-minute meeting (I had another meeting with a Pre College resident who was feeling depressed about their home life and wanted to talk) lasted for over an hour. I remember it lasted so long because I had to check my phone and then message them that I would have to reschedule our meeting. During the meeting with Mr. Shaffer, he broke HIPPA laws several times. He disclosed things about the student I was helping that I did NOT know. The whole conversation was very berating and degrading, and I didn't even face the brute of it and still felt extremely uncomfortable. During the meeting, he threatened both our jobs. We were told if we talk ill about ResLife that we would be fired. We were told if we told anyone about the back three (Residential Housing Buildings) being torn down despite still placing the incoming freshmen there, we would be fired (even though he told the whole Pre College staff this during training). At one point, I looked over to the staff member who was also present (Kristin), and she couldn't make eye contact with us. I've blocked out most of the experience because it was humiliating and degrading. I then became fearful that I could lose my job if I spoke up anymore about anything or did anything Mr. Shaffer perceived as speaking out negatively. The RA that I was with who had their job threaten was a good RA who did her job. But the fear that being good wasn't enough stayed in the office. I left that meeting wholly shaken. Kristin approached me after the meeting and told me to take the day off for myself and to get off-campus. I met with the other RA in the bathroom. It was clear she was having an emotional breakdown and was crying. We hugged after sharing a horrible experience like the one we just had. I left campus for a bit soon after the incident because I didn't want to be anywhere near campus or ResLife. I had*

*time to reflect on the comments I had heard during my sophomore year as an RA. He would make comments about students being trans or on the autism spectrum. He would make comments about students having disciplinary issues. He would make these comments and then say, "This stays between us" to a room full of RAs.*

*Just because we were RAs, we still should not have known students' private information without their knowledge. We signed a contract during my sophomore year, stating that we would like to return as RAs for the next year. Then after the incident during Pre College, we signed another contract that stated we would only speak positively about both the school and reslife. I kept my head down in my junior and senior years because, again, I was afraid for my job. I would report some things (another RA posted a prop gun on his Instagram, but nothing was done). The silver lining of COVID is I got out of that toxic environment sooner than planned. I could not go into his office after being berated for over an hour for two years.*

*If I reported, I'd lose my job. It was known by a supervisor (Kristin) that I was uncomfortable. I've had to counsel underclassmen RAs on how to navigate around Mr. Shaffer.*

*Anonymous*

*Class Year: 2020*

*"In the beginning of my Junior Year, August 2018, there was a roommate conflict in my dorm room. Chris Shaffer asked to meet with both me and my other roommates separately. Kristin and Erin were also present for my meeting. He went into details of what was wrong about the situation, all the while reminding me that I was a "bully", no better than a murderer (he compared us all to murders. That is not an exaggeration). He outright accused me of promoting*

*someone's hypothetical suicide attempt. I tried to explain my side of the story, and how the issue was just a huge misunderstanding, yet as I spoke, Chris continued to smile and nod slowly, a smug face. Throughout our entire meeting, Chris repeatedly called me a liar. I had apologized countless times; I didn't want to be deemed a bad person, because I'm not. It didn't matter. He didn't care about or believe a thing I was saying; he didn't care that I was hyperventilating and sobbing in his office, sitting through a panic attack. He told me that I was a terrible, horrible person multiple times. I was informed by my current roommate, who had held a meeting with him immediately before me, that I was going to be fired. He had informed someone of my employment status before I had any idea (I was an RA in his office at the time). Because I had lost my employment in the duration of this meeting, he also said - point blank - that I had no more housing or meal plan, that it was "my problem to figure out now". He told one of my roommates verbatim that we are, "the worst of humanity". The roommate issue had been resolved before even meeting with Chris, yet we were belittled for hours in our individual meetings. Chris had me in that office for over an hour, and continued to belittle me as I sobbed. When he realized that I couldn't calm down and that he'd done the damage he wanted to do, he shoved me off immediately onto my school counselor. He no longer wanted to deal with me. No one within the roommate conflict had any hard feelings, but Chris continued by having us meet with Jekeyma for "harassment", which even Jekeyma deemed ridiculous. I was not only fired, but I was forced to stand in front of all of my RA co-workers and publically announce my "resignation", even though it wasn't that at all. I actively avoided Chris throughout the duration of my Junior and senior year; just the sight of him caused my heart to race and chest to tighten. If Chris' goal was to completely tear me down and cause me to question my self-worth, he succeeded. He made me believe that I was an absolutely awful person. I attended counseling for a year to undo his damage. I know that I am not a bad or malicious person; I would never intentionally hurt someone, but he does.*

*My mother and I reported it to Tammy Walsh, in person. I also reported it to my Ringling Counselor. We met with an attorney in Tampa. Nothing was done on the school's part."*

Anonymous

Class Year: 2019

*"This is the email I sent to Ringling Human Resources in June, 2019.*

*Hello there.*

*I met with you twice at the end of last year. I wanted to report a situation that was happening within Resident Life. We met with Christine. In the end I decided I was genuinely too scared to take anymore action about the situation because I feared being fired. Since I am graduated, I would like to send this report to the Human Resources department at Ringling. I have already submitted this report to the office of Student Life as well.*

*At this point I just don't want this to happen to anyone ever again.*

*The reasons that I'm sending this email are as follows:*

*I believe that HIPAA laws have been broken, that the school's anti-discrimination policies have been broken, and that there is a generally unsafe environment within the Residence Life Office. My goal in sending this is to protect future students from having to go through what I, and the*

*other residents involved, had to go through. I genuinely would have taken my experiences to my grave if it weren't for my concern for future and current students.*

*This story is really long and very personal so I want to start by giving an overview of my main points. Chris Shaffer has been blackmailing me since 2016. I believe that Chris Shaffer has broken HIPAA laws by spreading students' private health information to Resident Assistants as well as other students without consent. I believe that Chris Shaffer has broken Ringling's Anti-Discrimination Policy by treating students and Residents Assistants differently based on Religion, Social-Economic Class, and Gender Identity.*

*In the Summer of 2016 I was trying to find the money for tuition so that I could attend my Sophomore year at Ringling. After getting denied from a private loan, I made a Facebook post asking if anyone knew options for finding tuition money. After I made this post, I received a Facebook message from Chris Shaffer. He essentially said he could get me a job as a Resident Assistant. He asked me some very personal questions about my financial situation, and said he could just look up my financial information if he wanted to. I thought at the time that he was helping me. He even joked that I would owe him loyalty in exchange for his help. After applying and getting referrals, I was hired as a Resident Assistant. It helped me enough financially that I could continue my education. I was under the impression that I had fairly gotten this position because I was never told otherwise.*

*This act of kindness was held over my head for the next three years. It was implied many times that I owed him because of this. And I was often told to keep information secret because of this act. There was an implication that if I spoke up about his wrongdoings I would be fired as a Resident Assistant, a position he knew was keeping me at Ringling. Chris Shaffer has used slurs against transgender individuals like "it" and "heshe" to me about a resident. He said they were*

*dangerous and called them an abomination because of their gender identity. It was implied that I couldn't have an opinion about this because he hired me.*

*The most egregious thing that happened, and to be frank, one of the only reasons I'm writing this email, is because multiple times Chris Shaffer has spread resident's private health information to other students without consent. More than once, Chris has made comments about students' disabilities or mental ailments to other students and staff members. Multiple times, Shaffer said "This student is on the spectrum" to Resident Assistant, other students, or Prostaff. I followed up with one of the students he said "was on the spectrum." This student never told Shaffer that they had a disability, and never consented to having this information spread to anyone else. In the Spring of 2018, I brought my concerns with this up to James Mitchell, who then texted Chris Shaffer and warned him that I wanted to report it. Chris Shaffer then messaged me on Facebook. I felt that I didn't have anyone to reach out to, and feared being fired, so I did not report these incidents. It's absolutely inappropriate that these things have happened and I want to do anything I can to prevent it from happening again.*

*Chris Shaffer has blatantly discriminated against me in the workplace because of my social economic status. Because Chris knew about my financial situation, he would constantly bring it up in the workplace, talk down to me about having loans, and even offer to buy my groceries in front of other Resident Assistants or staff members. I was treated differently because of my financial situation, and there was nothing I could do about it because I feared being fired.*

*This story is very personal, and I'm only really telling it because I don't want it to happen to anyone else. In the Summer of 2018 I again feared I would not be able to attend Ringling for my Senior Year due to financial problems. I worked Precollege 2018 as a Teaching Assistant. I went into Chris's office and asked if I could live on campus until the date tuition was due. He said he*

*would get back to me. Two weeks later I emailed him asking if he had more information. He said I would not be able to stay on campus. I was distraught, as I feared being homeless. Other Resident Assistants then came to me, after realizing that they, too, could not stay on campus after precollege. They were worried about financial situations/housing for the next month. Most Resident Assistants were expecting to stay because it was done years previously and there was never any communication that it wouldn't be happening again. Many students signed contracts that stated that they would be needing to stay on campus between the end of Precollege and when RA Training started.*

*Worried about my own situation, I emailed Chris asking if I could possibly pay for housing. He said there was no way that could happen. Chris requested a meeting with me the next day. He invited me, Kristin Dunham, and another Resident Assistant into his office, where he then spoke down to us and used strong/aggressive language with us for an hour and a half. He said "it was literally impossible to house anyone between precollege and Fall training".*

*He told me that I was ungrateful to him and should be loyal to him because he hired me. He said that I owed him because he let me totally bypass the entire Resident Assistant hiring process (something I was not made aware was done for me.)*

*When I brought up my concern for the other Resident Assistants, he accused me that I just wanted free housing (when I actually asked if I could pay for it.) He also said that I was the ONLY Resident Assistant complaining. He said that I was a problem. He said I was the only Resident Assistant "like this." The reality was that all Resident Assistants were freaking out and I was the only person voicing it. I reiterated that I only wanted to point out how Precollege Resident Assistants would be spending their entire Precollege paycheck on housing or flights back home for the next month. I pointed out that Residents living in Summer housing had open beds. Chris Shaffer threatened to fire me because I had "talked poorly about Reslife to all of the Teaching Assistants." This is something I did not do, and there was no proof that I did. He then told me, and another resident assistant in the room, information about the Fall 2019 Housing, the same information he told the entire Summer 2019 Precollege Staff, and said "If this*

*information gets out, I'll know who it was," and implied that we would be fired. He essentially created a reason to fire me out of thin air, and threatened me with it.*

*At the end of the meeting he said he was going to find a way to house everyone, essentially deleting the multiple comments he made about it being impossible, and proving to me that the meeting could have been 15 minutes long and was instead an hour or more of him speaking down to me. It was not in any way necessary for me to be yelled at, berated, and threatened in that way. I wanted to specifically tell this story for a few reasons. He knew that I could not report or do anything about him yelling at me because I would then be fired and would have to leave Ringling. But this incident incited so much fear into me that I literally didn't feel safe at work for the next year. Since Kristin was there for the incident, I felt that no Prostaff member at Ringling would listen to me, and me speaking out would result in my termination, and eventual withdrawal from the school. And unfortunately I know for a fact I am not the only person who has had this experience. I won't name them because most of them are Resident Assistants who literally don't feel safe to come forward about it. I don't want this to happen to anyone else.*

*I would be happy to provide more information. I feel hesitant to involve the names of other students, but I can elaborate more if it is needed, especially if it's about the spread of students' private information.*

*I didn't want to come forward about this. The only thing that's pushed me to do so is the fear that other students or Resident Assistants are being unfairly mistreated or discriminated against. I also don't want anyone else's personal information to continue to be so easily spread around.*

*I reported to Darren Mathews. I spoke with him on the phone and emailed him.*

*This information I included above is the email I sent to HR. I had a follow up phone call with Darren Mathews. Darren said things like "You don't want this person fired, do you?" Even though I presented that Chris Shaffer had blackmailed me, and broken HIPAA laws. After my call with Darren, I never heard back about what action was being taken, or how anyone would*

*be held accountable. I emailed him after the call with some more information, and never got a response. This call was in June 2019."*



**Chris Shaffer**

Did you book housing off campus next year?

I'm not going to engage in your conversation publicly; but i may be able to help

How much of a loan are you seeking?

**Chris Shaffer**

I'm not meaning to pry (I could look your stuff up anyway) but I may be able to help. What's the amount that you lack after all of your financial aid is applied?

**Chris Shaffer**

Would you be available for training 7/29?

I can't promise anything.

Tiffany Bartlett in my office hires and supervises

She reports to me

I can tell her to hire you and she has to but I try not to be that guy.



**Chris Shaffer**

I sensed that, just clarifying your thoughts for you 😕

Your position on pot?

(After all, you are from Colorado)

I'd actually use that as a point of humor, regardless of your position cause it's not legal here 😕

The only other thing people sometimes get hung up on is if they come from a strong religious background (or atheist) they can sometimes come off as closed minded. Good to be open minded, cherish everyone for their differences more so than point out faults...That sorta thug

*After a meeting with multiple students, an RA, and a Prostaff member about a roommate dispute, I received this email from one from one of the students. Private health information was shared about a roommate who was not present in the meeting.*

During the meeting, i brought to Chris's attention on how my roommate staring at me made me uncomfortable. Chris then stated that he is not a medical professional and does not have the clearance/expertise to state this for a fact, but: ▮▮▮▮▮▮ may be on the autism spectrum and for that reason she may stare due to not having the same social

*When I asked the student if they ever shared any health information with Chris Shaffer, this was*

 I have not discussed anything about my mental illness or disabilities to him

*the response I received.*

Anonymous

Class Year: 2020

*"Went in because I was having housing issues due to PTSD and anxiety issues with flashbacks.
Didn't feel safe. I had documentation of history with PTSD and all correct forms and he was
ridiculously condescending. Even doing creepy thing with leaving lights off in the room (at first I
thought he might be hungover, it was a Tuesday but I figured it might be a rough night, not my
business). Turns out it's a weird scare tactic to make people uncomfortable and he's done it with
the others the year I reported it. It was my first semester in 2015 towards end of first semester.
Even after seeing paper work, he denied it was important, said it wasn't real, said PTSD wasn't
a big deal and doctor's letter had no value (which I knew wasn't true), then after fighting him for
a WHILE (which honestly, with my background, I learned how to do, luckily) he said fine and he
would look into what he could do. Later it comes up that there's a room open in an even unsafer
building, I didn't get a chance to respond so he called my dad and told him I'd sent him an email
declining new housing and therefore couldn't do a refund of my housing for next semester
because it was clearly just me being uncooperative. He straight up told my dad I was a liar and
was being a problem (which was not the right thing to say my dad). My dad called him out on it
and asked to see the emails (which didn't exist) and surprise surprise, he "lost" them. I still had
the one he sent me though, telling me I could move but I'd have to be done within a few hours of
sending it, in the middle of the day, on a school day with classes, that I didn't see. I forwarded it
to him, full email so you could see there was no response from yet and showing the time stamp so
my dad could see he called RIGHT after sending it and Coupled with the fact he told my dad I
was lying about ptsd and being dramatic, it did not go well. Still didn't get any refund on
housing but they did assign someone else to my room when I moved out to be somewhere safer,
just kept the money. I was out before first semester even started and even if refund had been a
thing or allowed, harassing someone and denying medical exceptions, not smart. Especially
when you say there's email proof but magically can't find it. I'm not the first to have files and
emails "lost", I'm sure there's been many since 2015. I know for a fact there were plenty before
2015, all by Chris Shaffer. It was even implied that I should not call the police should something*

*happen to me, just let him handle it because police shouldn't get involved. Thankfully the
students warned me ahead of time to ignore that bit of "advice".*

*Tried to [report], was told by him that he was one to report to. So didn't really work out.*

*There are multiple instances from other people that I was warned about in the beginning. He
was friendly (kind of creepy, like predator space invading kind of way) up until I told him I was
having a problem. That's when the scare tactics started and they were ridiculous. I'm scared for anyone who goes
through an assault on campus who has to deal with him. Completely demeaning in the way he
talks and once you make a report, he treats you crappily every day after that, for every year."*

Anonymous

Class Year: 2017

*"Students and friends would confide in me (as a RA) that they did not feel comfortable
approaching Shaffer with any incidents relating to sexual assault, stalking, toxic roommates, or
safety. They said he had previously talked down to them, gas lighted them, shamed them, blamed
them as the victim. I did notify other ResLife staff know how uncomfortable those students were
with reporting incidents to Shaffer again, but I was told they should anyways. No other
action/advice was offered.*

*Shaffer had lunch dates with one of the counselors (I believe his name was Ken? he passed away
around 2017) to talk about students private therapy sessions. This is only known because he
would then come back to ResLife and share 'privately' to a few RA's that other RA's who sought
out therapy aren't fit for the job and should be fired because you "can't have someone mentally
unstable as a RA." Multiple levels of in appropriate conduct - none of which was his to learn in*

*the first place and should never have left Kens office. Related - a serious reform is needed in the health center if its current state is anything like 2017.*

*Shaffer pardoned his son (a student) from getting caught smoking weed and underaged drinking. Other students did not receive such treatment."*

Anonymous

Class Year: 2019

*"This interaction was through calling the office and speaking to Chris over the phone. So this account is my own memory of events that happened.*

*My Senior year, 2018-19, my house had a governed thermostat. I noticed it early on (Sept 2018) and it sucked, it's something a crappy landlord puts in to stop tenants from changing the temperature. It was set to 76 degrees, I was told all off campus housing through the school had that. He dismissed my argument over the phone after I said mildew was growing in the house because, "You have AC and it is sufficient." My room was at the front of the house (1142 Guilford Ln) and had windows on three sides with no shade trees. It would get up to 88 degrees (on numerous occasions) without any ability to open windows (The windows cranks were taken out.) or turn the temperature down further. I would go on to find out in fact none of my friends in off campus houses had this governed thermostat. I got in contact with maintenance directly by phone after a couple of months and I remember them offering me an in room ac unit because mine wasn't "working." I managed to get them to come out and put a normal thermostat after reiterating that my room had a mildew smell. I couldn't sleep in my room a couple nights at least due to the heat and my asthma got worse over the time it was like this. The gentleman who fixed it was confused as to why the thermostat was like that and expressed he didn't know of any other units that had it.*

*Chris' response to me left me feeling very upset but the anger I felt when I realized others were able to use their thermostats normally was infuriating. This is the worst interaction I had with Chris.*

*I sadly do not have an email like I had wished due to my need to call the offices at the time as I did not trust anyone to get back to me via email. I wish I had followed up with emails now for a paper trail but my classes and getting my AC fixed were more important at the time.*

*Freshman year I butted heads with Chris, I honestly don't remember what it was about now other than I got my parents involved. But I have a sneaking suspicion that is why I was never able to become an RA. He hated my guts from the first month and I learned to go through anyone else in the office because if I talked to him, nothing would get done and I would be made to look like a fool."*

Anonymous

Class Year: 2021

Ok, though I have had multiple interactions with him, here are the ones that stand out.

*"In the summer of 2018 I was a precollege RA. As an RA I reported to Shaffer, as well as Kristin and Candice. While I did not generally interact with him too much in the beginning. He is a very hard man for me to read. I often felt on edge because I was unsure whether or not he would be joking or angry. During my time as an RA he took me aside and offered me a RA position for the fall, provided I room with a freshman student with Aspergers. The caveat was because I have a familial connection to this girl, even though I had never met her. I ended up not taking the job for various reasons, including likening my assigned living space. But I felt the pressure from Chris. Sort of that dad-like disappointment and judgment that I wouldn't take the position. But I stood my ground, and finished up precollege.*

*Then things went south. Four weeks before move-in day a fellow roomate of mine informed me that our fourth person had dropped out. We found out from Instagram. We received no alert from ResLife, no indication at all that our roommate situation had changed. We were stressed and confused and a tad bit angry. So I emailed Chris hoping to get some answers and clear things*

*up. It took him over 8 days to respond. When he did respond I got a short 3 sentence response that basically said our roommate had dropped out and there was probably another person already assigned. My other roommate emailed him to ask if there would be a chance to choose our roommate, since we had a friend who was slotted for a single room. He once more responded to her in 1-2 sentences, giving us little information or sense of security. My roommate continued pushing for answers, and then Chris lost it. He sent the nastiest, most unprofessional email I had ever read. He said that maybe had we contacted him a week earlier we could have chosen our roommate. Which mind you, I did. He just never responded to that email. He threatened us that if we attempted to bully our new roommate we would be punished. Now, I was shocked. He just accused me of potential bullying, even though he worked  with me all summer. Even though he placed me in a position of power and offered said position to me for the coming year. I was just utterly astounded at how unprofessional he was, and how we still had zero information about our rooming situation. My fellow roommate emailed him back, and very professionally berated him for his lack of information and unprofessional manner, and finally, finally he wrote back with the information we had wanted to hear from the beginning. Now, I ask, why is the person in charge of resident life and housing so unable to communicate about the topics he has been hired to be in charge of. I do not understand his anger, or his rude and unprofessional manner about a task he is in charge of. Had he emailed me back in the beginning within a timely manner, and with all the information I needed it would have taken him max 15 minutes. But instead he expected us to roll over and allow him to do what he pleased with our living situation.*

*He lost a lot of respect in my eyes. And I believe his unprofessional manner influenced his resident life colleagues. I am currently going through the process of getting my ESA on campus, and all of my communication with Erin Smith has been appallingly unprofessional. ResLife has continually treated me like a stupid child, and I truly believe that realm of thinking comes from Chris Shaffer being in charge. I avoid interaction with ResLife as much as possible simply because I do not want to deal with their sass, and rude demeanor. During the roommate issue that summer of 2018 I was so scared that Chris would use his power to ruin my college life. I pleaded with my mom not to confront or report him, but I am done being silent. Chris is exactly*

*the wrong type of leader and I don't want any more students having to deal with his mood swings or power plays."*

Anonymous

Class Year: 2019

*"Freshman year, 2016 I threw a birthday party in Bayou. The group wasn't large, only close friends staying up late and we complied when RA's told us to keep the volume down. Regardless we were freshmen and had to meet with Chris, we figured we'd get a normal first-time warning. Chris then proceeded to call each of our family members and blow what had happened into astronomical proportions. Chris framed it as if we were on the edge of being expelled and this was our last straw. None of us had done anything wrong before that situation. When my mother reiterated what he told her I was shocked. Two other friends approached me in tears from what he had said to their parents. His version of teaching a lesson was scaring us into never crossing him again."*

Anonymous

Class Year: 2018

*"A transphobic student went on a tangent on Facebook, talking about how trans people kill themselves because they're mentally ill. This was when Trump was elected and trans suicides spiked along with hate crimes. I spoke up against her, explaining how she was wrong and she, in turn, reported me for making her feel unsafe. Chris called me in and tried to play the situation down and intimidate me to not challenge the bigoted vitriol of a classmate who sat across from me. I'm trans. He did not care if I felt unsafe, just that the "political fighting" stop. He eventually came to the conclusion that I was not actually threatening the transphobic classmate*

*after a long and tense conversation in which I was talked down to the entire time. He then went on to questioning me on my transness, in a way that felt belittling, like I had to explain/prove it to him. It felt invasive and scrutinizing. Chris Schaffer is not fit to be interacting with students if his response to an obviously bogus claim is a 30 minute interrogation on "transgender ideology" and the validity of a student's identity."*

Anonymous

Class Year: 2016

*"In November 2015 Chris Shaffer had found out my hedgehog was living in my dorm with me and had sent Tiffany Bartlett and Courtney Brenek to inspect my room a couple times to make sure she was no longer there. Over the next few weeks he called me and emailed me multiple times to set up a meeting with him in his office. On November 11th he emailed me a notice for a Student Conduct Hearing stating that I was being charged with violating the pet policy. I'm not sure if a hearing was standard procedure, as far as I was aware you were just charged a fine everyday until the pet was off campus and at that point she had been long gone. I believe the meeting took place on December 11th and it was just the two of us in his office. He began yelling at me that he had evidence my hedgehog had been in my dorm and threatened me with it saying he would take further action but refused to show me any proof or what the consequence would be. He continued trying to intimidate me into a confession. It was very clear that he was on a power trip and had some major anger issues. I sat there terrified and eventually felt like I had no choice but to apologize to him. His demeanor immediately changed and he suddenly began acting friendly towards me telling me that's all he had wanted. At that point it was very apparent that he had no intention of taking action against me and was just trying to use scare tactics on me. I made sure to completely avoid him after that."*

Anonymous

Class Year: 2021

*"This was in February of 2018 I believe. Basically what happened was I was going through some really bad depression and started self harming. So, my girlfriend at the time (I don't want to use her name as I haven't gotten permission) called health services for me and then called a suicide hotline. Basically we didn't know that the hotline sent police to our location, so when Chris Shaffer showed up at her room to let her know that, he was super rude and passive aggressive. We were hoping for help over the phone and he made us feel like idiots for not knowing that wasn't a thing. Again, I know it's not as bad as other people's experiences, but I hope it helps"*

Anonymous

Class Year: 2020

*"I was a head Orientation Leader (OL) for the 2019 incoming freshman class. I was a senior at the time, and this happened during move-in day for freshman (not international move-in, regular move-in). My job that day was to walk around bringing OLs water/checking in with OLs/guiding any lost parents or students around, so I was all over campus. Through checking in with multiple OLs, I had learned that Chris Schaffer as well as Erin Smith were being incredibly uncooperative with both the OLs as well as parents and new freshmen regarding parking in the bayou lot. I was told that Erin and Chris had changed how they wanted parking to work multiple times without telling OLs, and proceeded to yell at them for not knowing what to do and wouldn't explain the new system to them. I then went to the bayou lot to see what was happening, and upon getting there I witnessed Chris Schaffer screaming and cursing at parents and students for not knowing where to park/go. Not politely telling them, but full screaming and cursing. He then*

*cursed and yelled at Trent (another res life worker) seemingly for no reason. In checking in with other OLs who were there, this abuse of power was going on all morning.*

*This was reported the same day it occurred, freshman move in day Fall 2019, to Candace Johnson who then passed it on to Jekeyma Robinson. I was told I would have to have a bigger meeting with Jekeyma to report it and it would turn into a "big thing." I said I'm comfortable moving forward with the report, and I never heard anything back ever. Below is a screenshot of a conversation I had with another orientation leader who witnessed the event, asking if she would be comfortable coming forward with the story. This message was sent 8/21/2019 at 9:25 pm"*



Yikes yes I'm totally okay with coming forward with you!

I'm happy to help them with whatever they need cuz it definitely was a big problem this morning

Anonymous

Class Year: 2021

*The End of freshman year I had asked to opt out of a housing contract I signed, I am aware that it was a contract I was held accountable to. This absolutely does not excuse the behavior shown by Schaffer. Respectively I had built up a case to why I should be opted out due to my safety, age, and mental wellbeing, yet he was on his phone the entirety of the meeting. I was not heard out at all. I felt belittled as a concerned student, not because I didn't get the answer I wanted, but because Shchaffer paid no mind or attention to a conversation I was willing to have. This is not a position Ringling should have someone like this in.*

**From:** Larry Thompson
**To:** Ringling College SPRING 2020 1st Year Students, SPRING 2020 2nd Year Students, SPRING 2020 3rd Year Students, Staff, Trustees, Full Time and Visiting Full Time Faculty, Part Time and Long-Term Part Time Faculty
**Date:** Friday, June 26, 2020
**Subject:** Message to the Ringling College Community

Dear Ringling College Community,

We were recently made aware of allegations involving a member of our community. These allegations do not reflect actions that conform to our core values or our expectations of what constitutes appropriate professional and acceptable behavior at Ringling College of Art and Design. We take all such allegations by any member of our community - student, faculty, staff, alumni - very seriously. To do less threatens the very fabric of respect, civility, and integrity that make it possible for us to foster the creativity and ethical standards that are the lifeblood of all we do here.

We are in the process of reviewing the alleged behavior according to our established guidelines and protocols, which require us to treat all parties with respect and to maintain confidentiality as legally required. It is our responsibility to follow legal protocols that ensure student and employee privacy, as well as to preserve the integrity of any and all investigations. We are therefore highly constrained in the information that we are permitted to share about the outcomes of reviews.

The College has policies in place against behavior that is in opposition to its values and/or relevant legal statutes. These policies can be found on our Title IX Reporting webpage, the Ringling College Faculty Handbook, the Ringling College Staff Handbook, and the Ringling College Student Handbook. Complaints can be filed online and can be made anonymously if preferred. Our complaint process is vital to ensuring we address behaviors that violate our collective trust. Although determining whether to file a complaint is a complex and personal decision for everyone, it is incumbent upon us all to hold accountable any whose actions undermine the integrity of our community.

We strive to create and foster a culture and a community in which everyone feels safe and valued and that encourages the exchange of different ideas, experiences, and perspectives. Our expectation is that all students, faculty, and staff will demonstrate civility, inclusiveness, dignity, honesty, and safety at all times.

Larry R. Thompson


EXHIBIT C

**8:52**



Tammy ›

Tue, Jun 23, 12:08 PM

There is a lot out there on Twitter and Facebook in comments about you. Do NOT respond to anything. The College is aware....

Tue, Jun 23, 5:41 PM

I'm not responding.

And death threats on Twitter. This kind of harassment is a serious concern. She must have a calendar announcement set. It's a year ago she tried the same stuff.

iMessage

EXHIBIT D

8:52 

 

**Tammy ›**

Tue, Jun 23, 7:11 PM

Darren is going to reach out to you tomorrow. Have you read everything being posted?

Do you have any reports on Benny Davis relative to Title IX?

I have read everything I think.

I sent you an email relative to Benny

Thanks! I had that info., but it wasn't a Title IX report...so that is all you

   

      

8:53



Tammy ›

Thanks!  I had that info., but it wasn't a Title IX report...so that is all you have as well?

There was Facebook and Twitter....

Do you recognize the names of those posting?

There are many people on there that I've never met. Not even students. Yes I recognize a bunch.

I am on my phone. Not sure I'm getting a detailed look at the title IX thing.



iMessage

8:53



Tammy ›

detailed look at the title
IX thing

Okay....check tomorrow
for me then on title
IX....thanks!

I don't twitter so on Ben
Davis, is he victim or
alleged?

Alleged...

Okay. If he is alleged,
who was the victim?
Are they saying they
made a report to me?

No idea on
victim....there was an
additional post about

iMessage

8:53



Tammy ›

nothing being done on two title 9 reports involving him.  I have nothing.  No detail on where reported.

So they're saying that an unknown person reported a title IX to me and I did nothing? Twice?

I know of 3 rapes that happened during Ringling that weren't taken seriously ███████████ When reported to the school Ringling did little to nothing. The most they did was suspend ██████SCHOOL JOB for a FEW months.
(New thread to not stray from CS)

  iMessage 

      

8:53



**Tammy ›**

I know of 3 rapes that happened during Ringling that weren't taken seriously ███████████ ████████ When reported to the school Ringling did little to nothing. The most they did was suspend ██████SCHOOL JOB for a FEW months.
(New thread to not stray from CS)

🌐 **Megan Rose Ruiz** @MeganRoseRuiz1 · 19h
Since we're talking about dangerous men in art schools... If you're a woman going to Ringling, or planning on going to Ringling, stay the FUCK away from Chris Shaffer.
Show this thread

12:16 PM · 6/23/20   Twitter for iPhone

# I have Report and Dean's Panel for ███████..nothing on ████████ If you have nothing, then there was never any reports made.

**Thing is, I don't do title**

iMessage

  

      

8:53

TW

Tammy ›

█████...nothing on
█████ If you have
nothing, then there was
never any reports made.

Thing is, I don't do title
IX. I am searching email
now. His name isn't
█████ It's █████
██████████

Goes by █████

Okay...thanks! I'll search
that...

There is nothing I can
see in maxient. No
cases for him at all.
Possible it was before
maxient? Hard to tell.

iMessage

8:54





**Tammy** ›

Yes...I think so....I have nothing ....

So, by that comment, they're saying that the college did nothing about these things.

They aren't saying that I did nothing. Right?

If they're saying I knew about it and did nothing, that's interesting. I mean, did you ever know of me to know of something that serious and do nothing?

Again, I don't do the title

  iMessage 

      

8:54



**Tammy** ›

that's interesting. I mean, did you ever know of me to know of something that serious and do nothing?

Again, I don't do the title IX stuff anyway. If I did get a report, I'd forward it.

Hard to tell....Since I had nothing...just wanted to be sure you had nothing...I shared with you what was posted in the chain...

Okay

  iMessage 

      

8:54



Tammy ›

Sun, Jun 28, 5:54 PM

Herald Tribune apparently contacted College requesting an interview. All sent to Raelyn.

Interesting. All the posts disappeared

Really? Interesting, I agree.

I wonder if they warned her that she's committed a variety of civil and criminal offenses

Looking now....did you

 iMessage

8:54



Tammy ›

Looking now....did you screen shoot any?

I screen shot the whole thing for my lawsuit

Not removed. Hidden.

I am not familiar with how any of that works.

Mon, Jun 29, 10:42 AM

Cancel culture doesn't exist. If it did, we wouldn't have so many predators, abusers, and bigots in positions of power. If it did, we wouldn't need the #MeToo movement. If it did, we wouldn't need to say that #BlackLivesMatter.

When someone calls you out for harming others, it's not a cancellation. You are not the victim. This is not about you. This is about the people whom you have hurt, intentionally or otherwise, and their right to pursue accountability for the harm you perpetuated.

iMessage

**8:54**



Tammy ›

Really?   Interesting, I agree.

I wonder if they warned her that she's committed a variety of civil and criminal offenses

Looking now....did you screen shoot any?

I screen shot the whole thing for my lawsuit

Not removed. Hidden.

I am not familiar with how any of that works.

  

      

8:55



Tammy ›

Wed, Jul 1, 5:24 PM

I'm trying to look up info on any of the attachment to the open letter, but a lot of what is in the attachment are anonymous.  Are you able to provide any names based on your memory to any of the anonymous statements?

I'm in the middle of something but will get back to you

Okay....thanks!

Wed. Jul 1. 6:35 PM



8:55



Tammy ›

Thu, Jul 2, 8:25 AM

Let me know what level of information you'd like on the "anonymous" contents of the "stories" attachment.

I wanted the name or names if you recognized from the "story" and and report or hearing documents that you might have....Once I have names, I'll look up to see if anything as well.  Thanks!

So, I am faced with a difficult situation. I know each person involved in

  iMessage 

      

8:55



Tammy ›

So, I am faced with a difficult situation. I know each person involved in this "stories" attachment and can easily tell my side of the story.

My difficulty – on a principled level, none of this should be considered a "report" or a "grievance." The "open letter" email was sent from an anonymous gmail account. It is fair to say who it is from, but we would not allow someone to make a

iMessage

8:55







**Tammy** ›

who it is from, but we would not allow someone to make a change to their meal plan if not from their secure account. Is this "open letter" being considered a report? Are the contents of the emailed open letter being investigated as if it is a report?  If so, it seems incredibly short sighted for me to provide names and details of something that in my mind a: shouldn't even be considered a report and b: are noted as

  iMessage 

      

8:56



**Tammy** ›

b: are noted as anonymous.

I have always liked and respected you and do not want this to be taken as insubordination but if you tell me that you're doing this to defend me, I'll forge ahead. I will do so based on a very serious level of trust in which I seem to be the only person with a lot to lose here.

Out of fairness, I'm not sure I have much less to lose. My reputation has been systematically

iMessage

8:56



Tammy ›

se based and very serious level of trust in which I seem to be the only person with a lot to lose here.

Out of fairness, I'm not sure I have much less to lose. My reputation has been systematically destroyed on campus, in the field, and for the future.

As a further side note, yesterday and today weren't/aren't really days off after all so I hope I'm not charged for them.

  iMessage 

8:56



**Tammy** ›

I have to be honest with you. I'm reading over the "stories" thing and it's making me sick. I know some right away, I would need to be at my office computer with all my old archived emails to accurately pinpoint others. What a bunch of lies and nonsense. I have never yelled at or cursed at anyone. Jesus. Keeping my office lights off when I have a 150 square foot window in it makes me intimidating and creepy?

I really don't think I can

iMessage

8:56

Tammy ›

have never yelled at or cursed at anyone. Jesus. Keeping my office lights off when I have a 150 square foot window in it makes me intimidating and creepy?

I really don't think I can do this today. Sorry.

If you pick out the ones that are important to dig into, can you send them to me and let me do this sometime over the weekend?

Yes, certainly.

8:57



Tammy ›

Tue, Jul 14, 10:16 PM

What I forwarded was what I sent to Darren.

Oh good...

If she is accurately retelling her conversation with Darren that has me very concerned.

I would hope it is not accurate. Texting Christine now.

Christine says absolutely not...From my perspective it is a good example of how

  iMessage 

      

8:58



Tammy ›

Christine says absolutely not...From my perspective it is a good example of how interactions get misconstrued.

Hopefully.

If nothing else, it shows their motivation to continue the witch hunt and just how reliable they are as sources.

I appreciate you following up though. I'm presuming this investigation must be nearing its conclusion at

iMessage

8:58



Tammy ›

I appreciate you following up though. I'm presuming this investigation must be nearing its conclusion at which point I need to move on to my next step with litigation.

My sense it is getting to the end...I'm working to show all that we do...and despite not having Maxient way back...our records are pretty good with email reports, etc....I am sure Darren will be in contact.  I woke Christine...I forget not everyone is on our



8:58



Tammy ›

presuming this investigation must be nearing its conclusion at which point I need to move on to my next step with litigation.

My sense it is getting to the end...I'm working to show all that we do...and despite not having Maxient way back...our records are pretty good with email reports, etc....I am sure Darren will be in contact.  I woke Christine...I forget not everyone is on our Student Life schedule 😳!

iMessage

8:58



Tammy ›

Wed, Jul 15, 11:51 AM

Did anything further come of the "really big case" they're building against me?

Christine and I have been in zooms since 9 am....still on...I haven't heard from Darren....

Thanks. Just checking.

I take it Darren hasn't responded to you?

He has not

Thu, Jul 16, 12:08 PM

iMessage

8:59

**TW**

**Tammy** ›

Thu, Jul 16, 12:08 PM

All of the chat comments are visible



If you don't come to campus in the fall, will you be able to get housing on campus in for the spring semester?

From Tiana's iPhone to Everyone:
TUITION PLEASE

From Riley Connolly to Everyone:
order 66ing us much?

From Seanne Ince to Everyone:
PLEASE SPEAK ON THE TUITION

From Molly Hursh to Everyone:
Why is Chris Shaffer here?

From Friday.Al to Everyone:
what about the fees regarding activity fees, the health fees, technology fees that we aren't using when we go online

From William Wang to Everyone:
tuition should not be so high

There's one



iMessage

8:59



**Tammy** ›

There's one



^^ now it seems I sexually assaulted someone?

Please do not ask me to address this hostile

iMessage

8:59

 

**Tammy** ›

Please do not ask me to address this hostile group

It is truly my hope that this chat screen disappears. All those comments are still visible.

If you have made the chat private and any current student accuses me of a crime I truly hope they will be brought up on charges. I'm sure the comments are still coming in.

There was an issue a

  iMessage 

      

8:59







Tammy ›

There was an issue a
Raelyn has to re-
set....was supposed to
be private with not
ability to talk.

Thu, Jul 16, 2:13 PM

We are going to switch
to a webinar format for
Monday so just panel
are able to be seen and
heard.  I can address
housing questions for
Monday.

Okay. I will not be in
tomorrow. This is very
upsetting and that's all I
really want to say about

   iMessage  

      

8:59



Tammy ›

Okay. I will not be in tomorrow. This is very upsetting and that's all I really want to say about it. Thanks.

I know...so sorry that occurred. I certainly understand how upsetting.

What just occurred is a crime in the state of Florida. And I have no word back from HR. I can only presume that the words are true because this hasn't been stopped.

iMessage

9:00



Tammy ›

Fri, Jul 17, 4:09 PM

Heard anything from HR yet?

Darren is supposed to reach out to you early next week I believe.

Have you a sense that anything exists that requires any response from me?

I think that Darren is going to have you go through what you know about any of the reports attached to the open letter. Many were anonymous...like you

  iMessage 

9:01



**Tammy** ›

I think that Darren is going to have you go through what you know about any of the reports attached to the open letter. Many were anonymous...like you and I went through. I have sent them stuff we could find where we new names or knew situation, etc. to show things were addressed as we had documentation.

Okay

Sun, Jul 19, 12:26 PM

  iMessage 

      

9:01

TW

Tammy ›

Okay

Sun, Jul 19, 12:26 PM

I'll save you from zoom on Monday.  Best if you do not sign in. I am sure you had no desire anyway.

Ironically enough, even though the thing Thursday was a mess, I am glad that people could see that their tactics didn't work and that I'm still employed.

If you are telling me that you don't want me to

iMessage

9:01



Tammy ›

If you are telling me that you don't want me to sign in, then that's okay with me. You're my supervisor.

Like I said previously, I'm getting the feeling like I'm being pushed out since I don't really get any response from HR and this social media campaign just continues to roll onward.

We are changing the format for one on Monday as well.  Yes, please do not sign in.  I know that HR plans to

  iMessage 

      

9:01 



Tammy ›

We are changing the format for one on Monday as well. Yes, please do not sign in. I know that HR plans to get with you hopefully early in the week. They have been working on pulling information together, etc. also...Larry is filming a video today to address some of the student issues. It reinforces fairness, confidentiality, mechanism for reporting and states social media posts are not reports, etc. Addresses tuition issue too., Covid

   

      

9:01 



Tammy ›

format for one on Monday as well.  Yes, please do not sign in.  I know that HR plans to get with you hopefully early in the week.  They have been working on pulling information together, etc.
also...Larry is filming a video today to address some of the student issues.  It reinforces fairness, confidentiality, mechanism for reporting and states social media posts are not reports, etc.  Addresses tuition issue too., Covid changes, etc.

  iMessage 

      

9:02



Tammy ›

Wed, Jul 22, 6:20 PM

I have the hearing notice and email communications with Cole prior, but do not have the sanction letter? Do you have as at times you would write under my signature?

I do not.

But she was informed of the outcome in person after the hearing. I was there

I can go to my office in the am and see if I have the hard file. It may be there if that's helpful

  iMessage 

      

9:02

**TW**

**Tammy ›**

> I can go to my office in the am and see if I have the hard file. It may be there if that's helpful

> Or it might more likely be in student life because for deans panels you always had the "turn this in after" note on it

Yes....that would be helpful. I found the Public Safety report.

I'll look too.

> But it happened and she was informed

Yes...Also...The Public

iMessage













9:02

**TW**

Tammy ›

Yes.... Also....The Public Safety report has her statement and notes what she wanted as outcome.

Nice

Were you able to see if she submitted a maxient report?

I found the hearing file....has everything except sanction letter. Checking...

Nothing....

I truly don't know where I'd look for the sanction



iMessage

9:03



Tammy ›

I truly don't know where I'd look for the sanction letter because if it was on my computer I think that was 3 computers ago. But I will look in hard files When I get back to the office.

So she didn't file a maxient, right?

Do you save things to mydocuments?  We also still have his "student file" that we used to keep as we keep for 7 years...and hearing notice is in there, but no sanction letter?  So I

iMessage

9:03



**Tammy** ›

sanction letter?  So I have hearing file and other file.  Do you remember outcome?

Disciplinary probation would be my best guess. It was a "sexual assault" on technical terms maybe but not any penetration. Sorry if that is gross. That is just a best memory guess though. I know he finished school and he came and talked to me about bringing a lawyer and we discussed but he decided against all that

  iMessage 

      

9:04



**Tammy ›**

Very odd I can't find.

Thu, Jul 23, 8:35 AM

If you look at the word document deans panel notice for kornell, it has an electronic signature and was authored by Jen Awe. I'd guess that she did the outcome letter also as I was "investigator."

Okay....probably..
Thanks for checking into.

I'll still look to see if I have a hard copy in my

iMessage



9:04

**Tammy** ›

she did the outcome letter also as I was "investigator."

Okay....probably.. Thanks for checking into.

I'll still look to see if I have a hard copy in my piles on my desk. Anything else I need to look for while I'm in there?

See if you have an outcome letter for Hampton Julmis. Thanks!

Okay. Will do.

   

      

9:05



**Tammy** ›

Thu, Jul 23, 4:20 PM

Tom pinto, later changed name to Issa, says online they filed a report about me repeatedly and nothing was done. Did you get a report? I have literally never had a cross word with them.

Nothing....

Odd. Yet another person claiming to have filed reports but not really I guess

Thu, Jul 23, 6:55 PM

Still haven't heard a

iMessage

9:05



Tammy ›

Thu, Jul 23, 6:55 PM

Still haven't heard a peep from Darren

Thu, Jul 23, 9:02 PM

Sorry, I don't have any more info. He is supposed to get with you....

I can talk not assume that he is swamped ....

Understood. I'm sure all this faculty stuff is a whole new layer

Fri, Jul 24, 10:43 AM



9:05

**TW**

**Tammy** ›

Fri, Jul 24, 10:43 AM

Are you in the office/ working today or on vacation?

I'm out.

What do you need?

Wanted to clarify legal action with someone so that I stay in good standing with my employer. I don't want to make her into a martyr and/or have her claim retaliation.

Fri, Jul 24, 12:30 PM

iMessage

9:05



Tammy ›

standing with my employer. I don't want to make her into a martyr and/or have her claim retaliation.

Fri, Jul 24, 12:30 PM

I alerted Christine of your question. Be sure to talk with Darren as we discussed.

Okay. He texted and said he was on the phone but would call me

Thanks

Oh good!

   

      

9:06



Tammy ›

Thu, Jul 30, 12:21 PM

I talked to Larry. He had no such meeting with anyone. He was very bothered by post. Where did the post come from? Facebook? It looked private (per Raelyn). Do you have more info on it?

It was posted on Instagram by current RA Lydia Wolfahrt. They're posting to Instagram which only uses photos within which the text isn't searchable when they use my name. Very crafty way to get the

iMessage

9:06



Tammy ›

word out and generate the next wave of reports.

I personally saw it and captured the image.



IMG_2820.PNG

And this one was on Lindsey Lim's

iMessage



9:07



**Tammy** ›

But the fact is, someone knew the number of cases and the disposition of the situation and they shared it with the students attacking me. I didn't have that information but someone did and they were far too accurate with the information for it to be a guess.

Sat, Aug 1, 5:04 PM

Chris....to protect you, I think it is best for you not to respond to any student/parent

  iMessage 

      

9:07

TW

**Tammy** ›

Sat, Aug 1, 5:04 PM

Chris....to protect you, I think it is best for you not to respond to any student/parent emails....have Erin do or if especially difficult....refer my way for now until we get through this....This holds true for other student scenarios as well.

Understood. I didn't realize I needed protecting but appreciate that you're willing to help me navigate.

9:08



Tammy ›

Wed, Aug 26, 2:40 PM

So, I will adhere to the command from Christine that I not speak to anyone about this. However, I am very concerned about william being on staff with several members of the twitter mob, especially if I'm told that I can't say anything and I can't warn him to be careful. Very difficult position to be in as a parent.

I have received death threats today. This is not okay and is very




iMessage











9:08



Tammy ›

I have received death threats today. This is not okay and is very concerning for him because there's no reason to believe that he is safe there on campus as a part of an RA staff that will go to these lengths to lie about me.

Sent as Text Message

Wed, Aug 26, 7:10 PM

I can not speak to what you were told by Christine, but certainly think you can have a conversation with your son as a parent. I would

iMessage

  

      

9:09

**Tammy** ›

Wed, Aug 26, 7:10 PM

I can not speak to what you were told by Christine, but certainly think you can have a conversation with your son as a parent. I would advise that you inquire with Christine. In the interim, I can reach out to William and offer support to him as a student. Also, if you feel he is unsafe, you need to make decisions as a parent. Who made the death threats? Where were the death threats?



9:09



Tammy ›

EDUCATION

# Former student complained about a Ringling College dean. Now he's suing her for defamation

BY GIUSEPPE SABELLA AUGUST 26, 2020 05:00 AM



Current and former students at the Ringling College of Art and Design have accused a longtime



Listen to this article now

Threats are all over social media. Some made to me directly via messenger.

  iMessage 

      

**9:09**



**Tammy** ›

Threats are all over social media. Some made to me directly via messenger.

I personally do not feel in danger. I do, however, worry about william. He is very upset about this and while I appreciate the offer, I'm not sure it will help if you were to contact him.

Another post by current RA Lydia Wolfahrt.

And today's news article was updated to include

iMessage

9:09 

 

**Tammy ›**

> And today's news article was updated to include a quote from Raelyn. Interesting to know this:

After laying out the recent complaints, the letter to Ringling and the ensuing media coverage, the lawsuit goes on to say that "on or about July 30, 2020, Ringling College concluded their investigation into the allegations by Ruiz and found no wrongdoing by Plaintiff."

After a version of this story was published online and in print, a spokeswoman for the college contacted the Bradenton Herald by email and clarified that Ringling's most recent investigation was still ongoing.

"The inquiry that began in summer 2020 was absolutely not concluded in July, and is, in fact, still ongoing," said Raelyn Lincoln, special assistant to the college president.

Shaffer is now suing Ruiz for "an amount to be determined at trial." He is also seeking attorney's fees, a public retraction and injunctive relief to prevent Ruiz from making "defamatory remarks."

RELATED STORIES FROM BRADENTON HERALD

**Relative to William, I'll still reach out.**

> Any sense as to why the investigation would be noted as ongoing when it concluded this morning?

   iMessage  

      

9:09



Tammy ›

I do not know?

Thu, Aug 27, 12:31 PM

Do you have a sanction letter for Jamie Flores from Dean's Panel 2013? Also...any reports or hearing notices for Manuel Zapata?

Oh geez, are there more people coming forward about my wrongdoing?

I haven't seen the posts, but Raelyn said there were two related to these two alums. My

iMessage

9:10



**Tammy** ›

I haven't seen the posts, but Raelyn said there were two related to these two alums.  My understanding was that posts targeted these two....

You may not be finding it because it's jaime

Emailing now

Oh....thanks!  I guess a post shared where he works and his website.

That is called Doxing. In case you didn't know.

   iMessage  

      

9:10



**Tammy** ›

That is 2015. Then there's 2013 when he was terminated as an RA that I also forwarded

It is the 2013 one I am looking for....thanks much!

By the way, Giles of that vintage are usually in the share drive titled "judicial" or conduct, which no longer appears in my available drives. Not sure why that would be but thought I'd let you know.

My best guess on

iMessage

9:10



**Tammy** ›

My best guess on zapata is that it was never reported. I don't have any email about it even from another source. Are they saying I took the report?

If I knew the Vic/reporter it might help

I do not have a name for a Vic....

Also, the post I see on Twitter doesn't mention us at all, it calls him a rapist and doxes his name and address

I'm not sure of wording

  iMessage 

9:10



**Tammy** ›

I do not have a name for a Vic....

Also, the post I see on Twitter doesn't mention us at all, it calls him a rapist and doxes his name and address

I'm not sure of wording from post about Zapata...

Okay...I guess you found it.

Tap to Download
IMG_3101.PNG
367KB

iMessage



1:29

**Thread**

andi c.    straw hat suppre... ···
@airismile

Manuel Zapata is a rapist. He raped one of my friends while he was a student at Ringling College of Art and Design. He works as a 3D Animator in the San Francisco Bay Area. This is his website.

Home | manuelzapata
zapatamanuel.com

6:00 PM · 8/26/20 · Twitter Web App

**19** Retweets and comments  **41** Likes

Tweet your reply

9:11




Tammy › 

IMG_3101.PNG

Wow!

Raelyn is just wanting to be prepared if more comes I believe.

Tap to Download
IMG_3102.PNG
1.7 MB

I'm guessing the person didn't come forward.

Jekeyma has nothing on Zapata. Only an alcohol violation on Flores.

   

      

1:30 

 **andi c.** 🍓 **straw hat su...** · 19h · · ·
Replying to @airismile

The friend who was assaulted was intoxicated. He raped he while she was unconscious, and then came to class the next day as if nothing happened. Here is his LinkedIn profile.

 Manuel Zapata - San Francisco Bay Area...
linkedin.com

💬 1    🔁 1    ♡ 12    ⬆️

 **andi c.** 🍓 **straw hat su...** · 19h · · ·
Here is an image of him. His nickname is "Taco". We were friends since freshman year. I am tired of keeping quiet.



Tweet your reply

    🔍    🔔    ✉️

9:11



Tammy ›

Jekeyma has nothing on Zapata.  Only an alcohol violation on Flores.

Tap to
Download
IMG_3103.PNG
1.4 MB

Tap to
Download
IMG_3105.PNG
1.5 MB

Thanks for sending the posts.

Found having d copy files for the 2015 case.

Thu, Aug 27, 6:08 PM

  iMessage 

      



**1:32**

< **andi c.** ✦ **straw hat suppre...**
88.4K Tweets

**Tweets**   **Tweets & replies**   **Media**   **Likes**



**andi c.**   **straw hat su...** · 19h  ···
Jamie Flores is a rapist. He has assaulted two of my friends while he was at Ringling College of Art and Design. He was never penalized, and we was able to graduate and work professionally. He is a motion designer in the New York area. Here is his website.

 JAIME
jfloresdesign.com

💬 1        ↻ 25        ♡ 37        ⬆



**andi c.**   **straw hat su...** · 19h  ···
I know he has assaulted many more people. The victims were penalized, but not the rapist himself. I'm tired of being quiet about this.

💬 1        ↻        ♡ 15        ⬆




**andi c.**   **straw hat su...** · 19

          



1:32

< **andi c.** ✦ **straw hat suppre...** 000
88.4K Tweets

**Tweets**   **Tweets & replies**   **Media**   **Likes**

**andi c.**   **straw hat su...** ·19h ···
I know he has assaulted many
more people. The victims were
penalized, but not the rapist
himself. I'm tired of being quiet
about this.

💬 1          ⇄          ♡ 15          ⬆️

**andi c.**   **straw hat su...** ·19h ···
Here is his picture. His about
section says he is "A motion
designer with a passion for
learning, visual narrative, people,
and salsa dancing."

He raped at least two of my
friends while they were
intoxicated.



💬 2          ⬆1 1          ♡ 12          ⬆️

🏠          🔍          🔔          ✉️

9:12



Tammy ›

Sat, Aug 29, 4:50 PM

**Where did you see that about potential protest on 9/12?**

Twitter

Then it disappeared. I thought you may want to know anyway.

**Of course!  Thank-you!**

**Do you know who posted?**

I do not. Twitter allows anonymous names.

**Okay.....thanks!** 😐

9:13



Tammy ›

Mon, Aug 31, 10:56 AM

Do you know who
posted the Protest info.?

I do not.

Thanks!

What I did notice,
though, is that there are
some similarities in the
format/style of the
screenshot that look
familiar.

Mon, Aug 31, 4:57 PM

Tap to
Download
IMG  3167.PNG

iMessage

9:13



**Tammy** ›

Fri, Sep 4, 8:24 AM

By the way, I didn't speak to anyone in the last two days. Every single PA person approached me with support for this situation, ranging from statements like "we hope you win" to "it's just wrong what she and others have done" etc. I said thank you for the kind words.

That's good! I am glad they said something to you. I had one of them say that to me....I can't remember her

iMessage

9:14



**Tammy** ›

remember her name....maybe Dory? She is very sweet. Full support for you. She wanted me to pass it along.

Yes. The silent by far majority. I have done nothing to raise a mob of support and that may prove a mistake in hindsight but I never thought it necessary to do that if there's any justice in the world.

Fri, Sep 4, 10:12 AM

As I am not really

iMessage


**Ringling College**
**of Art + Design**

Chris Shaffer
Associate Dean of Students for Residence Life

August 25, 2020

Dear Mr. Shaffer,

Thank you for your patience and cooperation as Ringling College has worked to conduct a thorough, neutral fact-finding investigation into a series of reports and claims regarding behavior on your part. These reports and claims appear to have been submitted in response to social media posts and other subsequent actions asking for reports regarding your behavior.

Along with numerous anonymous stories that were attached to an "Open Letter" submitted to the campus community, 17 reports naming you as an "alleged responsible party" were submitted through the Maxient system between June 24, 2020 and July 20, 2020.

After interviews with complainants, review of previously prepared reports regarding identifiable events, and due to the number of reports describing similar concerns, it was determined that grouping issues thematically would provide the most appropriate method of further investigation.

The reports and issues as collected all fell within the following themes, all of which were investigated to the extent possible:

1. You did not appear attentive to students in meetings.
2. You did not respond to or address student complaints/issues with the appropriate level of seriousness or concern.
3. You used offensive and/or discriminatory comments (including inappropriately sharing private health information).
4. You made threats or implied threats regarding RA's employment.
5. You abused the power of your position to unilaterally make decisions regarding student misconduct and disability accommodations.

Subsequent to the commencement of the investigation, a rumor indicating that the investigation was almost complete circulated on social media on July 29, 2020. That posting contained another call for reports against you and twenty new reports were submitted through Maxient over the next two days. A very brief review of these reports occurred and they appeared to all fall within the same themes identified in the first group.

It is important to note that while the reports and social media postings used language which implied more serious conduct, all actual issues raised fell within the themes described above. Nothing more serious was alleged, nor was any evidence of anything more serious discovered.

This letter serves to inform you that the investigation into the claims is now complete. Having reviewed the available, relevant evidence including interviews with complainants, yourself, and witnesses, written statements, and previously written reports, the College determined the following as to each issue:

EXHIBIT E

 **Ringling College**
of Art + Design

Issue #1 You did not appear attentive to students in meetings.

- You have not consistently presented the appearance of an attentive, interested party to students who are often in an emotional state.

Issue #2 You did not respond to or address student complaints/issues with the appropriate level of seriousness or concern.

- While perhaps unintended, your use of humor and sarcasm often fails to build rapport with students, and may actually damage some relationships. This has apparently led to some students' perception that you do not present or display the appropriate level of seriousness or concern when performing intake meetings.
- We find that you have taken appropriate actions regarding student complaints by either addressing the complaints yourself or by moving the complaints into the proper processes. However, many students fail to understand the processes for making reports, and do not understand your role in those processes.

Issue #3 You used offensive and/or discriminatory comments (including inappropriately sharing private health information).

- You have occasionally used language that is insensitive to an individual's identity, experiences or situation and that has been interpreted as offensive and derogatory.
- You have not inappropriately shared protected health information.

Issue #4 You made threats or implied threats regarding RA's employment.

- You have not threatened the employment status of RAs, but have used language that was interpreted in that way.

Issue #5 You abused the power of your position to unilaterally make decisions regarding student misconduct and disability accommodations.

- You have not used your position to unilaterally make decisions regarding student misconduct or disability accommodations. However, students have interpreted your actions and behaviors to suggest that you can quickly and without consultation make of decisions of that nature. This continued interpretation by students is detrimental to the College's ability to appropriately carry out its responsibilities to provide safe and transparent conduct and accommodation processes.

Conclusion

In light of the above findings, it has been concluded that both your verbal and non-verbal communications with students may be detrimental to your effectiveness with students and are not consistent the College's values, principles and policies. The College requires the following:

- Your attendance at training programs identified by Human Resources and the Vice President of Student Life to improve communication skills, especially as they relate to dealing with emotional or sensitive situations and difficult people.





**Ringling College**
of Art + Design

- Participation in coaching sessions related to comprehending and adapting to behavior styles, and diversity sensitivity provided by an external, professional entity jointly agreed upon by yourself, Human Resources and the Vice President of Student Life.
- This letter is notice that further use of language that is insensitive to an individual's identity, experiences or situation cannot be tolerated.
- Finally, a reassignment of duties and a change of title which focuses more closely on student housing and administration will begin immediately.

Please keep in mind that submitting concerns/complaints is a protected activity and any adverse action taken against a complainant by you are by someone on your behalf could constitute unlawful retaliation.

We know this has been a difficult period for you and are committed to working together to build on what we have learned from the investigation.

Please address any questions, or any response you may choose to provide, to me.

Sincerely,

Darren Mathews
Director of Human Resources
Ringling College of Art and Design

Received on August 25, 2020

Chris Shaffer



**Ringling College
of Art + Design**

Office of the President

August 27, 2020

PERSONAL DELIVERY

Mr. Chris Shaffer
333 Suwanee Ave.
Sarasota, FL 34243

Dear Chris:

This letter is a separation, waiver, and general release agreement, ("Agreement") and it describes the understandings and agreements between you and Ringling College of Art and Design, its Officers, Directors, and Board Members ("Ringling College"). As we have mutually agreed, your employment with Ringling College will end on September 15, 2020. To ease your transition, we are willing, under the conditions described in this letter, to offer you additional compensation and benefits that are more than what you would otherwise be entitled to receive upon separation. Please sign in the place provided at the end of this document if you agree to the terms of this Agreement. You have been advised that you have 21 days to consider this Agreement from the date of this Agreement (August 27, 2020) which will be September 17, 2020. However, keep in mind that this offer can be withdrawn until it is signed. If you do not sign this agreement within 21 days, the offer is automatically withdrawn and null and void.

1.      You are resigning from your position as Associate Dean of Students for Residence Life effective September 15, 2020, which means your employment with Ringling College will end on that date. The reason(s) for your resignation will be mutually agreed upon by you and Ringling College and publicized as such. Ringling College will not contest your claim to unemployment, but it is understood that Ringling College has no control over decisions about unemployment by the Florida Department of Economic Opportunity, Reemployment Assistance Program. Ringling College is required by law to report all payments you are receiving to that Agency.

2.      Separate and apart from any consideration you are receiving for signing this Agreement, you will continue to receive the following salary and benefits through September 15, 2020:

EXHIBIT __F__

Mr. Chris Shaffer
August 27, 2020
Page 2

a.   Pay your semi-monthly salary of $3,759.84 (less applicable withholdings) through September 15, 2020;

b.   Continue your semi-monthly Retirement Plan matching contribution in the amount of $187.99 which will be made in accordance with the regular contribution schedule through September 15, 2020.   This amount requires a matching employee contribution and assumes the current employee contribution.  The amount may change based on the amount of the employee contribution;

c.   Continue your health plan coverage through September 30, 2020. Effective October 1, 2020, you will be eligible to continue your health plan coverage at your own cost under COBRA for which you will receive separate notice from Employee Benefits Corporation (EBC);

d.   Continue your pre-tax participation in the medical flexible spending account program through September 15, 2020.  Effective September 16, 2020, you will be eligible to continue your participation on a post-tax basis under COBRA for which you will receive separate notice from Employee Benefits Corporation (EBC);

e.   Continue tuition remission for your child, William Shaffer through the end of the Fall 2020 semester;

f.   Pay you on September 15, 2020, in a lump sum, subject to applicable withholdings and payroll taxes, for the remaining vacation leave that you have not taken prior to September 15, 2020.  Assuming you do not take any more vacation days, this payment would be for 11 vacation leave days – 10 days rolled over from your previous anniversary year of August 27, 2019 through August 26, 2020 and 1 accrued day from August 27, 2020 through September 15, 2020 ($3,817.68 total).

3.   In addition to the sums described in paragraph 2 above, and as consideration for your waiver and general release in paragraph 4, your dismissal of any lawsuits filed against alumni or current Ringling students, and the other promises in the Agreement, Ringling College will:

a.   Pay you an amount equal to ten (10) months of salary ($75,197) ("Consideration Amount").  These Consideration Amount payments will be made in equal semi-monthly installments of $3,759.84 beginning September 30, 2020, and ending July 15, 2021, according to the College's normal payroll schedule.  Applicable withholdings and payroll taxes will

Mr. Chris Shaffer
August 27, 2020
Page 3

be deducted from all Consideration Amount payments, however, no additional Retirement Plan contributions will be made after September 15, 2020;

b.     Effective October 1, 2020, pay the premium to continue your current health plan coverage under COBRA through July 31, 2021. This includes the full COBRA premium for you and the current employer-paid portion of the family coverage (in the monthly amount of $1,440.26 for a total of $14,402.60). You will be required to pay the non-employer paid portion of the family coverage. After July 31, 2021, you will be required to pay the full cost if you wish to continue coverage under this plan for the remaining period COBRA is offered. (Ringling College's payment of your COBRA premiums does not extend the period of time for which you are eligible for COBRA and you must elect COBRA and complete all required COBRA documents to be entitled to this);

c.     Pay the tuition for your child, William Shaffer, to attend Ringling College of Art and Design for the Spring 2021 semester and 2021-2022 academic year, provided your child remains in good academic standing.   These tuition payments are subject to required tax reporting. Ringling College will not be responsible for, nor will it pay for, tuition for classes, conferences, seminars or classes which are in addition to Ringling College's regular tuition for onsite/remote classes. All expenses other than tuition such as fees, housing or any other costs incurred by you or your child as a result of his attending Ringling College will not be paid by Ringling College. Cash payments will not be made in lieu of tuition.

Both you and Ringling College agree the Consideration Amount and COBRA payments would not ordinarily be paid by Ringling College and you would not be entitled to the payments or the letter of reference absent your execution of this Agreement. Therefore, if you do not execute this Agreement on or before September 21, 2020, you will not receive any of the payments/benefits in this Paragraph 3 and this offer shall be null and void on that date.

You further agree to cause the lawsuit against Megan Ruiz (and any lawsuit you may have filed against any other Ringling College alumni or against any current student) filed by your attorney to be dismissed and to provide Ringling College with proof of the dismissal no later than 3 business days after you execute this Agreement. If the lawsuit filed in Sarasota county, Case No. 2020-CA-003308 and any other lawsuit filed against Ringling College alumni or current students has not been dismissed and the dismissal not filed within the time period described above, you will not receive any of the payments and benefits descried in paragraph 3 above.

Mr. Chris Shaffer
August 27, 2020
Page 4

4.    In return for the various promises and payments described in paragraph 3 above made by both you and Ringling College as described in this Agreement:

a. you agree to release and discharge Ringling College, its Officers, Directors, and Board Members, (collectively referred to as "The Released Parties") from any and all claims, demands, damages, or causes of action arising out of or pertaining to your employment with Ringling College. You further agree not to file or cause to be filed any claims or lawsuits of any kind against The Released Parties, including, but not limited to, any and all charges, claims, demands, causes of action, or lawsuits of any kind or nature whatsoever, known or unknown, matured or unmatured, including, but not limited to actions alleging breach of contract or tort, *quantum meruit,* or any legal actions or proceedings or acts or omission by The Released Parties under any state, federal or local law concerning discrimination or retaliation, or under any other law or regulation, including but not limited to Age Discrimination in Employment Act ("ADEA") and the Older Workers Benefit Protection Act ("OWBPA"), the Family and Medical Leave Act, Title VII of the Civil Rights Act of 1964 as amended; the Americans with Disabilities Act; and the Florida Civil Rights Act or any other claim from the beginning of time until the date of you sign this Agreement. You also agree not to recover from a lawsuit or any other action filed by you or on your behalf by a third party involving or mentioning Ringling College, its Officers, Directors, or Board Members. Notwithstanding the foregoing, this Agreement does not preclude you from participating in any investigation conducted by any federal, state or local government agency, however you agree you will not be entitled to any compensation resulting from any investigation. **This is a General Release.**

By signing this Agreement, you also acknowledge and confirm you have been paid all compensation and wages for services to Ringling College (apart from that described in this Agreement) and that you have no unreported work-related injuries or illnesses.

You further agree to cause the lawsuit against Megan Ruiz (and any lawsuit you may have filed against any other Ringling College alumni or against any current student) filed by your attorney to be dismissed and to provide Ringling College with proof of the dismissal on or before the date you execute this Agreement. This Agreement will not be effective unless and until the lawsuit filed in Sarasota County, Case No. 2020-CA-003308 or any other lawsuit filed against Ringling College alumni or current students has been dismissed.

Mr. Chris Shaffer
August 27, 2020
Page 5

    b.    the Released Parties as defined above agree to release you and agree they will not sue, make any claims or demands against, or seek monetary or other compensation or relief (including attorneys' fees and costs) for any of your acts or omissions of any kind related or pertaining to your employment with Ringling College, whether or not known, matured, asserted or suspected including such claims as might arise out of any oral or written contract, or that might arise out of any local, state or federal regulation or law.  This includes but is not limited to any claims, rights or demands arising out of any oral or written contract, and any rights, claims, causes of action or demands available under any local, state or federal, regulation, law or ordinance, including but not limited to common law or statutory claims of any kind whatsoever, criminal claims, tort claims, breach of contract claims, or other claims the Released Parties may make against you from the beginning of time until the effective date of this Agreement.

    5.    Although your last day of work is September 15, 2020, pursuant to the requirements of the ADEA and the OWBPA, you may take twenty-one (21) days from the date you originally receive this letter (August 27, 2020) to consider whether to sign this Agreement. However, keep in mind that this offer can be withdrawn until it is signed. You should consult with an attorney at your own cost, if you wish. You will have seven (7) days following the date you sign this Agreement to revoke the Agreement.  To be effective, your revocation must be directed to and received by Dr. Larry R. Thompson no later than the seventh day following your execution of this agreement. **Your entitlement to benefits you are receiving in exchange for this Agreement, including, but not limited to the Consideration Amount payments to you and COBRA payments on your behalf by Ringling College as set forth in paragraph 3(a) and (b) above, will not start until the expiration of the seven (7) day revocation period following your execution of the Agreement.**

    6.    By signing this Agreement, you confirm that you have not filed any formal or informal claims or charges or lawsuits against Ringling College or any of the Released Parties.

    7.    Upon written request by you or from any third party for a reference from Ringling College to another employer or potential employer, Ringling College will confirm the dates of your employment, your position and your pay, but will make no further statement except that it is College policy not to provide any other information on former employees. All requests for references must be directed to Christine DeGeorge, Vice President for Human and Organizational Development.  Dr. Larry R. Thompson will also provide a letter of neutral reference to prospective employers.

Mr. Chris Shaffer
August 27, 2020
Page 6

8.     You agree to observe "good behavior" towards Ringling College.  "Good behavior" means you will not take adverse action against the College, nor will you criticize or make negative statements about or do anything to diminish the reputation of the College.  Furthermore, this section means that neither you nor any person acting at your direction or request or with your cooperation and assistance will criticize Ringling College, its faculty, its staff, its administration, its employees, its students, its methods of operation, its policies and procedures, or its role as a community citizen, nor will you criticize Ringling College's treatment of you.

9.     This Agreement supersedes all previous agreements between you and Ringling College, and you are not relying on any promises or representations other than those stated in this Agreement, including the Staff Handbook. Furthermore, you acknowledge that neither Ringling College nor you have any other obligations to the other party other than as described in this agreement.

10.     Starting on the date you receive this Agreement, both parties agree to keep the terms of this Agreement confidential including, but not limited to, the payments referenced above. You may disclose the terms of this Agreement to your immediate family, your attorney and accountant and as required by law, including a valid subpoena.  Any disclosure by you or anyone you have told will be deemed a disclosure by you and it will be considered a material breach of this Agreement and such disclosure will negate all obligations of Ringling College to pay the Consideration Amount made to you and COBRA payments on your behalf by Ringling College as set forth in paragraph 3(a) and (b) above. Ringling College may disclose the terms of this Agreement to its Officers, Directors, Board Members, and its agents (such as accountants, lawyers, etc.) and as required by law, including in response to a valid subpoena.

In the event either party learns that it will be required by law to disclose the existence of this Agreement, to produce this agreement, or to disclose any of the terms of this Agreement, whether by subpoena or through discovery process related to any lawsuit, the party receiving the request will notify the other party in writing via email and fax within two (2) business days of receiving the request for disclosure or production. Both parties agree to take all reasonable action to prevent disclosure or production on its own behalf or on behalf of the other party. Either party to this Agreement shall have the right to seek judicial intervention to prevent disclosure or production. Nothing in this paragraph shall preclude either party from producing or disclosing the terms of this Agreement to the extent necessary to pursue its right to enforce the terms of this Agreement if the other party has breached the terms of the Agreement.

11.     You acknowledge that you have been privy to confidential and proprietary information belonging to Ringling College.  Such information includes, but is not limited to student information, financial information, salary information and strategic and

Mr. Chris Shaffer
August 27, 2020
Page 7

operational plans. You agree to maintain the confidentiality of that information. If you are subpoenaed to testify in any matter in which such information may be disclosed, you will immediately notify Ringling College of the subpoena in order to give the College time to determine whether to take any action with respect to the subpoena.

12.   By September 15, 2020, you agree to return all property belonging to Ringling College which may be in your possession including any and all purchasing cards, documents, reports, files, memoranda, records, credit cards, cell phone, door and file keys, computers, computer access codes or property (including computers etc.) that you received, prepared or helped to prepare in connection with your employment with Ringling College, and to return all Ringling College property regardless of when you discover it in your possession. You also agree to give to Ringling College Institutional Technology staff or Department of Human Resources all passwords to items on College computers or in the "Cloud". You will continue to have access to your email through September 15, 2020, after which time the automatic reply indicating you are no longer at Ringling College will begin.

13.   Each party acknowledges this decision to resign is a mutual decision and this Agreement is not an admission of wrongdoing by either party. Each party has complied with all applicable laws, regulations and ordinances and Ringling College is making the payments described in paragraph 3 and other promises described above as a gesture of goodwill. Each party recognizes the cost of bringing and defending lawsuits, even ones without merit, so it is their intent to avoid litigation by entering into this agreement which will amicably end their relationship and provide benefits to each of them.

14.   This Agreement shall be governed by the laws of Florida. Each part of this Agreement is severable and if any provision is determined to be legally invalid or unenforceable, all other parts shall remain in full force and effect. Any legal action to enforce this Agreement may be brought only in the state or federal court in or for Sarasota County, Florida and both parties expressly waive any right to venue elsewhere and both parties waive their right to a jury trial. If any action is brought to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to recover its attorneys' fees and other costs incurred, up through any appeal.

You acknowledge you have read and understand this Agreement; that you have been provided an opportunity to consult with an attorney at your own cost; and that you fully and voluntarily agree to all of its terms. If any of the terms of this agreement change, the 21 day period referred to in paragraph 5 above will not be extended and it will continue to run.

Mr. Chris Shaffer
August 27, 2020
Page 8

If you have any questions, please do not hesitate to contact me.

Sincerely,

Larry R. Thompson, President
RINGLING COLLEGE OF ART AND DESIGN

AGREED TO AND ACCEPTED:

_____
Chris Shaffer                        Date



**Ringling College
of Art + Design**

Office of the President

September 10, 2020

Christopher Shaffer
333 Suwanee Ave
Sarasota, FL 34243

Re:     Termination of Employment

Dear Chris:

Earlier this summer, allegations arose on social media attributing behaviors to you that do not
reflect the College's values or expectations. We take such allegations seriously and asked
those with concerns to file complaints through the Ringling Reporting Form. We then began
investigations of those complaints filed before July 20, 2020, and briefly reviewed those filed
after. Based on the findings regarding those complaints, a developmental plan was created to
allow for your continued employment with Ringling College.

Then, on August 26, we learned of a lawsuit, through an article published in the Bradenton
Herald, that you had filed against the alumnus who initiated the call for complaints on social
media. In late July, during the investigation, you mentioned to Human Resources that you
were considering filing a lawsuit. You were advised that doing so while the investigation was
pending would likely be considered interfering in the investigation and that it would have the
effect of discouraging persons from raising concerns or making complaints. Despite this, you
filed the suit prior to the completion of the investigation.

Although U.S. law generally gives everyone the freedom to file a lawsuit, Ringling staff also
agree to govern themselves by the Ringling College policies that prohibit retaliation against
those filing complaints or raising concerns and from interfering with an ongoing
investigation. The Staff Code of Conduct also prohibits conduct by staff which is adverse or
prejudicial to the best interests of the College or engaging in conduct on or off the job that is
unbecoming a Ringling College employee.

Ringling College has a strong and vested interest in providing an effective conduit for anyone
in the Ringling College community to raise issues and make complaints without fear of
retaliation or retribution. Ringling College expects its employees to act in ways that align with
our standards of behavior, our values, and our policies. Your lawsuit against a former student
creates the type of chilling effect that Ringling College's policies are intended to prevent. I find
that by filing the lawsuit referenced above, in addition to acting contrary to Ringling College
policies, you have engaged in actions that are considered contrary to Ringling's values and
beliefs, interfered with an ongoing investigation, and infringed on the rights and interests of
the College and its community members. Furthermore, they are adverse to the best interests
of the College, and are unbecoming a Ringling College employee. This has left me no choice
but to terminate your employment effective September 10, 2020.

2700 N. Tamiami Trail | Sarasota, FL 34234-5895 | T 941 359 7601 | F 941 359 6108
president@ringling.edu | www.ringling.edu

EXHIBIT_ G

Chris Shaffer
September 10, 2020

As a gesture of good will to help you through the transition, you will be paid two additional weeks of pay. Your final check will be processed on the next regular pay cycle and will be available by direct deposit on Tuesday, September 15, 2020.

Enclosed is a document regarding matters related to your separation from Ringling College.

Sincerely,

Larry Thompson
President
Ringling College of Art and Design

cc:     Tammy Walsh
        Personnel File, Payroll



**Ringling College
of Art + Design**

Human Resources

# GROUP LIFE INSURANCE PORTABILITY/CONVERSION NOTICE

To:                                    Christopher Shaffer

Date of Notice:                        September 10, 2020

Termination Date of Coverage:          September 10, 2020

Amount of Coverage Terminated:         $91,000 – Basic Life
                                       $300,000 – Voluntary Employee Life
                                       $150,000 – Voluntary Spouse Life
                                       $10,000 – Voluntary Child Life

Upon separation of Full-time employment, you are entitled to make application to OneAmerica for a portability or conversion option with certain restrictions. You must apply for the portability or conversion option within 31 days from the date your Group Term Life Insurance coverage ends.

If you are interested in the portability or conversion option, you must contact OneAmerica at 1-800-553-5318.

Please refer to your Life Insurance Certificate for more Information regarding the portability and conversion options or contact me at 941-309-4058.

Darren Mathews
Director of Human Resources

cc:      Personnel File



RINGLING COLLEGE OF ART AND DESIGN
ALUMNI NEWSLETTER

Dear Ringling College Community,

Earlier this summer, allegations arose on social media regarding the Ringling College Associate Dean of Students for Residence Life, Christopher Shaffer. We take such allegations seriously and asked those who had a complaint or concern to submit their issues to us online through the Ringling Reporting Form. We investigated about two dozen reports received through July 20. Another nearly two dozen reports were received after July 21 that have been reviewed but not yet fully investigated. Although there was no evidence of either violations of law by Mr. Shaffer or any issues of physical harm to students in any of these reports, there were behaviors described by complainants that do not reflect Ringling College's values as an institution.

In early August, before the investigation had ended, Mr. Shaffer filed a lawsuit against the alumnus who had initiated the call for complaints on social media. Although he had been informed that filing a lawsuit would likely be considered an interference with the investigation, he filed this lawsuit without our knowledge or consent, and we did not know about it until the later part of August.

U.S. law generally gives everyone the freedom to file a lawsuit. However, staff of the College also agree to govern themselves by the Ringling College Staff Code of Conduct and other policies that prohibit retaliation against those filing complaints or raising concerns, engaging in conduct which is adverse or prejudicial to the best interests of the College, or engaging in conduct on or off the job that is unbecoming a Ringling College employee.

Ringling College has a strong and vested interest in ensuring a welcoming campus environment. One mechanism for fostering such an environment is to provide an effective conduit for anyone in the Ringling College community to raise issues and make complaints without fear of retaliation or retribution. This open process allows Ringling College to learn about and address possible problems and provides us the opportunity to improve. People may be less willing to alert Ringling College to any concerns if they knew they might be sued for doing so.

Ringling College expects its employees to act in ways that align with our standards of behavior, our values, and our policies. Mr. Shaffer's lawsuit against a former student creates the type of chilling effect that Ringling College's policies are intended to prevent. Thus, such actions are considered contrary to Ringling's values and beliefs, are adverse to the best interests of the College, and are unbecoming a Ringling College employee. Therefore, Ringling College has ended Mr. Shaffer's employment at Ringling College, effective today.

EXHIBIT H

This situation has provided Ringling College an opportunity to evaluate the structure for the Office of Residence Life and, more importantly, our process for receiving and handling complaints. As a result of this inquiry, we have determined that the current structure in the Office of Residence Life has caused confusion and frustration for students, especially in regards to the complaints process. Ringling College has taken this feedback to heart, and is enacting changes to help clarify roles and expectations.

- The College will change the structure of the Office of Residence Life to more clearly delineate the role of housing administration from the responsibility of residence life management.

  * The restructured role of Associate Dean for Housing and Residence Life will have general oversight responsibility for these areas through two direct reports: The Director of Residence Life, a new position, and the Director of Housing Operations, a revised current position. We will begin work to fill the Associate Dean and Director of Residence Life roles immediately.

  * The Director of Residence Life will be student-facing and will help students with housing issues, oversee housing-related student conduct, and supervise the Resident Coordinators, to whom the Resident Assistants report. This role will also help students through the process of filing any complaints they may have.

  * The Director of Housing Operations will focus on facilities, marketing, assignments, maintenance, and planning for our residential community. This position will be effective immediately.

- The College will improve our communication with those who raise issues or file complaints and enhance our website to better outline the process for raising such concerns and to explain the follow-up that can be expected. While privacy policies and laws protect many details of the process and the outcome, we will work to do better to stay in contact with the complainant throughout the process and let the person know when any investigation has ended.

Our primary goal is to ensure everyone can easily and effectively bring their concerns to the appropriate person to enable them to be addressed. We want to make the process as easy and as transparent as possible. With this foundation, Ringling College can continue to pursue the mission of preparing students to be discerning visual thinkers and ethical practitioners in their chosen areas of art and design.

Sincerely,

Larry R. Thompson
President

https://www.ringling.edu/sites/default/files/Clerv%20Act%202019%20Annual%20Report%20Security%20and%20Fire%20Safety%20Report%20Final.pdf?fbclid=IwAR1PZk24KItDAmExZdPmUJuhKWE1ix_PXaTeMth-VfciLV1DfVMtpQcGyZI

### ARRESTS AND REFERRALS FOR DISCIPLINARY ACTION FOR 2016, 2017, 2018

| OFFENSE | YEAR | RESIDENTIAL FACILITIES ON-CAMPUS | ON-CAMPUS (INCLUDES RESIDENTIAL) | NON-CAMPUS PROPERTY | PUBLIC PROPERTY | TOTAL |
|---|---|---|---|---|---|---|
| ARRESTS: WEAPONS: CARRYING,POSSESSING, ETC | 2016 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 |
| DISCIPLINARY REFERRALS: WEAPONS: CARRYING,POSSESSING, ETC | 2016 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 |
| ARRESTS: DRUG ABUSE VIOLATIONS | 2016 | 0 | 0 | 0 | 2 | 2 |
| | 2017 | 1 | 1 | 0 | 0 | 1 |
| | 2018 | 0 | 0 | 0 | 3 | 3 |
| DISCIPLINARY ACTION: DRUG ABUSE VIOLATIONS | 2016 | 13 | 13 | 0 | 0 | 13 |
| | 2017 | 10 | 10 | 0 | 0 | 10 |
| | 2018 | 4 | 5 | 0 | 0 | 5 |
| ARRESTS: LIQUOR LAW VIOLATIONS | 2016 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 |
| DISCIPLINARY ACTION: LIQUOR LAW VIOLATIONS | 2016 | 23 | 23 | 0 | 0 | 23 |
| | 2017 | 12 | 12 | 0 | 0 | 12 |
| | 2018 | 14 | 14 | 0 | 0 | 14 |

*Since statistics for "Residential Facilities" are included in "On-Campus" statistics, the "Total" will be the sum of OV, NC, and PP

### DATING VIOLENCE, DOMESTIC VIOLENCE, STALKING FOR 2016, 2017, 2018

| OFFENSE | YEAR | RESIDENTIAL FACILITIES ON-CAMPUS | ON-CAMPUS (INCLUDES RESIDENTIAL) | NON-CAMPUS PROPERTY | PUBLIC PROPERTY | TOTAL |
|---|---|---|---|---|---|---|
| DATING VIOLENCE | 2016 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 |
| DOMESTIC VIOLENCE | 2016 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 |
| STALKING | 2016 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 |

*Since statistics for "Residential Facilities" are included in "On-Campus" statistics, the "Total" will be the sum of OV, NC, and PP

# EXHIBIT "A"

EXHIBIT  I

| Index: | 107 |
|---|---|
| Page: | 1 of 4 |
| Subject: | Non-harassment Policy |
| Revised: | October 30, 2014 |

**Ringling College of Art + Design**

**STAFF HANDBOOK**

## Non-harassment Policy

Ringling College of Art and Design maintains a professional work and academic environment in which all employees and students are treated with respect and dignity. A vital element of this atmosphere is the College's commitment to equal opportunities and the eradication of discriminatory practices including harassment, with the goal to provide an academic and institutional climate of non-harassment. Forms of harassment that are encompassed by this policy include harassment based on sex, age, gender, color, race, national or ethnic origin, religion, marital status, sexual orientation, sexual identity, disability, veteran status, genetic information, or any other basis prohibited by law. Harassment is specifically prohibited by state and federal law and instances of harassment may result in both civil and criminal liability on the part of the individual harasser as well as the College. Harassment's destructive impact wastes human potential, demoralizes employees and students, and perpetuates the tendency for further unacceptable behavior. For these reasons, the College is opposed to harassment in any form in its workplace and activities. This policy establishes procedures to address problems and questions regarding harassment in a prompt, discreet and fair manner. All employees and students are expected to comply and cooperate with its provisions and in accordance with the code of professional ethics.

Definition of Sexual Harassment: Due to the inherent complexity of sexual harassment, the College's policy contains this special section defining sexual harassment. Sexual harassment is defined by this policy as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is aimed at coercing an unwilling person into a sexual relationship whether or not it involves physical contact; that makes rejecting such conduct the basis for employment or academic decisions affecting the individual; or that unreasonably interferes with the individual's work or academic performance by creating an intimidating, hostile, or offensive environment for work or learning.

Examples of sexual harassment are such actions as sexual attacks; sexual violence; the requesting of sexual favors accompanied by implied or overt threats concerning one's job, grade, letter of recommendation, or similar activities; verbal abuse of a sexual nature; physical contact such as patting, pinching, or unnecessary touching; subtle pressure for sexual activity; sexist remarks regarding a person's body, clothing or sexual activity; or derogatory comments about a person's sexual orientation.

EXHIBIT J



| Index: | 107 |
|---|---|
| Page: | 2 of 4 |
| Subject: | Non-harassment Policy |
| Revised: | October 30, 2014 |

Ringling College of Art + Design

STAFF HANDBOOK

Sexual harassment does not refer to occasional compliments of a socially acceptable nature or to welcome social interactions.

Instructional material shall not be the basis for discipline unless an appropriate review by the Human Rights Committee finds the material irrelevant to the subject of the course or finds that the cumulative presentation of specific material is unbalanced to the degree that it establishes an atmosphere of harassment.

A Special Note to Faculty, Teaching Assistants, Staff, and Other Persons in Positions of Power: Harassment occurs when a person who is in a position of trust or authority engages in behaviors or creates conditions that are inappropriate, unwanted and/or non-reciprocal. This is especially true in instances of sexual harassment when an unwelcome personal element is introduced into what should be a sex neutral situation. Because of the difference in power between faculty and students and supervisors and employees, a faculty member or supervisor cannot be certain that a personal relationship is truly welcome or consensual. Moreover, other individuals may be affected by such relationships. Those who abuse, or appear to abuse, their power violate their responsibility to the community. The College expects the faculty and staff to be aware of the potential for problems and conflicts of interest.

The Human Rights Committee: The Human Rights Committee is a fact-finding committee whose purpose is to respond to and resolve harassment complaints. The Committee is a standing committee appointed by the President and comprised of three faculty members, two staff members, and two students. The student members of the Committee will participate only in those cases where other students are involved. The Vice President for Human and Organizational Development will serve as coordinator without vote. If the complaint should be against the Vice President for Human and Organizational Development, one of the committee members is to serve as the coordinator, with vote.

Student to Student Harassment: Student-to-Student harassment complaints are to be processed under the disciplinary procedure established and operated by the Office of Student Life. All other harassment complaints are to be processed by the procedures outlined in this policy.

"On Notice" Option of Complaint: Individuals who feel they have been harassed may choose to put the offender "on notice" that the offender's behavior is unwelcome. Often this direct communication by the individual brings a stop to the harassment, and no further action is necessary.



| | Index: | 107 |
|---|---|---|
| **Ringling College of Art + Design** | Page: | 3 of 4 |
| | Subject: | Non-harassment Policy |
| **STAFF HANDBOOK** | Revised: | October 30, 2014 |

Use of the "on notice" option is not a prerequisite to initiating the complaint procedures set forth in this policy, and the College will not refuse to investigate a complaint on the grounds that the victim did not have a discussion with the offender.  In other words, the victim always retains the right to avoid direct interaction with the offender and to initiate the complaint procedure explained in this policy.

<u>Procedures for Informal Complaint</u>: Individuals who believe they have been the victim of harassment may seek an informal resolution of the problem.  Use of the informal complaint procedures is not a prerequisite to initiating a formal complaint.  Complaints of sexual assault must be made through the Procedures for a Formal Complaint.

Informal complaints may be oral or written and directed to the Vice President for Human and Organizational Development or to any member of the Human Rights Committee.  Informal resolution will generally involve the Vice President for Human and Organizational Development or the Human Rights Committee serving as mediators in an effort to resolve the complaint.  The accused will be informed of the existence and nature of the informal complaint and will have an opportunity to respond.  The Human Rights Committee or the Vice President for Human and Organizational Development, serving as intermediaries, will seek a resolution that both the complainant and the accused can agree upon.  If no mutually satisfactory resolution can be found, the Human Rights Committee, the Vice President for Human and Organizational Development, and/or the complainant can decide if further action is appropriate.

<u>Procedures for a Formal Complaint</u>: Harassment complaints are to be directed to the Vice President for Human and Organizational Development or to a member of the Human Rights Committee.  The Vice President for Human and Organizational Development or the contact person on the Committee will prepare a written record of the individual's factual allegations which the complainant will then have the opportunity to review before signing.  Although complaints should be brought as soon as possible, preferably within six months after an offensive incident, the College recognizes that the sensitivity involved in certain situations may cause individuals to delay taking action.

Once the initial complaint is prepared, the Vice President for Human and Organizational Development or the contact person on the Committee shall convene the entire Human Rights Committee to review the complaint, and to conduct an appropriate investigation of the allegations. This investigation may be limited to mediation and a negotiated settlement between the complainant and the accused. Based on the evidence collected, a designated member of the



| Index: | 107 |
|--------|-----|
| Page: | 4 of 4 |
| Subject: | Non-harassment Policy |
| Revised: | October 30, 2014 |

**Ringling College of Art + Design**

**STAFF HANDBOOK**

Human Rights Committee will prepare a report containing the Committee's findings and conclusions.

Possible outcomes of the investigation are that the allegations are substantiated, or that allegations are not substantiated, i.e. an inconclusive investigation. In the event the allegations are substantiated, the Vice President for Human and Organizational Development or the Human Rights Committee may endeavor, through mediation, to reach a negotiated settlement of the complaint.

If a negotiated settlement cannot be reached, the Human Rights Committee will refer the matter to the College's Vice Presidents for resolution. The Vice Presidents will not reopen a completed investigation unless it can be shown that the investigating individuals made specific errors in reviewing the facts. The Vice Presidents will consider the findings and recommendations of the Human Rights Committee and, in consultation with the President, render a decision. Decisions will be made using the preponderance of evidence standard (i.e. it is more likely than not that the alleged conduct occurred).

Protection of Complainant and Others: All information regarding harassment will be kept in confidence to the greatest extent practicable and appropriate under the circumstances. The College cannot guarantee that the identity of the complainant will be concealed from the accused harasser, but any retaliation committed by the accused harasser by way of irresponsible, malicious or unfounded complaints will be investigated. If an investigation reveals that the complainant falsely accused another of harassment knowingly or in a malicious manner, the complainant will be subject to appropriate sanctions and/or discipline.

In order to ensure that a complete investigation of harassment claims can be conducted it may be necessary for the College to disclose to others portions of the information provided by the complainant. The College will try to honor any complainant's request that the College not disclose certain information provided, consistent with the College's obligation to identify and correct instances of harassment, including sexual harassment.

Penalties: Every claim of harassment will be considered on its own merits. The College will take whatever corrective action and/or disciplinary measures it considers appropriate under the circumstances, including but not limited to counseling, reprimand, probation, suspension, transfer, demotion or immediate termination of an employee or student in accordance with the provisions, policies and procedures outlined in the appropriate Faculty, Staff or Student Handbook.

| | | |
|---|---|---|
| **Ringling College of Art + Design** | Index: | **118** |
| | Page: | **1 of 2** |
| | Subject: | **Title IX Compliance** |
| **STAFF HANDBOOK** | Revised: | **October 22, 2014** |

## TITLE IX COMPLIANCE

Ringling College of Art and Design is committed to creating and maintaining a community in which students, faculty, and staff can work together in an atmosphere free from all forms of discrimination. Specifically, every member of the College community should be aware that Ringling College is opposed to discrimination, including sexual harassment, and that such behavior is prohibited by College policy (see *Non-Discrimination Policy, Non-Harassment Policy, Sexual Misconduct Policy*). It is the intention of the College to take whatever action may be necessary to prevent, correct, and, if necessary, discipline for behavior which violates this policy. Title IX of the Educational Amendments of 1972 (Title IX) is Federal law which prohibits discrimination on the basis of sex in education, programs or activities. Sexual misconduct and harassment, as defined in the Ringling College of Art and Design Non-Harassment Policy and Sexual Misconduct Policy, is a form of sex discrimination prohibited by Title IX, and includes sexual harassment and sexual misconduct. This policy applies to students, faculty, staff and visitors and covers conduct both on and off campus. Off-campus conduct that is likely to have a substantial effect on a complainant's on-campus life and activities or poses a threat or danger to members of the Ringling College community may also be addressed under this policy.

While it is often thought of as a law that applies to athletics programs, Title IX is much broader than athletics and applies to all programs at Ringling College. While compliance with the law is everyone's responsibility at Ringling College, the College has a designated Title IX Coordinator and Deputy Title IX Coordinator to oversee its response to all reports of sex discrimination, including harassment and sexual misconduct, and coordinate compliance with the mandates of Title IX. The Title IX Coordinator and Deputy Title IX Coordinator are knowledgeable and trained in the College's policies and procedures, State and Federal laws that apply to sexual misconduct and harassment, and the dynamics of sexual misconduct and harassment. The Title IX Coordinator and Deputy Title IX Coordinator are available to meet with any individual to discuss the options for resolving a report under this policy.

**Title IX Coordinator**
Christine Carnegie DeGeorge
Vice President for Human and Organizational Development
Office of Human Resources, Joutras 1
2700 N. Tamiami Trail
Sarasota, FL 34234
941-359-7619
ccarnegi@ringling.edu

**Deputy Title IX Coordinator**
Dr. Tammy S. Walsh
Vice President for Student Life and Dean of Students

EXHIBIT K

| | | | |
|---|---|---|---|
| **Ringling College of Art + Design**<br><br>**STAFF HANDBOOK** | Index: | | 118 |
| | Page: | | 2 of 2 |
| | Subject: | | Title IX Compliance |
| | Revised: | | October 22, 2014 |

Office Location:  Ulla Searing Center, Second floor
(941-359-7510)
twalsh@ringling.edu

The Title IX Coordinator has the overall responsibility for the implementation of the Title IX program at Ringling College.  The Coordinator oversees the administration of grievance procedures for faculty and staff, and coordinates training, education and communication of all College non-discrimination and non- harassment policies.  The Deputy Title IX Coordinator oversees the administration of the grievance procedures for students and coordinates training, education and communication to students. Grievance procedures are described in the *Student Code of Conduct*, the *Non-Harassment Policy*, and the *Sexual Misconduct Policy*.

| **Ringling College of Art + Design** **STAFF HANDBOOK** | **Index:** | **119** |
|---|---|---|
| | **Page:** | **1 of 2** |
| | **Subject:** | **Violence Against Women Act (VAWA) Compliance** |
| | **Revised:** | **August 11, 2014** |

## Violence Against Women Act (VAWA) Compliance

The Violence Against Women Act (VAWA) was implemented in 1994 in recognition of the severity of the crimes associated with domestic violence, sexual assault, and stalking, as part of the Violent Crime Control and Law Enforcement Act of 1994. VAWA was reauthorized in 2000, 2005, and 2013 to strengthen the law.

The Violence Against Women Act provides protection to women against crimes of sexual violence. The act was amended on several occasions and placed new obligations on colleges and institutions to report and conduct educational programs under its Campus Sexual Violence Act (**Campus SaVE Act**), which amended the Clery Act.

The 2013 VAWA Reauthorization added a non-discrimination provision that prohibits discrimination on the basis of sex by organizations that receive funding under the Act and allows an exception for "sex segregation or sex-specific programming" when it is deemed to be "necessary to the essential operations of a program".

Ringling College does not discriminate on the basis of sex in its education programs and activities, or in the context of employment. Sexual harassment, including sexual misconduct as defined in the Ringling College *Non-Harassment Policy* and the Ringling College *Sexual Misconduct Policy*, and sexual violence is a form of sex discrimination prohibited by Title IX of the Education Amendments of 1972. (See Ringling College of Art and Design *Title IX Compliance*).

## Definitions:

**Domestic Violence** – Violence committed by a current or former spouse or intimate partner of the victim; by a person with whom the victim shares a child in common; by a current or former cohabitant with the victim; by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred; or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction in which the crime occurred.

**Dating Violence** – Violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim; and where the existence of such a relationship based on a consideration of the following factors:

- Length of relationship

EXHIBIT L



| | | |
|---|---|---|
| **Index:** | | **119** |
| **Page:** | | **2 of 2** |
| **Subject:** | **Violence Against Women Act** | |
| | **(VAWA) Compliance** | |
| **Revised:** | | **August 11, 2014** |

Ringling College
of Art + Design

**STAFF HANDBOOK**

- Type of relationship
- Frequency of interactions between the persons involved in the relationship

**Stalking** – A course of conduct involving more than one instance of unwanted attention, harassment, physical or verbal contact, or any other course of conduct directed at an individual that could be reasonably regarded as likely to alarm or place that individual in fear of physical, emotional or psychological harm or injury. This includes cyber-stalking, a particular form of stalking in which electronic media such as the internet, social networks, blogs, cell phones, texts, GPS or other similar devices or forms of contact are used to pursue, harass or make unwelcome contact with another person. Stalking and cyber-stalking may involve individuals who are known to one another or have an intimate or sexual relationship, or may involve individuals not known to one another.



**Ringling College of Art + Design**

**STAFF HANDBOOK**

**About Ringling, Mission and Governance**

and for programs, as delegated by the President, that foster student engagement and development and for strengthening the partnership between academic and co-curricular life, including those publications in the Student Handbook.

### Associate Dean and Director of Student Health Services

The Associate Dean and Director of Health Services is responsible for managing and providing overall leadership and direction for the programs and services offered through the Health Center which includes Counseling, Medical Services, Recreation and Wellness. Responsibilities include policy/procedural development, implementation and interpretation; strategic planning; outreach programming; and service assessment. The Director determines critical needs for the maintenance and growth of services and oversees contractual agreements related to medical services, electronic medical records databases, and contractual psychiatric services.

### Associate Dean of Students for Student Development

The Associate Dean of Students for Student Development assists with the oversight of the daily operation and management of the Student Life department. This includes responsibility for the oversight of major Student Life events such as: New Student/Family Orientation, Family Weekend, Student Life components of Open Houses and Accepted Students' Day, and Commencement. The Associate Dean is responsible for student development activities; campus ministry; educational and awareness programming; international student, commuter student, veteran student and non-traditional student support programs and services; Parents' Association; and advisement to various student organizations. The Associate Dean serves as a Student Conduct Administrator, and provides overall student support and crisis intervention.

### Associate Dean of Students for Resident Life

The Associate Dean of Students for Residential Life is responsible for overall operation and management of the Residential Life program that provides a living-learning experience for resident students. This includes community development, residence hall operations, oversight of the room assignment process, budget management, programming, emergency and crisis response and mitigation, and overall student development. The Associate Dean assists with oversight of the summer PreCollege Program and manages summer residency programs to include student housing,

EXHIBIT M



**Ringling College of Art + Design**

**STAFF HANDBOOK**

**About Ringling, Mission and Governance**

conferences and special group housing such as the Teachers' Institute. The Associate Dean oversees the Mail Room services and meal plan operations. The Associate Dean serves as primary Hearing Officer for residential violations of the Code of Conduct; serves as a member of the Dean's Hearing Panel for serious student conduct violations and manages the Conduct Tracking Database.

### Director of the Center for Career Services

The Director of the Center for Career Services develops, implements, and oversees comprehensive career development and career preparation programs and services for students and alumni. The Director is responsible for career preparation, developing career opportunities, student career counseling, oversight of a developing internship program, student recruiter satisfaction, and continual identification and development of new/current employer relationships. The Director is responsible for outreach to parents, students, alumni, recruiters and other community members.

### Director of Food Services

The Director of Food Services reports to the Vice President for Student Life/Dean of Students but is employed by Chartwells, Inc. He/she is responsible for the daily meals served on campus.

### Director of Student Volunteerism and Service-Learning

The Director of Student Volunteerism and Service-Learning empowers students through volunteerism and service-learning to create positive change by offering a variety of opportunities that offer personal, academic, and/or artistic growth outside the classroom. The Director is responsible for: the development of the College's opportunities for meaningful volunteerism and service-learning; supervising student volunteer leaders in scholarship and fellowship programs; assisting faculty with building service-learning into the curriculum; preparing and conducting campaigns to promote engagement of faculty, staff and students; and investigating and applying for grants that support the volunteer program.



**Ringling College**
**of Art + Design**

**Student Life**

September 10, 2018

Lauren Wilson
Sent electronically to lwilson1@c.ringling.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2018000702

Dear Ms. Wilson,

This letter serves to confirm the outcome of the Conduct Hearing which was held on September 10, 2018 in Office of Student Life over an incident occurring on August 30, 2018. The following determinations were made regarding your responsibility for alleged violations of the Student Code of Conduct as described in the Student Handbook:

1. Violation of College policies, rules or regulations -- Responsible

As a result, the following sanctions have been assigned:

As a result, you have been issued a Disciplinary Warning. This warning is a written notice given to draw your attention to the fact that your behavior was not appropriate with Ringling College standards. Please understand that should a breach of Ringling College Code of Conduct occur again or you are found responsible for any future offenses, you may expect to receive more severe disciplinary action. Disciplinary Warning is not noted at all on your official College transcript.

As discussed, you have the right of appeal if you so desire and you need to do so within 72 hours of the issuance of the sanction as described in the Student Handbook. The Student Handbook can be found online on the student portal. Your appeal should be submitted to Dr. Tammy S. Walsh, Vice President for Student Life and Dean of Students twalsh@ringling.edu. You may submit an appeal based on the following: a) you have suffered a violation of your rights and the violation impacted the decision reached; b) significant and relevant new information which could not have been presented has since surfaced; and/or c) you have reason to believe the sanction or decision levied are duly arbitrary or unjustified, and can provide reasonable evidence or apparent cause to support this contention (Student Handbook).

Please know that we are here as an advocate for you and to help if you need us. Please let me know if you have any questions.

Sincerely,

Jekeyma Robinson
Associate Dean of Students for Student Life

CC:   Dr. Tammy S. Walsh, Vice President of Student Life and Dean of Students

EXHIBIT   N

EXHIBIT

I can't honestly believe this is going on. I had no idea why you were mad until Karen talked to me... I had no idea you were past out I thought you just had your eyes close like we were previously talking. I wasn't going to do anything..Im not that kind of guy. That's why I hate this. I don't want you to be afraid of me or hate me. I've always hated those guys who take advantage of people and are assholes. I don't want to be a monster like them and I'm not. In all truth I like hanging with you, talking with you about stuff, and being friends. I really dont want that to be ruined. Sorry if you thought it was weird that I came to your room.. I just thought we were having a good time and I just wanted to hang a little bit longer I'm sorry. I guess if you were passed out and woke to that you would freak out. However you didn't seem like that...we talked after... And you don't need to worry because I wasn't going to do anything. I was just doing the goosebumps thing..thought you were awake I'm sorry. I wish you could have talked to me first. I had no idea you passed out and freaked out because it didn't seem like it. Now it's becoming something

bigger and makes me feel like one of the things I hate most. I'm sorry really I'm your friend not one of "those" guys. Plus I have a girl at home I still love. I hope we can be okay and be friends because I like hanging with you.

really need some space. Just leave me alone.

I am not okay with anything that happened the other night. You need to leave me 100% alone including my friends. If you know im around somewhere, please, stay away. Whether anything was intentional or not, it still happened and i am not comfortable with you around. If you don't comply I will go to the school and file a statement about everything and let the school and law take care of it.

EXHIBIT

D

What the hell?!! I didn't do anything to you Why the hell are you doing this?  I have not even talked to you and avoided you.... Stop this. You are acting like I'm some predator who did something to you when I didn't! And like Im going to?! Wow....didn't know you were like this.

Sent from Sarasota



# Police Department
## Summary



| | |
|---|---|
| **Print Date/Time:** | 10/12/2020 09:31 |
| **Login ID:** | 1771 |
| **Case Number:** | 2018-00008865 |

Sarasota Police Department

**ORI Number:** FL0580100

## Case

| | | | |
|---|---|---|---|
| **Case Number:** | 2018-00008865 | **Incident Type:** | Misc. Officer |
| **Location:** | 1130 GREENSBORO LN | **Occurred From:** | 02/10/2018 13:13 |
| | Sarasota, FL 34234 | **Occurred Thru:** | 02/10/2018 13:13 |
| **Reporting Officer ID:** | 1650 - Hughes | **Disposition:** | |
| | | **Disposition Date:** | |
| | | **Reported Date:** | 02/10/2018 13:48 Saturday |

## Offenses

| No. | Group/ORI | Crime Code | Statute | Description | Counts |
|---|---|---|---|---|---|

## Subjects

| Type | No. Name | Address | Phone | Race | Sex | DOB/Age |
|---|---|---|---|---|---|---|
| Complainant | 1 Washington, Destiny | 1130 GREENSBORO LN 534 | (561)254-1380 | Black | Female | 12/18/1997 20 |
| Mentioned | 1 Berger, Nickolas Anthony | 1130 GREENSBORO LN 534 | | | Male | 02/01/1998 20 |

## Arrests

| Arrest No. | Name | Address | Date/Time | Type | Age |
|---|---|---|---|---|---|

## Property

| Date | Code | Type | Make | Model | Description | Tag No. Item No. |
|---|---|---|---|---|---|---|

## Vehicles

| No. Role | Vehicle Type | Year Make | Model | Color | License Plate State |
|---|---|---|---|---|---|

**Routing:**



## OfficerID: 1650, Narrative

On 02/10/2018 at approximately 1313 hours, I responded to the Ringling School of Art at 1130 Greensboro Ln Room 534 in reference to a possible suicide threat.

The Suicide Hotline called the Police Department stating they received a call from Washington who was advising that her boyfriend, Berger, was depressed and she felt that he might be suicidal. Upon arrival, I met with both Washington and Berger in Room 534. Berger stated for the last couple of weeks he has been feeling extremely depressed. Berger advised he has never been diagnosed with depression but is on medication for anxiety. He stated he feels like the anxiety medication he is taken could be the cause of his depression. Berger did not make any statements that he wished to harm himself or was suicidal to me. Berger advised he does not want to kill himself he is just very depressed. Washington told me she just wanted to get someone for Berger to talk to and didn't know any other options other than the suicide hotline.

I asked Berger if he would like me to transport him to Coastal so that he could voluntarily admit himself and speak to a doctor regarding his medication and depression. Berger agreed so I transported him and put him in contact with staff there.

Berger was displaying signs of depression but did not meet criteria for a Baker Act on this date.

Nothing further at this time.

**Starlett Massey**

| | |
|---|---|
| **From:** | Megan Ruiz <megan.r.ruiz@gmail.com> |
| **Sent:** | Wednesday, January 6, 2021 1:48 PM |
| **To:** | Starlett Massey |
| **Subject:** | Fwd: Followup |

---------- Forwarded message ---------
From: **mruiz** <mruiz@c.ringling.edu>
Date: Wed, Jan 6, 2021 at 10:47 AM
Subject: Fwd: Followup
To: Megan Ruiz <megan.r.ruiz@gmail.com>

---------- Forwarded message ---------
From: **Megan Rose Ruiz** <mruiz@c.ringling.edu>
Date: Mon, Jun 24, 2019 at 10:37 PM
Subject: Re: Followup
To: Taylor Parker <tparker1@ringling.edu>

Hello there.

I met with you twice at the end of last year. I wanted to report a situation that was happening within Resident Life. We met with Christine. In the end I decided I was genuinely too scared to take anymore action about the situation because I feared being fired. Since I am graduated, I would like to send this report to the Human Resources department at Ringling. I have already submitted this report to the office of Student Life as well.

At this point I just don't want this to happen to anyone ever again.

The reasons that I'm sending this email are as follows:
I believe that HIPPA laws have been broken, that the school's anti-discrimination policies have been broken, and that there is a generally unsafe environment within the Residence Life Office. My goal in sending this is to protect future students from having to go through what I, and the other residents involved, had to go through. I genuinely would have taken my experiences to my grave if it weren't for my concern for future and current students.

This story is really long and very personal so I want to start by giving an overview of my main points. Chris Shaffer has been blackmailing me since 2016. I believe that Chris Shaffer has broken HIPPA laws by spreading students' private health information to Resident Assistants as well as other students without consent. I believe that Chris Shaffer has broken Ringling's Anti-Discrimination Policy by treating students and Residents Assistants differently based on Religion, Social-Economic Class, and Gender Identity.

In the Summer of 2016 I was trying to find the money for tuition so that I could attend my Sophomore year at Ringling. After getting denied from a private loan, I made a Facebook post asking if anyone knew options for finding tuition money. After I made this post, I received a Facebook message from Chris Shaffer. He essentially said he could get me a job as a Resident Assistant. He asked me some very personal questions about my financial situation, and said he could

1

just look it up anyway. I thought at the time that he was helping me. He even joked that I would owe him loyalty in exchange for his help. I was hired as a Resident Assistant and it helped me enough financially that I could continue my education. I was under the impression that I had fairly gotten this position because I was never told otherwise.

This act of kindness was held over my head for the next three years. It was implied many times that I owed him because of this. And I was often told to keep information secret because of this act. There was an implication that if I spoke up about his wrongdoings I would be fired as a Resident Assistant, a position he knew was keeping me at Ringling. Chris Shaffer has used slurs against transgender individuals like "it" and "heshe" to me about a resident. He said they were dangerous and called them an abomination because of their gender identity. It was implied that I couldn't have an opinion about this because he hired me.

The most egregious thing that happened, and to be frank, one of the only reasons I'm writing this email, is because multiple times Chris Shaffer has spread resident's private health information to other students without consent. More than once, Chris has made comments about students' mental ailments to other students and Resident Assistants. In the Spring of 2018 I brought my concerns with this up to James Mitchell, who then texted Chris Shaffer and warned him that I wanted to report it. Chris Shaffer then messaged me on Facebook. I felt that I didn't have anyone to reach out to, and feared being fired, so I did not report these incidents. It's absolutely inappropriate that these things have happened and I want to do anything I can to prevent it from happening again.

Chris Shaffer has blatantly discriminated against me in the workplace because of my social economic status. Because Chris knew about my financial situation, he would constantly bring it up in the workplace, talk down to me about having loans, and even offer to buy my groceries in front of other Resident Assistants. I was treated differently because of my financial situation, and there was nothing I could do about it because I feared being fired.

This story is very personal, and I'm only really telling it to explain context. In the Summer of 2018 I again feared I would not be able to attend Ringling for my Senior Year. I worked Precollege 2018 as a Teaching Assistant. i went into Chris's office and asked if I could live on campus until the date tuition was due. He said he would get back to me. Two weeks later I emailed him asking if he had more information. He said I would not be able to stay on campus. I was distraught, as I feared being homeless. Other Resident Assistants then came to me, after realizing that they, too, could not stay on campus after precollege. They were worried about financial situations/housing for the next month. Most Resident Assistants were expecting to stay because it was done years previously and there was never any communication that it wouldn't be happening again.

Worried about my own situation, I emailed Chris asking if I could possibly pay for housing. He said there was no way that could happen. Chris requested a meeting with me the next day. He invited me, Kristin Dunham, and another Resident Assistant into his office, where he then spoke down to us and used strong/aggressive language with us for an hour and a half. He said it was literally impossible to house anyone between precollege and Fall training.

He told me that I was ungrateful to him and should be loyal to him because he hired me. He said that I owed him because he let me totally bypass the entire Resident Assistant hiring process (something I was not made aware was done for me.)

When I brought up my concern for the other Resident Assistants, he accused me that I just wanted free housing (when I actually asked if I could pay for it.) He also said that I was the ONLY Resident Assistant complaining. He said that I was a problem. He said I was the only Resident Assistant "like this." The reality was that all Resident Assistants were freaking out and I was the only person voicing it. I reiterated that I only wanted to point out how Precollege Resident Assistants would be spending their entire Precollege paycheck on housing or flights back home for the next month. I pointed out that Residents living in Summer housing had open beds. Chris Shaffer threatened to fire me because I had "talked poorly about Reslife to all of the Teaching Assistants." This is something I did not do, and there was no proof that I did. He then told me, and another resident assistant in the room, information about the Fall 2019 Housing, the same information he told the entire Summer 2019 Precollege Staff, and said "If this information gets out, I'll know who it was," and implied that we would be fired. He essentially created a reason to fire me out of thin air, and threatened me with it.

At the end of the meeting he said he was going to find a way to house everyone, essentially deleting the multiple comments he made about it being impossible, and proving to me that the meeting could have been 15 minutes long and was instead an hour or more of him speaking down to me. I wanted to specifically tell this story for a few reasons. He

knew that I could not report or do anything about him yelling at me because I would then be fired and would have to leave Ringling. But this incident incited so much fear into me that I literally didn't feel safe at work for the next year. Since Kristin was there for the incident, I felt that no prostate member at Ringling would listen to me, and me speaking out would result in my termination, and eventual withdrawal from the school. And unfortunately I know for a fact I am not the only person who has had this experience. I won't name them because most of them are Resident Assistants who literally don't feel safe to come forward about it. I don't want this to happen to anyone else.

I would be happy to provide more information. I feel hesitant to involve the names of other students, but I can elaborate more if it is needed, especially if it's about the spread of students' private information.

I didn't want to come forward about this. The only thing that's pushed me to do so is the fear that other students or Resident Assistants are being unfairly mistreated or discriminated against. I also don't want anyone else's personal information to continue to be so easily spread around.


On Mon, Dec 3, 2018 at 1:20 PM Taylor Parker <tparker1@ringling.edu> wrote:
Hi Megan-

Thank you again for coming in today. Maureen Keller, Christine's assistant, is going to be reaching out to you to determine a good time for you two to meet. If you get an email from that name that is why :) I believe that tomorrow the only time Christine has free is at 930... Maureen will fill you in, though.


Taylor S. Parker, Juris Doctor

Compliance Coordinator/Deputy Title IX Coordinator

Ringling College of Art and Design

2700 N Tamiami Trail

Sarasota, FL 34234-5895

(941) 309-4063

Pronouns: she/her/hers

