IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
CIVIL ACTION

**MEGAN ROSE RUIZ,**
**LYRA WILSON,**
**LAUREN WILSON,**
**CAITLIN HENNING,**
**ROXEANNE ZINSSER,**
**DYLAN BONNER,**
**NICKOLAS BERGER,** and
**BRYAN PAUL PATTERSON,**

       Plaintiffs,

                          Case No.:

       vs.

**RINGLING COLLEGE OF ART AND DESIGN, INC.,**

       Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, the Plaintiffs, MEGAN ROSE RUIZ, LYRA WILSON, LAUREN WILSON, CAITLIN HENNING, ROXEANNE ZINSSER, DYLAN BONNER, NICKOLAS BERGER, and BRYAN PAUL PATTERSON, by and through the undersigned attorneys, and hereby sues the Defendant, RINGLING COLLEGE OF ART AND DESIGN, INC., a Florida not-for-profit corporation, and alleges as follows:

### Introduction

As set forth in this Complaint, RINGLING breached its duty to protect its student population by providing a safe campus environment. RINGLING failed to protect the Plaintiffs from the mishandling of student-on-student reports of sexual assault, sexual harassment, threats of violence, and stalking. Plaintiffs' trauma from student-on-student misconduct was exacerbated by RINGLING'S misconduct, causing additional trauma. RINGLING breached its duty to protect Plaintiffs, who were students residing on campus at RINGLING at all material times hereto, from discrimination based upon gender, race,

disabilities, and LGBTQ+ status.  RINGLING failed to protect student employee plaintiffs from discrimination based upon disabilities and gender.  Plaintiffs suffered traumatization, fear, and helplessness due to RINGLING'S failure to protect them from its employees and agents.

Moreover, RINGLING has engaged in a pattern and practice of silencing students and covering up reports of student-on-student misconduct and violations of Florida and federal anti-discrimination laws since 2008.  RINGLING engaged in this conduct to misrepresent its campus as an extraordinarily safe campus in its marketing and promotion of the college. RINGLING knowingly allowed its student population to suffer repeated traumatization and silenced its students and alumni to profit from tuition and the revenue from housing and expenses.  In June of 2020, MEGAN ROSE RUIZ publicly spoke out about the misconduct, discrimination, and abuses of power she witnessed as a student employee at RINGLING. Plaintiffs then discovered that the abuses and trauma they suffered were part of a systematic campaign by RINGLING to silence students to prevent them from telling the truth about their experiences at RINGLING.   Plaintiffs have brought this lawsuit to hold RINGLING accountable and encourage RINGLING to create a safer and more protective environment for its students in the future.

## GENERAL ALLEGATIONS

1.      This is an action for damages in excess of Thirty Thousand Dollars ($30,000.00) Dollars, exclusive of costs and interest.

2.      Plaintiff, MEGAN ROSE RUIZ, is a resident of Los Angeles County, California.

3.      Plaintiff, LYRA WILSON, is a resident of Gwinett County, Georgia.

4.      Plaintiff, LAUREN WILSON, is a resident of Ouchita Parrish, Louisiana.

5.      Plaintiff, CAITLIN HENNING, is a resident of Manatee County, Florida.

6.      Plaintiff, ROXEANNE ZINSSER, is a resident of Sonoma County, California.

7.    Plaintiff, DYLAN BONNER, is a resident of Kent County, Michigan.

8.    Plaintiff, NICKOLAS BERGER, is a resident of Orange County, Florida.

9.    Plaintiff, BRYAN PAUL PATTERSON, is a resident of Yakima County, Washington.

10.    Defendant, RINGLING COLLEGE OF ART AND DESIGN, INC. ("**RINGLING**"), is a not-for-profit Florida Corporation doing business and located in Sarasota County, Florida.

11.    Venue is proper in this Court because the conduct giving rise to Plaintiffs' claims occurred in Sarasota County, Florida.

12.    The Plaintiffs have retained the undersigned law firm to represent them and are obligated to pay their attorneys a reasonable fee for their services.

### **Factual Allegations**

13.    RINGLING operates a private, not-for-profit higher education college with a focus on art and design located in Sarasota County, Florida.

14.    At all times material hereto, RINGLING employed CHRISTOPHER SHAFFER as its Associate Dean of Students for Residence Life.

15.    MEGAN ROSE RUIZ attended RINGLING from August 2015 until her graduation in May 2019.

16.    SHAFFER supervised Plaintiff, MEGAN ROSE RUIZ, during her employment as a Resident's Assistant ("**RA**") at RINGLING from August 2016 to May 2019.

17.    On June 22, 2020, Plaintiff, MEGAN ROSE RUIZ, posted on Facebook stating "Hey guys.  There is a big conversation happening about dangerous men in art communities. I'm just going to say it.  If you're a women and you go to Ringling, or plan on going to Ringling, stay the fuck away from Chris Shaffer.  Don't go into a space alone with him."  A copy of the "**Ruiz June 22, 2020 Post**" is attached and incorporated hereto as **Exhibit "A."**

18.   In response to the Ruiz June 22, 2020 Post, MEGAN ROSE RUIZ received numerous messages from students, alumni, former students, parents of students and alumni, faculty, former administrators, and current employees of RINGLING who had negative experiences with SHAFFER.

19.   Many of the messages that MEGAN ROSE RUIZ received stated that the sender feared retaliation from RINGLING and/or SHAFFER for speaking out about their experiences and concerns.

20.   MEGAN ROSE RUIZ encouraged the individuals who contacted her to share their concerns directly with RINGLING through its official channels.

21.   On June 24, 2020, MEGAN ROSE RUIZ sent an "Open Letter" to RINGLING. Attached to the Open Letter was a PDF entitled "Stories" that contained the redacted stories of reporting students, former students, alumni, and parents regarding their experiences at RINGLING.  Most of the stories involved negative experiences with SHAFFER.  A copy of the "**June 24, 2020 Open Letter**" is attached hereto as **Exhibit "B."**

22.   MEGAN ROSE RUIZ made public claims against SHAFFER based upon his wrongdoings committed as an employee and agent of RINGLING in the Open Letter, including the following:

(a) Mishandling and misconduct related to student-on-student reports of sexual assault;

(b) Mishandling and misconduct related to student-on-student reports of stalking;

(c) Mishandling and misconduct related to student-on-student reports of violence and threats of violence;

(d) Mishandling and misconduct related to the handling of students' private information, including but not limited to violations of HIPAA and FERPA;

(e) Discrimination related to students identifying as LGBTQ+;

(f) Discrimination related to students with lower socioeconomic status;

(g) Discrimination related to students based upon race;

(h) Discrimination related to students based upon disability;

(i) Discrimination related to students based upon mental health or invisible disabilities; and

(j) Discrimination related to students based upon gender.

23.     On June 26, 2020, RINGLING'S President Larry Thompson sent an email to the Ringling College Community, a copy of which is attached hereto as **Exhibit "C,"** in response to the Open Letter.  The email communication confirmed that the "allegations [against SHAFFER] do not reflect actions that conform to [RINGLING'S] core values or [its] expectations of what constitutes appropriate professional and acceptable behavior at [RINGLING]."

24.     Based upon information and belief, RINGLING conducted an internal investigation into the allegations against SHAFFER, which began in late June 2020.

25.     RINGLING did not terminate SHAFFER prior to commencing its investigation, nor did RINGLING limit SHAFFER'S access to RINGLING'S files regarding the reporting students and alumni. Instead, SHAFFER'S immediate supervisor Tammy Walsh involved SHAFFER in the investigation.  A copy of text messages between Shaffer and Walsh are attached hereto as **Exhibit "D,"** (the "**Shaffer/Walsh Messages**").

26.     On June 29, 2020, SHAFFER referenced in writing to Walsh his intended lawsuit against MEGAN ROSE RUIZ. *See* Exhibit "D" at page 12.

27.     Based upon information and belief, on or about June 30, 2020, SHAFFER met with Tammy Walsh, Darren Matthews, and Christine Carnegie, the Vice President of Human Resources at RINGLING, via Zoom regarding SHAFFER'S standing with RINGLING and the status of the investigation.  During this meeting, SHAFFER advised these representatives of RINGLING that he intended to file a criminal complaint and civil lawsuit against MEGAN

ROSE RUIZ.

28.     Based upon information and belief, Ms. Carnegie advised SHAFFER that he was free to pursue civil action against MEGAN ROSE RUIZ, but that such action would be at his own expense and may be construed as interfering with the ongoing investigation.

29.     On July 14, 2020, SHAFFER referenced in writing to Walsh his intention to file a lawsuit against MEGAN ROSE RUIZ. *See* Exhibit "D" at page 23.

30.     On July 24, 2020, SHAFFER referenced again in writing to Walsh his intention to file a lawsuit against MEGAN ROSE RUIZ, stating, "Wanted to clarify legal action with someone so that I stay in good standing with my employer. I don't want to make her into a martyr and/or have her claim retaliation." *See* Exhibit "D" at page 46.

31.     Based upon information and belief, on July 31, 2020, SHAFFER met with Darren Mathews, the Director of Human Resources at RINGLING. During this meeting, Mr. Mathews advised SHAFFER that the investigation into the allegations by MEGAN ROSE RUIZ had concluded, and despite RINGLING'S receipt of additional complaints regarding SHAFFER, no new investigation would take place.

32.     Based upon information and belief, during this July 31, 2020 meeting, Mr. Mathews advised SHAFFER that he would not be terminated.

33.     Based upon information and belief, during this July 31, 2020 meeting: SHAFFER advised Mr. Mathews that his lawsuit against MEGAN ROSE RUIZ was ready to be filed; SHAFFER offered to Mr. Mathews that he would not file the lawsuit if RINGLING would reimburse SHAFFER the retainer he paid to his attorney to commence the lawsuit; RINGLING did not respond to SHAFFER'S offer.

34.     On August 3, 2020, SHAFFER filed a lawsuit against MEGAN ROSE RUIZ, in the Circuit Court for the Twelfth Judicial Circuit in and for Sarasota County, Florida, Case No. 2020-CA-003308 (the "**Defamation Lawsuit**").

35.     The Second Amended Complaint in the Defamation Lawsuit contains 13 counts:
Libel Per Se (I); Libel Per Se (II); Libel (III); Libel Per Se (IV); Libel Per Se (V); Libel Per Se
(VI); Libel Per Se (VII); Libel Per Se (VIII); Defamation of Character (IX); Slander (X); Civil
Conspiracy (XI); Injurious Falsehood (XII); and Tortious Interference with a Business
Relationship (XIII).

36.     On August 25, 2020, RINGLING transmitted to SHAFFER a letter advising of
the conclusion of RINGLING'S investigation into the reports associated with the "Open
Letter," a copy of which is attached hereto as Exhibit "E."

37.     In the August 25, 2020 correspondence, RINGLING advised SHAFFER of its
retention of SHAFFER as an employee, albeit with "a reassignment of duties and change of
title which focuses more closely on student housing and administration," to begin
immediately. *See* Exhibit "E."

38.     RINGLING further advised SHAFFER to "keep in mind that submitting
concerns, complaints is a protected activity and any adverse action taken against a
complainant by you are [sic] by someone on your behalf could constitute unlawful retaliation."
*See* Exhibit "E."

39.     On August 27, 2020, RINGLING transmitted to SHAFFER a letter identified as
a separation, waiver, and general release agreement, a copy of which is attached hereto as
Exhibit "F."  The letter outlined the terms of a proposed separation and release whereby,
among other things, SHAFFER would "agree to cause the lawsuit against Megan Ruiz (and
any lawsuit you may have filed against any other Ringling College alumni or against any
current student) filed by your attorney to be dismissed and to provide Ringling College with
proof of the dismissal no later than 3 days after you execute this Agreement."  *See* Exhibit
"F."

40.     Based upon information and belief, SHAFFER did not sign the August 27, 2020

separation, waiver, and general release agreement.

41.     On <u>September 10, 2020</u>, RINGLING transmitted to SHAFFER a termination of employment letter, a copy of which is attached hereto as **Exhibit "G."**

42.     On <u>September 10, 2020</u>, RINGLING President Thompson transmitted a communication to the Ringling College Community regarding the termination of Shaffer, a copy of which is attached hereto as **Exhibit "H."**

43.     Based upon information and belief, RINGLING took no further action to seek to have the Defamation Lawsuit dismissed or otherwise resolved.

44.     At all times material hereto, RINGLING held itself out to be and specifically advertised itself as being a uniquely safe campus environment, with zero incidences of sexual assault, violence, and stalking occurring on their campus for multiple consecutive years.  This was a point emphasized by Ringling representatives at potential student interviews and during new student orientations.  Ringling's website also prominently displayed a snapshot of its Title IX reporting of zero incidents of "Dating Violence, Domestic Violence, Stalking for 2016, 2017, 2018."  A copy of the website snapshot is attached hereto as **Exhibit "I"** ("**Zero Reports 2016-2018**").  The snapshot of the Zero Reports 2016 – 2018 was removed from RINGLING'S website in 2020.

45.     As a not-for-profit college, RINGLING maintains a 501(c)(3) tax-exempt status with the Internal Revenue Service.

46.     As a private, not-for-profit college, RINGLING is subject to the provisions of the Americans with Disabilities Act and the Florida Civil Rights Act.

47.     RINGLING'S administration, including its employees, faculty, administration, and staff, and including SHAFFER, pursuant to a special relationship between the university administration and its students, had a special duty to ensure that the campus environment was safe pursuant to their representations.

48.     Generally, students, particularly those living in dormitories, rely on colleges for assistance and protection, and colleges are in the best, if not the only, position to assist. RINGLING understood this duty, and the reasonable expectations of students, as evidenced by its multiple aforementioned representations, including the Zero Reports 2016 – 2018.

49.     A special relationship exists between a college and its students, meaning that higher education institutions must take steps to ensure students are protected.  Where one party has more control, that party bears more responsibility.

50.     College students are vulnerable and dependent upon their colleges for a safe environment.  Colleges have a superior ability to provide that safety with respect to activities they sponsor and facilities they control.

51.     RINGLING'S Staff Handbook pertaining to its Non-Harassment Policy, prohibits "harassment based on sex, age, gender, color, race, national or ethnic origin, religion, marital status, sexual orientation, sexual identity, disability, veteran status, genetic information, or any other basis prohibited by law."  A copy of the Non-Harassment Policy is attached hereto as **Exhibit "J."**

52.     The Non-Harassment Policy acknowledges that sexual harassment is inherently complex and contains a "Definition of Sexual Harassment," which includes "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is aimed at coercing an unwilling person into a sexual relationship whether or not int involves physical contact; that makes rejecting such conduct the basis for employment or academic decisions affecting the individual; or that unreasonably interferes with the individual's work or academic performance by creating an intimidating, hostile, or offense environment for learning."  *See* Exhibit "J."

53.     The Non-Harassment Policy provides specific examples of sexual harassment, including "sexual attacks; sexual violence; the requesting of sexual favors accompanied by

implied or overt threats concerning one's job, grade, letter of recommendation, or similar activities; verbal abuse of a sexual nature; physical contact such as patting,  pinching, or unnecessary touching; subtle pressure for sexual activity; sexist remarks regarding a person's body, clothing or sexual activity; or derogatory comments about a person's sexual orientation." *See* Exhibit "J."

54.    The Non-Harassment Policy contains a "Special Note to Faculty, Teaching Assistants, Staff, and Other Persons in Positions of Power," which states in pertinent part:

> "Harassment occurs when a person who is in a position of trust or authority engages in behaviors or creates conditions that are inappropriate, unwanted and/or non-reciprocal. This is especially true in instances of sexual harassment when an unwelcome personal element is introduced into what should be a sex neutral situation.  Because of the difference in power between faculty and students and supervisors and employees, a faculty member or supervisor cannot be certain that a personal relationship is truly welcome or consensual. Those who abuse, or appear to abuse, their power violate their responsibility to the community."

*See* Exhibit "J."

55.    RINGLING'S  Non-Harassment  Policy  provides  that  student-to-student complaints are to be processed under the disciplinary procedure established and operated by the Office of Student Life. *See* Exhibit "J."

56.    RINGLING'S Staff Handbook contains a policy for Title IX Compliance pursuant to Title IX of the Educational Amendments of 1972, the Federal law that prohibits discrimination on the basis of sex in education, programs or activities.  A copy of the Title IX Compliance policy is attached hereto as **Exhibit "K."**  This policy provides that RINGLING "has a designated Title IX Coordinator and Deputy Title IX Coordinator to oversee its response to all reports of sex discrimination, including harassment and sexual misconduct, and coordinate compliance with the mandates of Title IX."

57.    RINGLING'S Staff Handbook contains a policy for the Violence Against Women Act (VAWA) Compliance, a copy of which is attached hereto as **Exhibit "L."**  This policy explicitly states that RINGLING "does not discriminate on the basis of sex in its

education programs and activities, or in the context of employment" and that "sexual harassment, including sexual misconduct . . . and sexual violence is a form of sex discrimination." The policy goes on to define domestic violence, dating violence, and stalking.

58.     As the Associate Dean of Students for Resident Life, SHAFFER was familiar with RINGLING'S Staff Handbook and responsible for: "overall operation and management of the Residential Life program that provides a living-learning experience for resident students." His position included oversight for "community development, residence hall operations, oversight of the room assignment process, budget management, programming, emergency and crisis response and mitigation, and overall student development." A copy of RINGLING'S Staff Handbook's provisions regarding SHAFFFER'S position is attached hereto as **Exhibit "M."**

59.     The availability of academic resources favors students living on RINGLING'S campus. The vast majority of RINGLING students reside in RINGLING on-campus housing.

60.     For freshmen students who reside in on-campus housing, there is a requirement for the students to purchase a pre-paid meal plan at RINGLING. Both the student housing and requisite meal plans generate additional revenue streams for RINGLING.

61.     As a result of RINGLING'S pattern and practice of implementation of the policies and procedures in the Student Handbook, the policies and procedures promulgated by the Office of Student Life (to the extent such Office of Student Life policies and procedures were in existence at the material times hereto), and the Staff Handbook, in conjunction with its undocumented pattern and practice of handling student reports of student-on-student sexual assault, threats of violence, violence, and stalking, RINGLING serves as law enforcement, housing authority, and final arbiter of student-on-student misconduct.

62.     Based upon information and belief, at all times material hereto, RINGLING'S

President Larry Thompson directly supervised the Title IX Department, the Human Resources Department, and the Resident Life Department at RINGLING.

63.     Based upon information and belief, at all times material hereto, Vice President Tammy Walsh directly supervised the Title IX Department, the Human Resources Department, and the Resident Life Department at RINGLING.

64.     Based upon information and belief, RINGLING'S Title IX Department, Human Resources Department, and Associate Dean of Students for Resident Life, SHAFFER, worked in tandem with Larry Thompson and Tammy Walsh to ensure that student and alumni reporters of student-on-student misconduct and student and alumni reports of discrimination were silenced and that applicable reports were not reported to the Department of Education in compliance with Title IX.

65.     Plaintiffs, in reliance upon the representations made by RINGLING regarding its extraordinary on-campus safety and Plaintiffs' reasonable expectations that RINGLING would adhere to the guidelines and operating principles outlined in its code of conduct and charter, agreed to pay tuition to attend RINGLING.

66.     Unbeknownst to Plaintiffs prior to their enrollment, RINGLING through its designated employees was aware that there were multiple students who reported incidents of student-on-student sexual assault, violence, threats of violence, stalking, and was aware of the Misconduct, Discrimination, and abuse of power by SHAFFER.  RINGLING administration knew or should have known about SHAFFER'S Misconduct, Discrimination, and abuse of power.  Despite this knowledge, RINGLING continued to represent to prospective and current students, including the Plaintiffs, that the campus was a safe environment free of Dating Violence, Domestic Violence, Stalking for the years 2016, 2017, and 2018.  RINGLING failed to disclose to prospective and current students, including the Plaintiffs, that there were multiple students who reported incidents of student-on-student sexual assault, threats of

violence, stalking, and was aware of SHAFFER'S misconduct and discrimination.

67.     Through undocumented protocol, RINGLING engaged in a pattern and practice of systematically dissuading student victims who attempted to report to its administration their experiences of student-on-student sexual assault, stalking, threats of violence, and violence from reporting these occurrences.

68.     The methods employed in the pattern and practice of dissuading victim reports involved manipulative tactics including minimization, blaming, and rejecting, to the victim, the victim's perception of their experience.

69.     The effects of such manipulative tactics were that victims were made to feel that they could not and should not file formal complaints against other students, that the conduct complained of was the fault of the victim, or that the victim was imagining the harmfulness of the conducts.

70.     Because RINGLING engaged in this process of systematically covering up instances of student-on-student misconduct, abuse of power, and incidents of discrimination, and directly or indirectly permitted the misconduct and discrimination by SHAFFER, Plaintiffs were further traumatized by the lack of a remedy for their traumatic experiences.

71.     Plaintiffs were further led to believe that their reports submitted to SHAFFER were substantiated and valid claims until they realized that the manipulation tactics used by SHAFFER were systematic and intended to silence students and prevent them from reporting student-on-student misconduct, SHAFFER'S misconduct and discrimination, and other abuses of power.

72.     Plaintiffs did not discover that RINGLING had a habit, pattern, and practice of concealing reports of student-on-student misconduct, SHAFFER'S misconduct and discrimination, and dissuading students from pursuing or effectively making reports until they began to understand that their negative experiences were not isolated experiences and in fact

were commonplace and should have been acted upon.

73.     Through their review of social media posts during the summer of 2020, Plaintiffs began to understand that other students had had similar experiences to their own experiences of the misconduct and discrimination.

74.     During and following the summer of 2020, the Plaintiffs experienced a period of discovery where they learned about the extent of RINGLING'S cover-up of SHAFFER'S Misconduct and Discrimination and subsequently learned that they had been actionably wronged by RINGLING.

<strong>NAMED PLAINTIFFS' FACTUAL ALLEGATIONS</strong>

***Lyra Wilson***

75.     Lyra Wilson, a young Black woman, attended RINGLING from August 2016 until she graduated in August 2020.

76.     Lyra was employed by RINGLING'S Campus Activities Board from August 2019 through March 2020.

77.     As a freshman at RINGLING, Lyra lived in a single apartment in the Keating Building on-campus.

78.     During the Fall 2016 semester, Lyra was sexually assaulted in her apartment by another student (the other student, John Doe is hereafter described as "**JD1**") who attended RINGLING and lived in the Ann & Alfred Goldstein Hall ("**Goldstein**").

79.     In the following days, Lyra told her friends about the sexual assault.  A few days after Lyra shared this information with her friends, she received an email from a Residential Coordinator, who asked to meet with her to discuss what had happened to her.

80.     Lyra promptly reported the sexual assault to the Residential Coordinator and a meeting with SHAFFER was scheduled.

81.     When Lyra presented to the scheduled meeting, she was surprised to find that in addition to SHAFFER and the Residential Coordinator, JD1 was also in attendance. Furthering the trauma of having to meet with JD1, the meeting room was dimly lit and SHAFFER directed Lyra and JD1 to sit right next to each other in chairs across from SHAFFER'S desk.   Lyra's close proximity to JD1 caused her to freeze up rendering her unable to effectively report information about the assault; she was also further traumatized by being forced to sit next to her assailant.   Lyra nevertheless reported the sexual assault to SHAFFER who was dismissive of her account.

82.     SHAFFER concluded the meeting as to Lyra, told Lyra to leave, and instructed Lyra to meet with Tammy Walsh.   SHAFFER remained in the room talking with JD1 and the Residential Coordinator.

83.     Lyra met with Tammy Walsh either that day or the following day. Lyra described for Walsh the details of the sexual assault.   Walsh told Lyra that Walsh would "file a report."   Walsh asked Lyra how Ringling should punish JD1.   Lyra was surprised by the question and stated that she did not know what JD1's punishment should be.   Walsh instructed Lyra to go to counseling. She told Lyra that she would be meeting with JD1 and that there would be a "hearing" conducted by RINGLING'S administration that would include JD1's parents to discuss JD1's misconduct in the next couple of days.   Walsh conveyed to Lyra that Lyra would not be allowed to participate in the "hearing."

84.     Lyra never received any report of any further action on her complaint, and on information and belief, no further action was taken.   RINGLING did not provide Lyra with any written information concerning policies and procedures regarding the investigation and the disciplinary process for student complaints of sexual assault.

85.     Based on the Zero Reports 2016 – 2018, *see* Exhibit "I," RINGLING did not report Lyra's complaint of student-on-student assault to the Department of Education as required by Title IX.

86.     As a result of the sexual assault, and particularly as a result of RINGLING'S and SHAFFER'S mishandling of Lyra's report of student-on-student sexual assault and discrimination against Lyra based upon her race and gender, Lyra was traumatized, and made to feel guilty and ashamed. Thereafter, Lyra was subjected to frequent, close contact with JD1, who was not excluded from campus, which further traumatized her.  Lyra attended counseling at RINGLING.  Despite attending counseling, Lyra continued to feel ashamed, powerless, and fearful.

87.     Subsequently, Lyra learned that JD1 had sexually assaulted other female students, which information further traumatized her, exacerbating her feelings of shame and guilt.

88.     Lyra did not discover that RINGLING had a habit, pattern, and practice of concealing reports of student-on-student misconduct, or that SHAFFER had a pattern of mishandling student complaints of sexual assault and of improperly dissuading students from pursuing or effectively making reports until she learned on or after June 22, 2020, of other students' negative experiences with SHAFFER and RINGLING administration.  Previously, Lyra reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

89.     As a result of her sexual assault at RINGLING and due to RINGLING'S and SHAFFER'S mishandling of Lyra's report of the sexual assault resulting in her continued exposure to JD1 and secondary traumatization, Lyra was diagnosed with depression by a RINGLING counselor following her sexual assault and has been receiving medical care and has been in therapy since, to the extent her financial situation permits.

***Lauren Wilson***

90.    Lauren Wilson attended RINGLING from August 2016 until she graduated in May 2020.

91.    Lauren was employed as an RA by RINGLING from May 2017 through August 31, 2018.

92.    During her sophomore year, Lauren was diagnosed by RINGLING'S on-campus therapy center with depression, anxiety, and eating disorders. SHAFFER was informed of these diagnoses shortly after they were made.

93.    As a result of Lauren's diagnoses of depression, anxiety, and eating disorders, Lauren is a qualified individual with a disability under the Americans with Disabilities Act and the Florida Civil Rights Act.

94.    At various times during Lauren's employment as an RA, SHAFFER marginalized Lauren while treating other similarly situated employees more favorably. SHAFFER frequently criticized her work performance despite Lauren receiving favorable performance reviews from the Residential Coordinators.

95.    In August of 2018, the beginning of her junior year at RINGLING, there was a conflict between Lauren and her roommates stemming from a miscommunication regarding a potential roommate switch. As a result of the roommate conflict, Lauren communicated the problem to the on-call Residential Coordinator, who advised SHAFFER.

96.    SHAFFER reached out to Lauren via Facebook Messenger to request a meeting. SHAFFER met with Lauren's roommates separately. As an RA, SHAFFER was Lauren's employer and manager. In his position, he oversaw all Resident Life employees, including the Resident Life Residential Coordinators and all of the RAs.

97.    Prior to Lauren's meeting with SHAFFER, Lauren's roommate, who had met with SHAFFER immediately beforehand, told Lauren that Lauren was going to be fired from

her RA position.  Lauren's roommate told Lauren that SHAFFER also told her that she, their other roommate, and Lauren were "the worst of humanity" and "no better than murderers."

98.     The roommate conflict had been resolved prior to the meeting with SHAFFER.  When Lauren presented to SHAFFER'S office, it was dark with the lights off.  SHAFFER began the meeting by detailing what was wrong with the roommate conflict and told Lauren that she was a "bully" and a "liar."  Lauren was not given an opportunity to explain her role in the roommate conflict because SHAFFER repeatedly called her a "liar" and interrupted her, stating "bullshit" on multiple occasions.

99.     Without giving Lauren the opportunity to defend herself, SHAFFER admonished and berated her for over an hour.  During that hour, Lauren suffered a panic attack, and was hyperventilating and sobbing, while SHAFFER told her what a "terrible" and "horrible" person she was.  SHAFFER took advantage of Lauren's mental health issues and abused his position of power over her.  SHAFFER told Lauren that she was terminated and told Lauren that as a result of her termination as an RA, that she had no more housing or meal plan at RINGLING.  SHAFFER told Lauren that if she "retaliated" against him, that he would have her "removed" from RINGLING.

100.     During the meeting, SHAFFER called Lauren's therapist at RINGLING'S on-campus therapy center, Nancy Long, to confirm that she was in her office.  He ended the meeting and instructed Lauren to go see Nancy Long.  At that point, Lauren was visibly physically distraught.  She was short of breath, her face was swollen and red and covered in black, streaked make-up.  Lauren was escorted out the back door of the building into the rain.

101.     Prior to terminating Lauren, SHAFFER failed to engage in the required interactive process to address Lauren's purported misconduct, including following the standard progressive discipline template, which is based upon the purpose of correcting, not punishing, work-related behavior.  SHAFFER'S mistreatment of Lauren and mishandling of

the roommate conflict constituted discrimination based upon Lauren's mental health conditions.

102.    Lauren's mother flew to Sarasota from Illinois upon hearing her daughter's report of what happened. She immediately scheduled an appointment with Tammy Walsh, the Vice President of RINGLING.

103.    Lauren and her mother met with Walsh.   Lauren and her mother relayed Lauren's interaction with SHAFFER to Walsh and complained about Lauren's treatment both as an employee and a student.  Walsh took notes during the meeting. Walsh concluded the meeting without agreeing to file a formal report or providing them with any written protocol for formally reporting SHAFFER'S conduct and actions.  Neither Lauren nor her mother received anything in writing from RINGLING'S administration regarding their attempted report of SHAFFER'S conduct or actions.

104.    Immediately after the meeting with Walsh, Lauren and her mother came to SHAFFER'S office to pick up Lauren's keys for her new housing.  SHAFFER told them, "I don't like the way you and your mother depicted me to Tammy."

105.    SHAFFER referred Lauren to Jekeyma Robinson, the Coordinator of Resident Life for Housing Operations who served as Student Conduct Administrator, and directed Mr. Robinson to formally charge Lauren with student misconduct for bullying and harassment. Mr. Robinson disagreed with SHAFFER'S recommendation and told Lauren he thought it was "ridiculous" and instead issued a disciplinary warning. *See* **Exhibit "N."**

106.    Subsequently, a RINGLING representative directed Lauren to announce her "resignation."  At that time, every Tuesday evening, there were two separate RA meetings. Lauren was directed to stand up and announce, at both meetings, that she was giving her resignation and to say "I am going in a different direction," using that specific phrasing. Lauren complied with these instructions.  Lauren reasonably believed that RINGLING had

the authority to order her to make these false statements based upon her status as a student and that she would be punished and possibly expelled if she did not comply. Lauren's mistreatment, including the coerced false resignation, caused her to suffer humiliation, public embarrassment, and shame for her misrepresentation to her friends and colleagues.

107.    Lauren did not discover that RINGLING had a habit, pattern, and practice of concealing and acquiescing in SHAFFER'S ongoing abusive conduct toward students and student employees of RINGLING, despite knowledge thereof, or that SHAFFER had a pattern of mishandling student and student employee issues, until she learned on or after June 22, 2020, of other students' negative experiences with SHAFFER and the RINGLING administration.

108.    As a result of SHAFFER'S and RINGLING'S wrongful termination of Lauren, Lauren suffered past and future loss of wages and benefits, plus interest.

109.    The trauma from Lauren's interactions with SHAFFER and Walsh, and RINGLING'S failure to address the abuse inflicted upon her by SHAFFER, particularly, resulted in Lauren becoming emotionally and socially withdrawn, self-doubting, and exacerbated her pre-existing mental health conditions. When Lauren saw SHAFFER on campus, she would spiral into an anxiety attack and return immediately to her dormitory room. Lauren attended counseling for over a year to address this trauma and only stopped attending counseling due to financial constraints.

### *Caitlin Henning*

110.    Caitlin Henning ("**Caiti**") attended RINGLING from August 2018 through her graduation in May 2022.

111.    Caiti was employed by RINGLING as an RA from June 2019 through May 2020, during which she had an exemplary performance record.

112.    Caiti has suffered from severe food allergies since she was born. Therefore,

Caiti is a qualified individual with a disability under the Americans with Disabilities Act and the Florida Civil Rights Act. As a result of Caiti's disabilities, major life activities, including her ability to consume food prepared by most private and commercial restaurants, cafeterias, and events, were substantially limited.

113.    Caiti's history of severe food allergies includes hospitalizations for food allergies. In 2016, she stopped breathing due to an anaphylactic reaction from food and received an emergency tracheotomy.

114.    RINGLING advertised its campus as a safe and supportive campus for someone with severe food allergies through its promotional materials and website. During Caiti's meetings with RINGLING'S representatives as a potential student, Caiti received assurances that she would receive reasonable accommodations for her disability. Caiti and her family relied upon these representations and selected RINGLING for her college experience based upon their understanding that the campus environment would be safe for a person with her disabilities.

115.    Upon her arrival to campus, Caiti heard reports of food poisoning and pests in the food provided at Hammonds, RINGLING'S sole cafeteria-style dining hall.

116.    Several people in Caiti's social circle advised her that they personally experienced food poisoning at Hammonds and elected to buy their own groceries and avoid Hammonds in order not to get sick again.

117.    Without a safe cafeteria or the equipment to make her own food, Caiti would be left with an unsustainable diet. Her allergies prevent her from eating most microwaveable foods.

118.    RINGLING requires all freshmen who live on-campus to purchase a meal plan at Hammonds. Thus, any student residing on campus who buys their own groceries is doing so at a cost in addition to the cost of the meal plan.

119. During her application process to be hired an RA in the Spring of 2019, before being hired as an RA, Caiti alerted the Residential Coordinators to her severe food allergies and informed them that the safest way for her to eat would be for her to have her own personal kitchen. For the 2019-2020 academic year, Caiti was placed in appropriate housing so she would have access to a personal kitchen.

120. As a PreCollege RA in the Summer of 2019, Caiti ate food from Hammonds after double-checking with the kitchen staff regarding its preparation. Immediately thereafter, Caiti went into anaphylactic shock, vomited outside Hammonds, her esophagus began to close, and she struggled to breathe. Caiti drove herself to the hospital and checked into the Emergency Department. She did not eat from Hammonds again, despite the meal plan being a part of her compensation as an RA.

121. Prior to beginning her sophomore year at RINGLING in Fall of 2019, Caiti repeatedly voiced her concerns to Wilrich regarding her inability to consume the food provided through RINGLING'S meal plan. Wilrich dismissed Caiti's concerns, stating that Caiti had access to a personal kitchen.

122. Caiti requested from SHAFFER that the portion of her compensation via the meal plan be substituted by monetary compensation so she could buy her own groceries to prepare food in her personal kitchen. SHAFFER told Caiti that this request was "uncalled for" and told her that "it would never happen."

123. Prior to the 2020-2021 school year, Caiti learned that her RA placement required her to be housed in Goldstein, the freshman dormitory where no rooms had private kitchens or kitchenettes and as to which there are restrictions on what kitchenware can be brought into the dormitory. Caiti reached out to Wilrich, who dismissed her concerns and advised her, "The RA placement is based on the job, not on a location."

124. Wilrich suggested that Caiti utilize RINGLING'S shared kitchen. Caiti

reminded Wilrich that Caiti's allergies are life-threatening and something as relatively minor as a cross-contamination could trigger an anaphylactic reaction.

125.    Caiti reached out to numerous employees and representatives at RINGLING seeking a reasonable accommodation for her deathly food allergies in light of her employee housing placement in Goldstein. Caiti emailed and met with Patricia Pete, Trent Kiesling, Wilrich, the Hammonds kitchen staff, Human Resources, and SHAFFER. No medically appropriate solution was proposed by RINGLING. Caiti was advised that she had to accept the housing where she was placed or RINGLING expected her to submit a notice of resignation.

126.    During a meeting with SHAFFER, he compared Caiti's food allergies to being vegan and implied that Caiti was simply being picky.

127.    SHAFFER discussed Caiti's claimed disability with another RA and told that person that Caiti's food allergies were akin to being Kosher.

128.    SHAFFER repeatedly dismissed Caiti's concerns, including when Caiti described for SHAFFER her 2016 anaphylactic reaction that resulted in the emergency tracheotomy and showed him her tracheotomy scar. SHAFFER repeatedly told Caiti that she was the problem and that she would not be receiving an accommodation.

129.    During her final meeting with SHAFFER on February 24, 2020, SHAFFER again told Caiti that RINGLING could not move an RA who did not "like" their placement. Caiti explained to SHAFFER that her request was not based upon her disliking her housing assignment. SHAFFER refused to acknowledge her disability and stated, "no, this is about disliking" her housing placement. SHAFFER told Caiti that "if someone came to apply as an RA and said, 'but the one thing is I won't live anywhere without a kitchen,' then [RINGLING] wouldn't hire them." SHAFFER told her that such a request made an applicant unemployable.

130.    Caiti reminded SHAFFER that she had advised RINGLING during her final

interview that she required a reasonable accommodation due to her food allergies.  Caiti offered an analogy to SHAFFER, stating that her situation was the same as a student who used a wheelchair being placed in Keating, student housing with no wheelchair access.  She explained that this was analogous to her request for a reasonable accommodation to have access to safe food, illustrating that her request was not about her "disliking" her placement but about her health and wellbeing.  SHAFFER responded, "yeah, but say if I'd seen this kid [in the wheelchair] get up and run, then I wouldn't hire them."  SHAFFER refused to provide Caiti a reasonable accommodation for her life-threatening food allergies.  SHAFFER ultimately gave Caiti two choices, to resign or to wait on a housing transfer that would not be forthcoming.

131.   Relying on SHAFFER'S statements to her that she had no right to the requested accommodations, Caiti ultimately resigned from her position as RA at RINGLING because SHAFFER refused to acknowledge her disability and refused to provide a reasonable accommodation.

132.   Caiti did not discover that RINGLING had a habit, pattern, and practice of discriminatory and abusive conduct toward students and student employees of RINGLING, or of concealing the same, that SHAFFER had a pattern and practice of violating students' privacy rights by disclosing their protected health information to third-parties in violation of HIPAA and FERPA, or that SHAFFER in particular had a pattern of mishandling student and student employee issues, until she learned on or after June 22, 2020, of other students' negative experiences with SHAFFER and the RINGLING administration.  Previously, Caiti reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

133.   As a result of RINGLING'S failure to provide a reasonable accommodation to Caiti based upon her life-threatening food allergies, Caiti experienced past and future lost wages and benefits, plus interest, pain and suffering, medical care expenses, and exacerbation

of her pre-existing conditions, including her severe food allergies, anxiety, and post-traumatic stress disorder.

134.    As a result of SHAFFER'S mistreatment of Caiti, including his violation of her medical privacy rights, and his refusal to acknowledge her severe food allergies, Caiti suffered anxiety attacks and recurrence of symptoms related to her post-traumatic stress disorder.  Caiti has been in mental health counseling since spring of 2021 to address these mental health symptoms.

### *Roxeanne Zinsser*

135.    Roxeanne Zinsser ("**Roxee**") attended RINGLING from August 2013 until she graduated in May 2017.

136.    As a freshman at RINGLING, Roxee was placed in student housing in Goldstein, the freshman dormitory on the Ringling campus.

137.    During the Fall 2013 semester, on <u>September 12, 2013</u>, Roxee was sexually assaulted by another student (the other student is hereafter referred to as John Doe, "**JD2**") who also resided in Goldstein.

138.    The next day, Roxee reported the sexual assault to her assigned RA.

139.    On <u>September 13, 2013</u>, JD2 exchanged Facebook messages with Roxee, in which he acknowledged some awareness of inappropriate actions toward her.  A copy of the Facebook messages is attached hereto as **Exhibit "O."**

140.    Subsequently, Roxee and her RA met with SHAFFER in his office where Roxee reported to SHAFFER the details of the sexual assault.  SHAFFER asked Roxee what she wanted out of coming to him for help.  Roxee told SHAFFER that she did not need JD2 to be punished, she just wanted him moved to another floor at Goldstein so that her chances of running into him were much slimmer.  SHAFFER told Roxee that he could not force JD2 to move to another room unless she filed an official report with Ringling.  SHAFFER

explained that filing an official report with the college would be a lot of work and effort and told Roxee, "you really don't want to do that." SHAFFER suggested that instead, Roxee should send JD2 a very clear message to leave her alone, and that if JD2 did not then leave her alone, then she should come to SHAFFER and let SHAFFER deal with JD2.

141.    Roxee sent the message that SHAFFER recommended to JD2. JD2 responded on September 18, 2013, with a Facebook message, a copy of which is attached here as **Exhibit "P."** JD responded, "What the hell?!! I didn't do anything to you Roxee! Why the hell are you doing this?"

142.    Roxee brought the messages to SHAFFER and he requested that Roxee compile all of the information into an email to him, including screenshots of the Facebook messages, which she did. Roxee told SHAFFER that she wanted either: (1) JD2 to never speak to her again or come near her again, or (2) JD2 to be moved to another dorm.

143.    Roxee trusted that SHAFFER would take care of this situation for her. Roxee moved forward with making an official report to RINGLING based upon her understanding that this was the only way that SHAFFER could relocate JD2. SHAFFER said to Roxee, "are you sure you want to do this?" and insinuated that the formal report process would be a huge effort on RINGLING'S part. Roxee told SHAFFER that, "no, [she didn't] want to do this, but [SHAFFER was] not giving [her] any choices. If this is the only way to get [JD2] moved, then we have to do it."

144.    SHAFFER told Roxee that he opened up an official report against JD2.

145.    Roxee never received a copy of the report but was advised verbally as to the date and time of the "hearing."

146.    Emily Cano, another RINGLING student, attended the "hearing" with Roxee. Emily testified that she witnessed JD2 followed Roxee to her room the night of the assault and witnessed JD2 harassing Roxee the following day. There were approximately 7

RINGLING employees in attendance, including SHAFFER, Tammy Walsh, and the Head of Security. JD2 was not present when Roxee was there.

147.    SHAFFER and the Head of Security asked Roxee a series of offensive and irrelevant questions. SHAFFER asked Roxee what she was wearing at the time of the sexual assault by JD2, indicating that her clothing choice was relevant to the question of the sexual assault.

148.    Based upon information and belief, JD2, his parents, and his lawyers met with RINGLING'S administration separately.

149.    Roxee never received any notice of the outcome of the "hearing."

150.    JD2 moved to another dormitory. Based upon information and belief, JD2 did so not at RINGLING'S directive but based upon his lawyer's advice.

151.    Subsequent to this, one day as Roxee was walking across campus, SHAFFER approached her and said, "your buddy isn't going to his mandatory therapy." Roxee was traumatized at SHAFFER'S reference to JD2 as "her buddy" and felt additional shame and trauma due to this mocking reference to her sexual assault.

152.    During the 2015-2016 academic year, RINGLING permitted JD2 to enroll in a 9-student fine arts class in which Roxee was also enrolled, held in a small classroom, further traumatizing Roxee by forcing her into regular close contact with her assailant.

153.    Roxee did not discover that RINGLING had a habit, pattern, and practice of concealing reports of student-on-student misconduct and improperly failing to protect victims of sexual assault, or that SHAFFER had a pattern of mishandling student complaints of sexual assault and of improperly harassing students who sought to make reports until she learned on or after June 22, 2020 of other students' negative experiences with SHAFFER and the RINGLING administration. Previously, Roxee reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

154.    Roxee suffered trauma which manifests itself as panic attacks, depression, and low self-esteem.  She has attended years of mental health counseling due to both the sexual assault and RINGLING'S mishandling of her report.

### *Dylan Bonner*

155.    Dylan Bonner, a gay man, attended RINGLING from August 2009 until he graduated in May 2013.

156.    As a freshman at RINGLING, Dylan lived in Goldstein, the freshman dormitory on the Ringling campus.

157.    During the beginning of the Fall 2009 semester, Dylan was sexually assaulted by his roommate (his roommate is hereafter referred to as John Doe or "**JD3**") at Goldstein on two occasions.

158.    Subsequently, Dylan and JD3 met with SHAFFER to request a roommate change.  Dylan reported to SHAFFER the two sexual assaults that JD3 perpetrated on him and described those assaults.  JD3 denied that the assaults occurred.

159.    During a subsequent meeting, SHAFFER told Dylan that he did not believe Dylan's reports of the sexual assaults.  SHAFFER told Dylan that, "I'm on [JD3's] side with this one.  I always have a tendency to root for the underdog."

160.    SHAFFER warned Dylan that he risked being expelled from RINGLING.

161.    SHAFFER advised Dylan that JD3's family threatened to sue Dylan for slander if he continued to talk about the sexual assaults.

162.    SHAFFER told Dylan that if he wanted to file a formal report of the sexual assaults, Dylan had to email him a detailed summary of the sexual assaults.  SHAFFER instructed Dylan to copy his parents on the emailed summary despite Dylan being over the age of majority.  Dylan sent the summary to SHAFFER and his parents.  SHAFFER again told Dylan that he was at risk to be expelled.

163.    Subsequently, in 2009, SHAFFER verbally advised Dylan that he conducted a "hearing" to investigate Dylan's claims that JD3 sexually assaulted him. SHAFFER told Dylan that he was not allowed to attend the hearing.  Dylan did not receive any written policies and procedures on the disciplinary process.

164.    Prior to the date the "hearing" was to occur, JD3 told Dylan that his parents made a sizable donation to RINGLING to help build the new library.  JD3 told Dylan that because of this donation to RINGLING, JD3 was not worried about there being any consequence to him at the hearing.

165.    Dylan did not receive any documentation confirming whether or not the "hearing" occurred, what disciplinary action was taken against JD3, or what findings were made by RINGLING at the "hearing."  SHAFFER verbally advised Dylan that the "hearing" had occurred and that Dylan that he was very fortunate not to be expelled. SHAFFER verbally communicated to Dylan that the outcome of the "hearing" was that JD3 and Dylan were supposed to stay away from each other, were assigned different dormitory rooms, and Dylan was instructed to see a RINGLING therapist.

166.    Dylan did not discover that RINGLING had a habit, pattern, and practice of concealing reports of student-on-student misconduct and improperly failing to protect victims of sexual assault, or that SHAFFER had a pattern of mishandling student complaints of sexual assault and of improperly harassing students who sought to make reports until he learned on or after June 22, 2020 of other students' negative experiences with SHAFFER and the RINGLING administration.  Previously, Dylan reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

167.    As a result of RINGLING'S and SHAFFER'S mishandling of Dylan's report of student-on-student sexual assault, Dylan felt traumatized, ridiculed, shamed, and humiliated. Dylan felt that Shaffer discriminated against him based upon his homosexuality.  Dylan's

feelings of helplessness and despair created by RINGLING'S and SHAFFER'S mishandling of his report of sexual assaults have affected Dylan's work, friendships, and romantic relationships, and caused him to suffer from general anxiety. Dylan has been in therapy since RINGLING'S and SHAFFER'S mishandling of his report of the sexual assaults.

### *Nickolas Berger*

168.    Nickolas Berger ("**Nick**") attended RINGLING from August 2016 through his graduation in May 2021.

169.    Beginning in the Fall 2017, Nick sought mental health counseling and treatment at RINGLING'S on-campus counseling center. Nick trusted RINGLING to ensure that his mental health records from the RINGLING on-campus counseling center would be maintained so as to ensure his privacy and protection as an individual suffering from the mental health conditions of depression and anxiety.

170.    In January 2018, RINGLING'S therapy center diagnosed Nick with major depressive disorder, recurrent episode in full remission, and social anxiety disorder.

171.    As a result of Nick's diagnoses of mental health conditions, Nick is a qualified individual with a disability under the Americans with Disabilities Act and the Florida Civil Rights Act.

172.    On February 10, 2018, while living in Goldstein, the freshman dormitory, Nick was suffering committed an act of self-harm.

173.    Nick's then-girlfriend, Destiny Washington, also a RINGLING student, was concerned for his well-being and sought outside help by calling the Suicide Hotline.

174.    Destiny and Nick believed that the Suicide Hotline provided a form of temporary counseling over the phone. They did not know that the Suicide Hotline sent the Sarasota Police Department to the caller's location.

175.    A few minutes after Destiny placed the call to the Suicide Hotline, SHAFFER

arrived at their location with a police officer. A copy of the Police Department Summary is attached hereto as **Exhibit "Q."**

176. The police officer was very polite. SHAFFER, however, admonished and mocked Nick and Destiny for being ignorant that the Suicide Hotline would send a police officer to them. SHAFFER berated them for calling the Suicide Hotline and causing the police to present to RINGLING and for wasting the police officer's and SHAFFER'S time. Based upon specific remarks made by SHAFFER, it was apparent to Nick that SHAFFER had improperly accessed Nick's mental health records from the RINGLING on-campus counseling center in violation of HIPAA and FERPA.

177. SHAFFER'S statements caused Nick to believe that Nick had committed a wrong by calling the Suicide Hotline and was to blame for SHAFFER'S harassment of him.

178. Nick did not discover that RINGLING had a habit, pattern, and practice of concealing and acquiescing in SHAFFER'S ongoing abusive conduct toward students, despite knowledge thereof, that SHAFFER had a pattern and practice of discriminating against students with disabilities, or that SHAFFER had a pattern of mishandling student mental health crises, until he learned on or after June 22, 2020, of other students' negative experiences with SHAFFER and the RINGLING administration. Previously, Nick reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

179. As a result of the abusive mistreatment Nick sustained, Nick experienced an exacerbation of his mental health conditions and the additional cost of medical and mental health care for his disabilities based upon that exacerbation. Nick continues to receive medical care and counseling for his disabilities.

### *Bryan Paul Patterson*

180. Bryan Paul Patterson ("**Bryan**") attended RINGLING from August 2008 until

he graduated in May 2012.

181.    At the time of Bryan's admission into RINGLING, he had been diagnosed with Bipolar-1.

182.    As a result of Bryan's diagnosis of Bipolar-1, Bryan is a qualified individual with a disability under the Americans with Disabilities Act and the Florida Civil Rights Act.

183.    During Bryan's freshman year at RINGLING, in the Fall of 2008 through Spring 2009, he made friends with another student (the other student is hereafter referred to as John Doe or "**JD4**") who became threatening and hostile toward Bryan after he came out as gay to JD4.  JD4 engaged in repeated stalking, threats of violence, sexual harassment, and discrimination based upon Bryan's LGBTQ+ status.

184.    On multiple occasions, JD4 stalked Bryan on the RINGLING campus.  On multiple occasions, JD4 sexually harassed Bryan by aggressively questioning him about his sexuality and engaging in unwanted discussions regarding Bryan's homosexuality.  On multiple occasions, JD4 displayed a folding knife to Bryan in threatening ways.  Bryan called campus security on one occasion because JD4 physically obstructed Bryan's entry into Bryan's own student apartment.  Bryan felt unsafe and sought help from RINGLING.

185.    Bryan presented to RINGLING'S Student Life offices in the Searing Building without an appointment.  He advised the RINGLING representative at the reception desk that he wanted to make a complaint against another student.  Bryan was directed to meet with SHAFFER in his office.

186.    Bryan explained the situation with JD4 and described the stalking, threats, and sexual harassment to SHAFFER.  SHAFFER dismissed Bryan's complaint immediately.  SHAFFER told Bryan that Bryan was to blame for the harassment and accused Bryan of being the instigator.  SHAFFER said to Bryan, "If you don't want people to treat you like that, you shouldn't talk about being gay."

187.    Bryan became very emotionally and physically upset during this exchange with SHAFFER and was crying.  Bryan repeated to SHAFFER that JD4 had a knife. SHAFFER replied, "If it was a problem, someone else would have reported it." SHAFFER asked Bryan to leave and Bryan departed SHAFFER'S office while sobbing and feeling traumatized, humiliated, and ashamed.

188.    Another Student Life representative noticed Bryan's emotional and physical state as he was leaving SHAFFER'S office.  That representative took Bryan aside and discussed the issue of his harassment and stalking.  After Bryan refused a one-on-one mediation with JD4, that representative told Bryan that she would make some kind of report and/or plan to speak with the student who threatened him.

189.    Bryan was never advised as to whether any representative from RINGLING ever talked to JD4 regarding the harassment and threats made to him or whether any action was taken with regard to his report regarding JD4's sexual harassment and stalking and threats of violence.

190.    As a result of the harassment and threats,and SHAFFER'S mishandling of his report and discrimination based on Bryan's homosexuality, Bryan was traumatized and went "back into the closet" to everyone but his closest friends, his therapists, and the few teachers that he trusted until late in his junior year at RINGLING.  Bryan's encounter with SHAFFER instilled in him a feeling that his sexual orientation was undesirable and made him unworthy of protection from harassment and/or violence from RINGLING and the community at large.

191.    During his junior year at RINGLING, Bryan was chosen as Trustee Scholar of Photography for his graduating year.  Receiving the award required Bryan to present a speech to RINGLING'S Board of Trustees and donors at a reception dinner in November of his senior year.  He worked with RINGLING administration to prepare promotional materials for the event.  Bryan discussed an early version of his speech with RINGLING representatives

and shared that he was planning to write his speech about struggling with the "otherness" of growing up in the Midwest as a gay man and an artist. Bryan was advised that he should not include the parts of his speech talking about his homosexuality because many of the Trustees were conservative and old-fashioned and might be offended. This interaction caused Bryan further trauma from RINGLING'S persistent discrimination of him based upon his homosexuality.

192.    Bryan did not discover that RINGLING had a habit, pattern, and practice of concealing reports of student-on-student misconduct and improperly failing to protect victims of sexual harassment, stalking, and threats of violence, or that SHAFFER had a pattern of mishandling student complaints of sexual harassment, stalking, and threats of violence, and of improperly harassing students who sought to make reports until he learned on or after June 22, 2020 of other students' negative experiences with SHAFFER and the RINGLING administration.    Previously, Bryan reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

193.    As a result of RINGLING'S mistreatment and SHAFFER'S mishandling of Bryan's report of student-on-student sexual harassment, stalking, and threats of violence, Bryan has suffered trauma and been diagnosed with chronic depression, generalized anxiety with panic disorder and social anxiety, post-traumatic stress, and received years of medical treatment and counseling for mental health therapy.

### COUNT I – CONSTRUCTIVE FRAUD
### (against RINGLING by LYRA WILSON, ROXEANNE ZINSSER, DYLAN BONNER, BRYAN PAUL PATTERSON, NICKOLAS BERGER)

194.    Plaintiffs, LYRA WILSON, ROXEANNE ZINSSER, DYLAN BONNER, BRYAN PAUL PATTERSON, and NICKOLAS BERGER ("**Count One Plaintiffs**") re-allege and re-incorporate paragraphs 1 to 74, 75 to 89, 135 to 154, 155 to 167, 180 to 193, and 168 to 179, including all exhibits thereto, as if fully reinstated herein.

195.    RINGLING represented to Count One Plaintiffs that its campus was uniquely and extraordinarily safe.

196.    However, RINGLING had knowledge that such representation was false, as multiple incidences of abuse by its administration, student-on-student misconduct, and misconduct and discrimination by SHAFFER in particular were systematically dismissed, covered up, undocumented, and unreported by SHAFFER and other employees of RINGLING.

197.    RINGLING intended for its prospective and enrolled students and their families to rely on this misrepresentation.  By misrepresenting the safety of RINGLING'S campus, RINGLING induced students to attend its college, induced the students and their families to pay tuition for their education, and induced students and their families to pay for housing and meal plans.

198.    Based upon RINGLING'S failure to properly disclose truthful information regarding its campus safety, Count One Plaintiffs sustained financial, mental, and physical injuries by acting in reliance on such misrepresentations.  As a result of their claims going unreported and/or unresolved by RINGLING, Count One Plaintiffs' experiences at RINGLING were accompanied by feelings of helplessness, fear, and concern that they would be subject to further abuses, further student-on-student misconduct, and/or further discrimination during the remainder of their time at RINGLING.

199.    Exacerbating its fraud, RINGLING, through its agents, including but not limited to SHAFFER, attempted to persuade and/or successfully persuaded Count One Plaintiffs not to file reports of the events that indicated the lack of safety and protection on campus for RINGLING students.  Where Count One Plaintiffs persisted in filing claims reporting such events, RINGLING, through SHAFFER and other employees, worked to convince Count One Plaintiffs that they were to blame for the incidents and that the incidents

would not have occurred if the Count One Plaintiffs had conducted themselves differently.

200.    Count One Plaintiffs were unaware that their reports made to SHAFFER were substantiated until they learned that the manipulation tactics used by SHAFFER were systematic and intended to prevent students from reporting instances of student-on-student misconduct, SHAFFER'S misconduct and discrimination, and other abuses.

201.    As a result of RINGLING'S constructive fraud against Plaintiffs, Count One Plaintiffs suffered the trauma of student-on-student misconduct, trauma from SHAFFER'S misconduct and/or discrimination, trauma from RINGLING'S failure to protect them, financial losses, negative impacts on their mental and/or physical health, loss of enjoyment of life, mental distress, emotional and/or physical pain and suffering, and/or other economic or non-economic damages, for which they are entitled to just compensation.

WHEREFORE, Count One Plaintiffs demands judgment in their favor and against RINGLING for constructive fraud, and seek compensatory damages, attorneys' fees and costs, and such other relief as this Court deems just and proper under the circumstances.

## COUNT II – CONSTRUCTIVE FRAUD
### (against RINGLING by CAITLIN HENNING)

202.    Plaintiffs, CAITLIN HENNING ("**Caiti**") re-allege and re-incorporate paragraphs 1 to 74 and 110 to 134, including all exhibits thereto, as if fully reinstated herein.

203.    RINGLING represented to Caiti and her family that its campus was a safe environment with students with disabilities, including disabilities that require accommodations.

204.    However, RINGLING had knowledge that such representation was false, as multiple incidences of RINGLING'S failure to provide reasonable accommodations to disabled students were covered up, undocumented, and unreported by SHAFFER and other employees of RINGLING.

205.    RINGLING intended for its prospective and enrolled students and their

families to rely on this misrepresentation. By misrepresenting the safety of RINGLING'S campus for students with disabilities, RINGLING induced students with disabilities to attend its college, induced those students and their families to pay tuition for their education, and induced those students and their families to pay for housing and meal plans.

206.    Based upon RINGLING'S failure to properly disclose truthful information regarding its campus safety for students with disabilities, Caiti sustained financial, mental, and physical injuries by acting in reliance on such misrepresentations. As a result of her reports and requests for a reasonable accommodation going unresolved by RINGLING, Caiti's college experience was accompanied by a pervasive fear that her life-threatening food allergies would result in her own illness or death due to RINGLING'S failure to provide her with reasonable accommodations.

207.    Exacerbating its fraud, RINGLING, through its agents, including but not limited to SHAFFER, encouraged Caiti to resign from her employment as an RA at RINGLING in order to avoid providing Caiti with the reasonable accommodation requested. Where Caiti persisted in pursuing a reasonable accommodation for her severe food allergies so that she could continue her employment as an RA, RINGLING through SHAFFER and other employees, worked to convince Caiti that she was being unreasonable and refused to provide the reasonable accommodation, thus requiring Caiti to resign from her position as an RA, lose the benefits of her compensation by way of on-campus housing, and suffer exacerbation of her mental health conditions.

208.    As a result of RINGLING'S constructive fraud against Caiti, she suffered trauma from the loss of her job due to the discrimination based upon her disability, trauama from the mistreatment by SHAFFER,  financial losses, negative impacts on her mental and physical health, loss of enjoyment of life, mental distress, emotional and physical pain and suffering, and other economic or non-economic damages, for which she is entitled to just

compensation.

WHEREFORE, CAITLIN HENNING demands judgment in her favor and against RINGLING for constructive fraud, and seeks compensatory damages, attorneys' fees and costs, and such other relief as this Court deems just and proper under the circumstances.

## COUNT III – NEGLIGENT SUPERVISION AND RETENTION
### (against RINGLING by MEGAN ROSE RUIZ)

209.    MEGAN ROSE RUIZ re-alleges and re-incorporates paragraphs 1 to 74, including all exhibits thereto, as if fully reinstated herein.

210.    In December 2018, while employed as an RA, RUIZ attempted to file a formal report against SHAFFER with Taylor Parker.  RUIZ explained to Parker that she did not feel safe at work.

211.    On December 4, 2018, RUIZ met with Parker and Christine DeGeorge to report her concerns about SHAFFER's misconduct and discrimination.  RUIZ advised them that she did not feel safe at work.  DeGeorge advised RUIZ that if she formally reported the complaint about SHAFFER, that DeGeorge could protect her from retaliation, but that DeGeorge could not prevent RUIZ from being fired from her position as an RA if she was not doing a good job.  RUIZ cried during this meeting and DeGeorge advised RUIZ that it was not her job to deal with crying students.  RUIZ ultimately decided not to file a formal report out of fear that she would be terminated from her job as an RA.

212.    Upon her graduation from RINGLING in May 2019, RUIZ contacted both the Office of Student Life and the Human Resource Department at Ringling to report what she had witnessed with regard to SHAFFER'S misconduct, discrimination, and abusive mistreatment of students and student employees, which she had also personally experienced while a student and employee of RINGLING. RUIZ recounted that although she had previously reported some of these experiences to DeGeorge, she was "genuinely too scared to take anymore action about the situation because [she] feared being fired. She continued that

since she was now graduated, she was reporting her experiences and those of others because she "just [didn't] want this to happen to anyone ever again." A copy of RUIZ'S June 24, 2019 email to Parker is attached hereto as **Exhibit "R."**

213.    RINGLING'S administration failed to take any action whatsoever in response to either of RUIZ'S reports about SHAFFER'S misconduct and discrimination.

214.    RINGLING'S administration further failed to prevent SHAFFER from retaliating against RUIZ.

215.    RINGLING had actual knowledge of SHAFFER'S intention to file a lawsuit against RUIZ. Prior to filing the Defamation Lawsuit, SHAFFER advised Larry Thompson and Tammy Walsh that he intended to file a lawsuit against MEGAN ROSE RUIZ for her public statements about SHAFFER while he was employed at RINGLING.

216.    RINGLING had actual knowledge of the Defamation Lawsuit filed on August 3, 2020 at the time that RINGLING transmitted the August 25, 2020 correspondence to SHAFFER wherein RINGLING agreed to continue SHAFFER'S employment.

217.    Accordingly, RINGLING was negligent in the supervision and retention of SHAFFER at all material times referenced herein in the following ways:

    a.    failing to determine whether SHAFFER was adequately trained in the supervision and care of students and student employees;

    b.    failing to adequately train or to require SHAFFER to obtain adequate training in the supervision of students and staff;

    c.    failing to ensure that SHAFFER complied with Florida and Federal law;

    d.    continuing to employ SHAFFER after he demonstrated his lack of knowledge with regard to the supervision and care of students;

    e.    continuing to employ SHAFFER after he demonstrated his lack of knowledge with regard to the supervision and care of student employees; and

f.      continuing to employ SHAFFER after he retaliated against RUIZ for her truthful public statements regarding SHAFFER and RINGLING.

218.    As a direct and proximate result of the aforesaid negligence in the supervision and retention of SHAFFER by RINGLING, RUIZ has sustained the following damages: negative impacts on her mental and physical health, financial losses associated with medical treatment for her mental and physical health, loss of enjoyment of life, inconvenience, insult, mental distress, humiliation, anxiety, lost wages, attorneys' fees and costs, and other economic or non-economic damages, for which she is entitled to just compensation.

WHEREFORE, MEGAN ROSE RUIZ demands judgment in her favor and against RINGLING for negligent supervision and retention, and seeks compensatory damages, reimbursement of her attorneys' fees and costs in the Defamation Lawsuit, her attorneys' fees and costs in bringing this lawsuit, and such other relief as this Court deems just and proper under the circumstances.

**COUNT IV– NEGLIGENT SUPERVISION AND RETENTION**
**(against RINGLING by LYRA WILSON, ROXEANNE ZINSSER,**
**DYLAN BONNER, and BRYAN PAUL PATTERSON)**

219.    Plaintiffs LYRA WILSON, ROXEANNE ZINSSER, DYLAN BONNER, and BRYAN PAUL PATTERSON re-allege and re-incorporate paragraphs 1 to 74, 75 to 89, 135 to 154, 155 to 167, 180 to 193, including all exhibits thereto, as if fully reinstated herein.

220.    Lyra Wilson, Roxeanne Zinsser, Dylan Bonner, and Bryan Paul Patterson suffered the mishandling of their reports of student-on-student sexual assault and/or sexual harassment and/or threats of violence, and discrimination based upon their disabilities and/or gender and/or race and/or status as LGBTQ+ individuals by SHAFFER.

221.    Lyra Wilson, Roxeanne Zinsser, Dylan Bonner, and Bryan Paul Patterson suffered manipulation tactics by SHAFFER and were made to believe that they had not been the victims of student-on-student misconduct. They did not receive any confirmation from

RINGLING validating their reports of student-on-student misconduct and, in fact, were verbally advised that the incidents they reported to SHAFFER were the result of their own faults. As a result, these plaintiffs did not discover that RINGLING had a habit, pattern, and practice of concealing reports of student-on-student misconduct, or that SHAFFER had a pattern of mishandling student complaints and of improperly dissuading students from pursuing or effectively making reports until they learned on or after June 22, 2020 of other students' negative experiences with SHAFFER and the RINGLING administration. Previously, they reasonably relied upon the misrepresentations of SHAFFER and RINGLING.

222.   At all relevant times, RINGLING employed and exercised control and supervision over SHAFFER.

223.   At all relevant times, RINGLING had actual knowledge of, and/or was deliberately indifferent to, SHAFFER'S misconduct, concealment of reports of student-on-student misconduct, harassment of students who brought such reports to SHAFFER, discrimination against students based upon their gender, race, LGBTQ+ status, and/or disabilities, and SHAFFER'S pattern and practice of systemically mistreating students who made such reports.

224.   SHAFFER'S pattern and practice of misconduct and discrimination and practice and pattern as an employee of RINGLING was created and furthered by RINGLING'S repeated failure to protect Lyra Wilson, Roxeanne Zinsser, Dylan Bonner, Bryan Paul Patterson, and other unidentified students, and by RINGLING'S failure to follow its own policies and procedures, and by RINGLING'S implementation of undocumented policies and procedures that permitted SHAFFER to engage in such conduct and actions.

225.   RINGLING acted with deliberate indifference to SHAFFER'S conduct and actions by failing to take any action to prevent them, deter SHAFFER, and/or protect Lyra Wilson, Roxeanne Zinsser, Dylan Bonner, Bryan Paul Patterson, and other unidentified

students.

226.    RINGLING was negligent in the supervision and retention of those employees, including but not limited to, SHAFFER and Tammy Walsh, working during the time of the incidents referenced in this Count in the following ways:

g.    failing to determine whether said employees were adequately trained in the supervision and care of students with complaints of sexual assault, sexual harassment, threats of violence, and stalking;

h.    failing to determine whether said employees were adequately trained in the supervision and care of students so as to avoid discrimination against students based on their disabilities, race, gender, and LGBTQ+ status;

i.    failing to adequately train or to require the employees to obtain adequate training requisite to fulfill their job duties and responsibilities;

j.    failing to ensure that said employees complied with Federal and Florida law;

k.    failing to ensure that said employees knew how to recognize when a student is in distress and how to appropriately respond to that situation; and

l.    continuing to employ said employees after they had demonstrated their lack of knowledge with regard to the supervision and care of such students in such situations.

227.    As a direct and proximate result of the aforesaid negligence in the supervision and retention of said employees by RINGLING, Lyra Wilson, Roxeanne Zinsser, Dylan Bonner, and Bryan Paul Patterson have sustained the following damages: medical expenses associated with mental health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, loss of enjoyment of life, economic damages, and other economic or non-economic damages, for which they are entitled

to just compensation.

WHEREFORE, LYRA WILSON, ROXEANNE ZINSSER, DYLAN BONNER, and BRYAN PAUL PATTERSON demand judgment in their favor and against RINGLING for negligent supervision and retention, and seek compensatory damages, attorneys' fees and costs, and such other relief as this Court deems just and proper under the circumstances.

## COUNT V– NEGLIGENT SUPERVISION AND RETENTION
### (against RINGLING by CAITLIN HENNING)

228.   Plaintiff, CAITLIN HENNING ("**Caiti**") re-alleges and re-incorporates paragraphs 1 to 74 and 110 to 134, including all exhibits thereto, as if fully reinstated herein.

229.   Caiti suffered the loss of her employment, mistreatment by SHAFFER, and discrimination based upon her disabilities due to RINGLING'S failure to provide her with a reasonable accommodation for her life-threatening food allergies.

230.   Through SHAFFER, RINGLING'S conduct and mishandling of Caiti's request for a reasonable accommodation resulting in Caiti's forced resignation from her employment as an RA at RINGLING constitute violations of the American with Disabilities Act, as amended by the ADA Amendments Act ("**ADAAA**"), 42 U.S. C. §§ 12101 to 12213 (collectively, the "**ADA**") and the Florida Civil Rights Act, Florida Statutes §§ 760.01 – 760.11 and Florida Statute § 509.092, (collectively, the "**FRCA**").

231.   Based upon RINGLING'S failure to provide a reasonable accommodation for Caiti, a student with disabilities, Caiti sustained financial, mental, and physical injuries. As a result of her claims going unreported and/or unresolved by RINGLING, Caiti's college experience was accompanied by a pervasive fear that her life-threatening food allergy would result in her own illness or death due to RINGLING'S failure to provide her with reasonable accommodations.

232.   RINGLING, through its agents, encouraged Caiti to resign from her employment as an RA at RINGLING in order to avoid providing Caiti with the reasonable

accommodation requested. Where Caiti persisted in pursuing a reasonable accommodation for her severe food allergies so that she could continue her employment as an RA, RINGLING through SHAFFER and other employees, used manipulation tactics and mistreated Caiti to convince her that she was being unreasonable and continued to refuse to provide the reasonable accommodation, thus requiring Caiti to resign from her position as an RA, lose the benefits of her compensation by way of on-campus housing, and suffer exacerbation of her mental health conditions.

233.    At all relevant times, RINGLING employed and exercised control and supervision over SHAFFER.

234.    At all relevant times, RINGLING had actual knowledge of, and/or was deliberately indifferent to, SHAFFER'S failure to provide Caiti with a reasonable accommodation as required by Florida and federal law, SHAFFER'S discrimination of Caiti as a student with disabilities, and SHAFFER'S pattern and practice of mistreating students and student employees.

235.    SHAFFER'S misconduct, including failing to fulfill his obligations to provide reasonable accommodations to a student RA with disabilities, the discrimination as to a student with disabilities, and SHAFFER'S practice and pattern of mistreating students as an employee of RINGLING, was created and furthered by RINGLING'S repeated failure to protect Caiti and other unidentified students, by RINGLING'S failure to follow its own policies and procedures, and by RINGLING'S implementation of undocumented policies and procedures that permitted SHAFFER to commit the misconduct, discrimination, and abuse of power.

236.    RINGLING acted with deliberate indifference to the acts of misconduct and discrimination by failing to take any action to prevent them, deter SHAFFER, and/or protect Caiti.

237.   RINGLING was negligent in the supervision and retention of those employees, including but not limited to, SHAFFER and Tammy Walsh, working during the time of the incidents referenced in this Count in the following ways:

a.   failing to determine whether said employees were adequately trained in the supervision and care of student and employee complaints of failure to provide reasonable accommodations as required by Federal and Florida law;

b.   failing to determine whether said employees were adequately trained in the supervision and care of students and employees so as to avoid discrimination against students based on their disabilities;

c.   failing to adequately train or to require the employees to obtain adequate training requisite to fulfill their job duties and responsibilities;

d.   failing to ensure that said employees knew how to recognize when a student is in distress and how to appropriately respond to that situation; and

e.   continuing to employ said employees after they had demonstrated their lack of knowledge with regard to the supervision and care of such students in such situations.

238.   As a direct and proximate result of the aforesaid negligence in the supervision and retention of said employees by RINGLING, Caiti has sustained the following damages: trauma from the loss of her job and her mistreatment by Shaffer, financial losses, negative impacts on her mental and physical health, medical expenses associated with physical health treatment and mental health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, loss of enjoyment of life, economic damages, and other economic or non-economic damages, for which she is entitled to just compensation.

WHEREFORE, CAITLIN HENNING demands judgment in her favor and against

RINGLING for negligent supervision and retention, and seeks compensatory damages, attorneys' fees and costs, and such other relief as this Court deems just and proper under the circumstances.

## COUNT VI– NEGLIGENT SUPERVISION AND RETENTION
### (against RINGLING by LAUREN WILSON)

239.    Plaintiff, LAUREN WILSON, re-alleges and re-incorporates paragraphs 1 to 74 and 90 to 109, including all exhibits thereto, as if fully reinstated herein.

240.    Title III of the ADA prohibits discrimination against students with disabilities in any private college, including RINGLING.  RINGLING had actual knowledge of Lauren's disability at the time of her admission to the college; moreover, RINGLING had actual knowledge of Lauren's disability at the time of her hiring as an RA at the college.

241.    RINGLING, through SHAFFER, discriminated against Lauren and harassed Lauren by creating a hostile work environment that targeted Lauren's areas of sensitivity due to her medical condition, thereby violating the American with Disabilities Act, as amended by the ADA Amendments Act ("**ADAAA**"), 42 U.S. C. §§ 12101 to 12213 (collectively, the "**ADA**") and the Florida Civil Rights Act, Florida Statutes §§ 760.01 – 760.11 and Florida Statute § 509.092, (collectively, the "**FRCA**").

242.    As a result of RINGLING'S violations of Title III of the ADA and the FCRA, Lauren sustained past and future lost wages and benefits, plus interest, and mental injury.

243.    At all relevant times, RINGLING employed and exercised control and supervision over SHAFFER.

244.    At all relevant times, RINGLING had actual knowledge of, and/or was deliberately indifferent to, SHAFFER'S creation of a hostile work environment in violation of Florida and Federal law, of SHAFFER'S discrimination of Lauren as a student with disabilities, and of SHAFFER'S pattern and practice of systemically mistreating students and student employees with disabilities.

245.    SHAFFER'S discrimination of Lauren as an employee of RINGLING with disabilities, discrimination of Lauren based upon her status as a student with disabilities and her gender, and SHAFFER'S mistreatment of Lauren was created and furthered by RINGLING'S repeated failure to protect Lauren and other unidentified students, by RINGLING'S failure to follow its own policies and procedures, and by RINGLING'S implementation of undocumented policies and procedures that permitted SHAFFER to commit the misconduct, discrimination, and abuse of power.

246.    RINGLING acted with deliberate indifference to the acts of misconduct and discrimination by failing to take any action to prevent them, deter SHAFFER, and/or protect Lauren.

247.    RINGLING was negligent in the supervision and retention of those employees, including but not limited to, SHAFFER and Tammy Walsh, working during the time of the incidents referenced in this Count in the following ways:

f.      failing to determine whether said employees were adequately trained in the supervision and care of student and employees as required by Federal and Florida law;

g.      failing to determine whether said employees were adequately trained in the supervision and care of students and employees so as to avoid discrimination against students based on their gender and disabilities;

h.      failing to adequately train or to require the employees to obtain adequate training requisite to fulfill their job duties and responsibilities;

i.      failing to ensure that said employees complied with Florida and Federal law;

j.      failing to ensure that said employees knew how to recognize when a student is in distress and how to appropriately respond to that situation; and

k.      continuing to employ said employees after they had demonstrated their lack of knowledge with regard to the supervision and care of such students in such situations.

248.    As a direct and proximate result of the aforesaid negligence in the supervision and retention of said employees by RINGLING, Lauren has sustained the following damages: trauma and exacerbation of her pre-existing mental health conditions, financial losses including past and future lost wages and benefits, plus interest, negative impacts on her mental health, medical expenses associated with mental health treatment, inconvenience, insult, mental distress, humiliation, anxiety, emotional pain and suffering, loss of enjoyment of life, economic damages, and other economic or non-economic damages, for which she is entitled to just compensation.

WHEREFORE, LAUREN WILSON demands judgment in her favor and against RINGLING for negligent supervision and retention, and seeks compensatory damages, attorneys' fees and costs, and such other relief as this Court deems just and proper under the circumstances.

### COUNT VII– NEGLIGENT SUPERVISION AND RETENTION
### (against RINGLING by NICKOLAS BERGER)

249.    Plaintiff NICKOLAS BERGER ("**Nick**") re-alleges and re-incorporates paragraphs 1 to 74 and 168 to 179, including all exhibits thereto, as if fully reinstated herein.

250.    Nick suffered discrimination and harassment based upon his disabilities, an invasion of privacy, and the inappropriate transmission of his protected health information by SHAFFER and other RINGLING employees.

251.    Title III of the ADA prohibits discrimination against students with disabilities in any private college, including RINGLING.  RINGLING had actual knowledge of Nick's disability at the time of SHAFFER'S discrimination and creation of a hostile environment for Nick.

252.    RINGLING, through SHAFFER, discriminated against Nick and harassed Nick by mistreating Nick during a mental health crisis, thereby violating the American with Disabilities Act, as amended by the ADA Amendments Act ("**ADAAA**"), 42 U.S. C. §§ 12101 to 12213 (collectively, the "**ADA**") and the Florida Civil Rights Act, Florida Statutes §§ 760.01 – 760.11 and Florida Statute § 509.092, (collectively, the "**FRCA**").

253.    Nick did not discover that he was a victim of discrimination and harassment by SHAFFER until he learned on or after June 22, 2020 of other students' negative experiences with SHAFFER and RINGLING, RINGLING'S habit, patter, and practice of allowing SHAFFER to mishandle student issues, discriminate against students with disabilities, and harass students who sought to make reports that could become public.

254.    At all relevant times, RINGLING employed and exercised control and supervision over SHAFFER.

255.    At all relevant times, RINGLING had actual knowledge of and/or was deliberately indifferent to SHAFFER'S misconduct and discrimination and mistreatment of students.

256.    SHAFFER'S misconduct, discrimination, and practice and pattern of mistreating students as an employee of RINGLING was created and furthered by RINGLING'S repeated failure to Nick and other unidentified students, by RINGLING'S failure to follow its own policies and procedures, and by RINGLING'S implementation of undocumented policies and procedures that permitted SHAFFER to commit the Misconduct, Discrimination, and abuses of power.

257.    RINGLING acted with deliberate indifference to the SHAFFER'S conduct and actions by failing to take any action to prevent them, deter SHAFFER, and/or protect Nick.

258.    RINGLING was negligent in the supervision and retention of those employees, including but not limited to SHAFFER, who were working during the time of the incidents

referenced in this Count in the following ways:

       m.    failing to determine whether said employees were adequately trained in the supervision and care of students with disabilities;

       n.    failing to determine whether said employees were adequately trained in the supervision and care of students so as to avoid discrimination against students based on their mental health status and disabilities;

       o.    failing to adequately train or to require the employees to obtain adequate training requisite to fulfill their job duties and responsibilities;

       p.    failing to ensure that said employees acted in compliance with Federal and Florida law;

       q.    failing to ensure that said employees knew how to recognize when a student is in distress and how to appropriately respond to that situation; and

       r.    continuing to employ said employees after they had demonstrated their lack of knowledge with regard to the supervision and care of such students in such situations.

259.    As a direct and proximate result of the aforesaid negligence in the supervision and retention of said employees by RINGLING, NICKOLAS BERGER has sustained the following damages: medical expenses associated with mental health treatment, inconvenience, insult, mental distress, humiliation, anxiety, emotional pain and suffering, loss of enjoyment of life, economic damages, and other economic or non-economic damages, for which he is entitled to just compensation.

WHEREFORE, NICKOLAS BERGER demands judgment in his favor and against RINGLING for negligent supervision and retention, and seeks compensatory damages, attorneys' fees and costs, and such other relief as this Court deems just and proper under the circumstances.

## COUNT VIII – BREACH OF IMPLIED CONTRACT
### (against RINGLING by LYRA WILSON, CAITLIN HENNING, LAUREN WILSON, ROXEANNE ZINSSER, DYLAN BONNER, BRYAN PAUL PATTERSON, and NICKOLAS BERGER)

260.    Plaintiffs, Lyra Wilson, Caitlin Henning, Lauren Wilson, Roxeanne Zinsser, Dylan Bonner, Bryan Paul Patterson, and Nickolas Berger ("**Count Eight Plaintiffs**") re-allege and re-incorporate paragraphs 1 to 74, 75 to 89, 110 to 134, 90 to 109, 135 to 154, 155 to 167, 180 to 193, and 168 to 179, including all exhibits thereto, as if fully reinstated herein.

261.    This is an action for damages as a result of a breach of implied contract.

262.    Count Eight Plaintiffs each entered into a contract of enrollment as a student at RINGLING and accepted RINGLING'S policies and procedures as delivered to them and as maintained on RINGLING'S website within their respective Student Handbooks, including *inter alia*, the "Core Values" of respecting "diversity and equity" of the student community, RINGLING'S promise to provide "a supportive, caring environment," and RINGLINGS' policies prohibiting discrimination and harassment against students based on their race, origin, ancestry, disability, and gender.

263.    RINGLING breached this agreement through its deliberate indifference of SHAFFER'S and other employees' misconduct and discrimination against students identifying as LGBTQ+, students based on race, disability, invisible disability, and gender, and SHAFFER'S and other employees' mishandling and misconduct related to student-on-student reports of sexual assault, sexual harassment, stalking, and threats of violence, and misconduct and mishandling and inappropriate transmission of students' private information, including information protected by HIPAA and FERPA.

264.    RINGLING knew or should have known that SHAFFER and other employees were actively engaging in misconduct and discrimination against students identifying as LGBTQ+, students based on race, disability, invisible disability, and gender, and mishandling

and misconduct related to student-on-student reports of sexual assault, sexual harassment, stalking, and threats of violence, and misconduct and mishandling and inappropriate transmission of students' private information, including information protected by HIPAA and FERPA.

265. However, RINGLING did not address or work to prevent the misconduct and discrimination by its employees. Instead, RINGLING engaged in a cover-up of student and alumni reports of misconduct and discrimination by its employees and agents. RINGLING'S administration worked in tandem with the offending employees and agents to conceal such reports and prevent students, parents, alumni, and former students from coming forward with such reports.

266. As a result of RINGLING'S breach of its implied contract with Count Eight Plaintiffs, Count Eight Plaintiffs suffered damages including but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, psychological damages, humiliation, physical assault, anxiety, emotional pain and suffering, loss of income or other compensation, loss of employment, and other economic and non-economic damages for which they are entitled to just compensation.

WHEREFORE, Count Eight Plaintiffs demand judgment in their favor and against RINGLING for breach of implied contract, and seek compensatory damages, attorneys' fees and costs, and such other relief as this Court deems just and proper under the circumstances.

## COUNT IX – BREACH OF FIDUCIARY DUTY
### (against RINGLING by LYRA WILSON, CAITLIN HENNING, LAUREN WILSON, ROXEE ZINSSER, DYLAN BONNER, BRYAN PAUL PATTERSON, and NICKOLAS BERGER)

267. Plaintiffs, Lyra Wilson, Caitlin Henning, Lauren Wilson, Roxeanne Zinsser, Dylan Bonner, Bryan Paul Patterson, and Nickolas Berger ("**Count Nine Plaintiffs**") re-allege and re-incorporate paragraphs 1 to 74, 75 to 89, 110 to 134, 90 to 109, 135 to 154, 155 to 167, 180 to 193, and 168 to 179, including all exhibits thereto, as if fully reinstated herein.

268.    As a private, not-for-profit college, RINGLING promoted and marketed itself to Count Nine Plaintiffs as providing its students with a safe, caring and nurturing learning environment wherein Count Nine Plaintiffs could rely upon and trust that RINGLING would provide an environment free of discriminatory practices and serve as a fiduciary to its students.

269.    RINGLING'S promotional and marketing materials state that RINGLING will foster the social development of its student body; that it will not tolerate harassment based on sex, age, gender, color, race, national or ethnic origin, religion, marital status, sexual orientation, sexual identity, disability, veteran status, genetic information, or any other basis prohibited by law; that it will not tolerate amongst its student body any unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is aimed at coercing an unwilling person into a sexual relationship whether or not int involves physical contact, or any sexual harassment that  unreasonably interferes with the student's work or academic performance by creating an intimidating, hostile, or offense environment for learning; that it will not tolerate sexual harassment including attacks, sexual violence, the requesting of sexual favors accompanied by implied or overt threats concerning one's job, grade, letter of recommendation, or similar activities, verbal abuse of a sexual nature, physical contact such as patting,  pinching, or unnecessary touching, subtle pressure for sexual activity, sexist remarks regarding a person's body, clothing or sexual activity, or derogatory comments about a person's sexual orientation; that it conducts Title IX Compliance pursuant to Title IX of the Educational Amendments of 1972; that it conducts Violence Against Women Act (VAWA) Compliance; and that it overall maintains an extraordinarily safe and welcoming campus for students regardless of their race, gender, socioeconomic status, LGBTQ+ identity, and disabilities.

270.    Through its marketing and promotional materials, and its status as a private, not-

for-profit college, RINGLING has a fiduciary duty to its student body to implement appropriate policies and procedures and comply with its own policies and procedures and to maintain a safe and protective environment for its students.

271.   Generally, students, particularly those living in dormitories, rely on colleges for assistance and protection, and colleges are in the best, if not the only, position to assist.

272.   A special relationship exists between a college and its students, meaning that higher education institutions must take steps to ensure students are protected.

273.   College students are comparatively vulnerable to other members of the population at large and are dependent upon their colleges for a safe environment. Colleges have a superior ability to provide that safety with respect to activities they sponsor and facilities they control.

274.   RINGLING'S policies and procedures and implementation of its day-to day operations result in the vast majority of its students residing in on-campus housing, sustaining themselves on campus dining facilities through their meal plans, relying on RINGLING'S administration and staff to handle and arbitrate all complaints of student-on-student misconduct and protect them from discrimination, and generally relying on RINGLING to provide all of their housing, food, academic, social, and safety needs. RINGLING'S fiduciary duty is therefore a heightened and special duty owed to its student population.

275.   Count Nine Plaintiffs vested confidence in RINGLING in good faith and accepted this invitation of trust and relied upon RINGLING to provide them with a safe, caring and nurturing environment. As RINGLING'S employee and Associate Dean of Students, SHAFFER invited Count Nine Plaintiffs' utmost trust and confidence as Plaintiff's fiduciary, pursuant to which SHAFFER had a duty to provide Count Nine Plaintiffs with an environment free of discrimination and harassment. Count Nine Plaintiffs had utmost of trust and confidence in SHAFFER and RINGLING as their fiduciary.

276.   RINGLING'S administration, including its employees, faculty, administration, and staff, and including SHAFFER, pursuant to a special relationship between the university administration and its students, had a duty to ensure that the campus environment was safe pursuant to their representations.

277.   With regard to campus safety and the handling of student-on-student reports of misconduct, RINGLING, through unwritten protocol directed SHAFFER to handle all such reports, regardless of whether a Title IX Compliance Officer was in place.  Through unwritten protocol, RAs and Resident Coordinators were directed to send any student with a complaint of student-on-student misconduct directly to SHAFFER, as the Associate Dean of Students for Resident Life.

278.   SHAFFER, along with other RINGLING administration and staff, routinely failed to appropriately handle these reports, failed to appropriately document these reports, failed to discipline students for misconduct, and failed to provide the complaining student with appropriate notice establishing the disciplinary process and notice of the outcome of the disciplinary process.

279.   SHAFFER further, with the knowledge and support of Larry Thompson and Tammy Walsh, among others, engaged in the abuse and mistreatment of RINGLING students and caused numerous breaches of RINGLING'S heightened duty owed to its students, including Count Nine Plaintiffs.  SHAFFER'S conduct and actions, along with other RINGLING employees' conduct, was the proximate cause of the harm suffered by Count Nine Plaintiffs.   Through SHAFFER, RINGLING engaged in a pattern and practice of systematically dissuading student victims who attempted to report their experiences of student-on-student sexual assault, sexual harassment, stalking, and threats of violence from reporting these occurrences. SHAFFER routinely used manipulation tactics to accomplish the goal of silencing such reports, which is known to cause long-term effects including trauma,

anxiety, and depression.

280.    Alternatively, where students insisted upon reporting student-on-student sexual assault, sexual harassment, threats of violence, violence, and/or stalking, SHAFFER, contrary to his employer's special relationship with its students, ensured that such reports were not appropriately handled by official channels so that no documentation exists.

281.    These actions constitute RINGLING'S breach of its duty to warn the Count Nine Plaintiffs of unsafe conditions, breach of its duty to protect Count Nine Plaintiffs from known hazards, and breach of its duty to report incidences of student-on-student reports of misconduct pursuant to state and Federal law.

282.    As a result of RINGLING'S and SHAFFER'S manipulative tactics, Count Nine Plaintiffs were unaware that their claims were substantiated and valid until they discovered that RINGLING had a habit, pattern, and practice of using manipulation tactics to conceal reports of student-on-student misconduct, that SHAFFER had a pattern and practice of mishandling student complaints and issues, that SHAFFER had a pattern of discriminating against students and student employees based on race, gender, disability, and LGBTQ+ status, based upon their gaining knowledge of other students' negative experiences with SHAFFER and the RINGLING administration on or after June 22, 2020..

283.    As a result of RINGLING'S breach of its special fiduciary duty to Count Nine Plaintiffs, Count Nine Plaintiffs suffered damages including but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, psychological damages, humiliation, physical assault, anxiety, emotional pain and suffering, loss of income or other compensation, loss of employment, and other economic and non-economic damages for which they are entitled to just compensation.

WHEREFORE, Count Nine Plaintiffs demands judgment in their favor and against RINGLING for breach of fiduciary duty, and seek compensatory damages, attorneys' fees

and costs, and such other relief as this Court deems just and proper under the circumstances.

## PRAYER FOR JURY TRIAL

Plaintiffs pray for a jury trial on all issues so triable.

Respectfully Submitted,

_/s/ Starlett M. Massey_
Starlett M. Massey
Florida Bar No. 44638
**Massey Law Group, P.A.**
P.O. Box 262
St. Petersburg, Florida 33731-0262
(813) 868-5601 (Tel)
Designated Email:
smassey@masseylawgrouppa.com;
service@masseylawgrouppa.com
**Attorneys for Plaintiffs**